# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LASHAWN JONES, *et al.*, and<br>THE UNITED STATES OF AMERICA,<br><br>PLAINTIFFS<br><br><br>SUSAN HUTSON, Sheriff,<br><br><br>DEFENDANT. | §<br>§<br>§  Civil Action No. 2:12-cv-00859<br>§  Section I, Division 5<br>§  Judge Lance M. Africk<br>§  Magistrate Judge Michael B. North<br>§<br>§<br>§<br>§<br>§ |

## Report No. 23 of the Independent Monitors
### July 13, 2026

Margo L. Frasier, J.D., C.P.O., Lead Monitor
Susi Vassallo, M.D., Medical Monitor
Patricia L. Hardyman, Ph.D., Classification Monitor
Nicole Johnson, M.D., Mental Health Monitor
Shane J. Poole, M.S., C.JM., Environmental Fire Life Safety Monitor
Diane Skipworth, M.C.J., R.D.N., L.D., R.S., C.C.H.P., C.L.L.M., Food Safety Monitor



COMPLIANCE REPORT #23

***Compliance Report #23***
***LASHAWN JONES, et al., and the United States of America v.***
***Susan Hutson, Sheriff***

Table of Contents

**Page**

I.      Introduction                                                              4
       A.  Summary of Compliance                                                  7
       B.  Opportunities for Progress                                            11
       C.  Review Process of Monitors' Compliance Report #21                     24
       D.  Communication with Stakeholders                                       24
       E.  Recommendations                                                       25
II.    Conclusions and Path Forward                                             25
III.   Substantive Provisions
       A.  Protection from Harm                                                  27
           A.1. Use of Force Policies and Procedures                            32
           A.2. Use of Force Training                                           33
           A.3. Use of Force Reporting                                          36
           A.4.  Early Intervention System                                     41
           A.5. Safety and Supervision                                          43
           A.6. Security Staffing                                               54
           A.7. Incidents and Referrals                                         56
           A.8. Investigations                                                  59
           A.9. Pretrial Placement in Alternative Settings                     61
           A.10. Custodial Placement                                            62
           A.11. Prisoner Grievance Process                                     89
           A.12. Sexual Abuse                                                    97
           A.13. Access to Information                                          98
       B.  Mental Health Care                                                    98
       C.  Medical Care                                                         150
       D.  Sanitation and Environmental Conditions                             154
       E.  Fire and Life Safety                                                 171
       F.  Language Assistance                                                  176
       G.  Youthful Prisoners                                                   178
       H.  The New Jail Facility                                                179
       I.  Compliance and Quality Improvement                                   179
       J.  Reporting Requirements and Right of Access                           182
IV.    Status of Stipulated Orders – February 2015, April 2015, and June 2024   183



COMPLIANCE REPORT #23

**Page**

**Tables**

Table 1 – Summary of Compliance – All Compliance Reports .............. 9
Table 2 – Status of Compliance – Stipulated Agreements ................ 10
Table 3 – Summary of Incidents CY 2018-CY 2025 ..................... 29
Table 4 – CY 2018-CY 2025 All OJC Reported Incidents by Month ....... 30
Table 5 – CY 2018-CY 2025 OJC Reported Incidents ................... 45

**Figures**

Figure 1 – Percentage of Black Male Inmates Assigned Special Population
            Housing Units—Oct. 2024-December 2025 .................. 70
Figure 2 – Percentage of Black Male Inmates Assigned Special Population
            Versus OPSO Black Male Population—July 2025-December 2025  70
Figure 3 – Rates and Completion Time of Initial Custody Assessments
            Completed CY 2025 ..................................... 73
Figure 4 – Number of OPSO Booking Per Month—CY 2024-CY 2025 ........ 74
Figure 5 – Custody Override Reasons— Oct. 2024-December 2025 ........ 75
Figure 6 – Mandatory and Discretionary Override Rates by Gender
            CY 2024-CY 2025 ...................................... 76
Figure 7 – Pending Custody Assessments October 2024-December 2025 ... 77
Figure 8 – Victimization of Inmates on the Mental Health Caseload
            CY 2024-CY 2025 ...................................... 79
Figure 9 – Number of Attachments input by Classification Staff
            CY 2024-CY 2025 ...................................... 80
Figure 10 – Percentage of Initial Custody Assessments with Attachment
            CY 2024-CY 2025 ...................................... 80
Figure 11–Rate of Disciplinary Infractions for the OPSO ADP: CY 2024-
            CY 2025 .............................................. 87
Figure 12—OPSO ADP vs. Number of Disciplinary CY 2024-CY 2025 ...... 87
Figure 13—Most Serious Disciplinary Infraction/Report with Finding of
            Guilty: July 2023-December 2025 ....................... 88

**Charts**

Chart 1—Facility, Food Service, Medical, Mental Health, and Miscellaneous
            Grievances ........................................... 92
Chart 2-- Inmate/Inmate Physical Violence and PREA, Staff Misconduct and
            PREA, Life-Threatening, and Use of Force Grievances ..... 92
Chart 3--  Commissary, Programs, Inmate Funds, Property, Grievance
            Appeals, Legal and Law Library Grievances .............. 94
Chart 4—Overdue Grievance Reports by Month ....................... 95

**Appendices**

Appendix A - Summary Compliance Findings by Section Compliance
Reports 10 – 23 ................................................ 189



COMPLIANCE REPORT #23

**Compliance Report # 23**

I.      **Introduction:**

This is Compliance Report #23 submitted by the Independent Monitors providing assessment of the Orleans Parish Sheriff's Office's (OPSO) compliance with the Consent Judgment of June 6, 2013. Compliance Report #23 reflects the status of OPSO's compliance as of December 31, 2025. This report is based on incidents, documents, and compliance-related activities between July 1, 2025 and December 31, 2025. Where appropriate, the report reflects whether there has been a change, for better or worse, that occurred between December 31, 2025, and the on-site compliance tour. All of the monitors were present on-site for the compliance tour that occurred January 12-15, 2026. This report is based on the observations and review of OPSO documents by the Monitors during the on-site visits and during the monitoring period.

Throughout the time the Monitors have been involved in enforcement of the Consent Judgment, the on-site visits have played an integral role. During the on-site visit for the compliance tour and the on-site visits by the Lead Monitor and various other monitors in between the compliance tours, the Monitors have endeavored to provide guidance to OPSO as to how to remedy the unsafe and unconstitutional conditions which existed when we began monitoring in late 2013, and which continue to exist. In addition to the on-site compliance tour of January 12-15, 2026, all of the Monitors were present at OPSO July 28-31, 2025, for the compliance tour associated with Compliance Report #22. The Lead Monitor also visited July 9-10, 2025, July 22-23, 2025, September 15-17, 2025, October 13-15, 2025, November 17-19, 2025, and December 15-17, 2025. Monitor Poole also visited September 14-17, 2025, and December 2-4, 2025. Additionally, all of the Monitors were in frequent contact with OPSO via other methods such as emails, telephone calls, and virtual meetings.

Sheriff Susan Hutson was sworn in as Orleans Parish Sheriff in May 2022. Compliance Report #23 is the sixth monitoring period for which Sheriff Hutson was sheriff the entire time.

On May 14, 2024, Judge Africk held a hearing on the status of compliance with special emphasis on the findings in Report #19. After hearing testimony from the monitors as to conditions and compliance, the Court ordered OPSO, in consultation with



the parties, to file a stipulation regarding a corrective action plan (CAP) with respect to provisions in non-compliance by June 13, 2024. The Court also set deadlines for the filing of stipulations regarding corrective action plans with respect to provisions in partial compliance of June 24, 2024, August 2, 2024, and September 28, 2024. The parties agreed to a Stipulation and Order that was entered by the Court on June 17, 2024. As part of the Stipulation and Order, OPSO is required to provide a report on its progress with adherence to the corrective action plans each month, to file a report quarterly with the Court, and other obligations. OPSO has provided the monthly reports and filed quarterly reports. The quality of the reports and the progress on adherence to the corrective action plans will be addressed later in this report.

The requirement that OPSO, in consultation with the parties and monitors, formalize corrective action plans which were intended to ultimately result in substantial compliance with each provision of the Consent Judgment was a monumental step. The Monitors have consistently urged OPSO to put in place the necessary processes and procedures to not only obtain compliance, but to sustain compliance. The Monitors have stressed that such processes and procedures would allow OPSO to take the necessary steps towards compliance, provide adequate proof of compliance, independently assess compliance with the Consent Judgment and its own policies and procedures, and address shortcomings without waiting for the Monitors to point out the shortcomings in the semiannual reports to the Court. The Monitors have provided guidance as to how to go about the various review functions and how to establish a compliance unit that would operate independently of those whose performance would be assessed. While there had been talk about the formation of a compliance unit over the lifetime of the Consent Judgment, it did not become operational until Sheriff Hutson took office. The Compliance and Accountability Bureau (CAB) has been in existence for the past five monitoring periods. The requirements of the Orders issued by Judge Africk necessitated the formalization of the corrective action plans including producing a corrective action plan for every provision not in substantial compliance.

The establishment of and beginning to develop the CAB and the Jail Compliance Team (JCT) were monumental steps in the right direction. A fully staffed compliance initiative, trained in conducting audits in a correctional setting, with a fully developed



strategic plan will allow OPSO to recognize deficiencies in its operations and address them. Unfortunately, despite the passage of over three years, neither the CAB nor JCT have been adequately staffed and a strategic plan as to how to carry out their duties has not been developed by OPSO. Having a fully functioning compliance initiative is essential to the work to be done on gaining and sustaining compliance. Equally important is adopting a culture where accountability is embraced as opposed to a culture where there is a reluctance to recognize and address deficiencies. In some instances, the efforts of those whose job it is to objectively review data and accurately assess compliance status has been undermined. In other instances, those charged in the CAB with analysis of data have attempted to present the data in a manner to minimize and/or not accurately reflect the level of compliance with the Consent Judgment so as to paint the OPSO in a more favorable light than appropriate based on the data.

During the compliance period, OPSO continued to not have an electronic way of recording when and if security checks took place in the housing units. Since there was not an electronic record of security checks, deputies were required to record the checks on a paper form. Often, supervisors, who were also required to make security checks and inspections, did not record their security checks in any manner. During the compliance tour and other monitoring visits, the Monitors ask deputies to show them documentation of the security checks. It is not unusual for the deputies to say that the form is up in the control pod or indicate that they have made rounds but have not written them down. Even when recorded, entries on the paper form are not sufficient proof that an appropriate security check actually occurred and when it occurred. To appropriately verify the accuracy of the times recorded and the method used, the JCT spent many hours watching video to determine if and when the security check occurred and whether it was performed correctly. As part of the corrective action plan, CAB performed a baseline audit of staff and supervisor security checks for the period of April 14, 2024, through April 20, 2024. The audit found that the day shift actually only performed 15% of the checks indicated on their logs and the night shift actually only performed 7% of the security checks indicated on their logs. It is important to note that this does not mean 15% and 7% of the <u>required</u> security checks were carried out in an appropriate manner. It only means that, of the security checks recorded, 15% and 7% were accurate. The percentage



of required security checks performed was even lower. While the accuracy of the recording of security checks has improved since April 2024, the systemic deficiencies in the performance of security checks still exists as will be noted later in this report. It still remains true that on the majority of the housing units, an adequate security check is only performed, if at all, when a physical count of the inmates takes place; twice a day. Supervisors often claim they conduct security checks and inspections, but the appearance of the housing areas and the lack of documentation calls those claims into doubt.

In other areas of the Consent Judgment, progress has been sporadic. In some areas, there has been progress, and in some cases, there has been regression. Overall, ratings improved in six (6) provisions and regressed in nine (9) provisions. Five (5) provisions were moved to Substantial Compliance while seven (7) provisions regressed from Substantial Compliance. One (1) provision moved from Non-Compliance to Partial Compliance, but two (2) provisions moved from Partial Compliance to Non-Compliance and one (1) provision moved from Substantial Compliance to Non-Compliance. There are now eight (8) provisions in Non-Compliance. Three (3) of the provisions in Non-Compliance are related to the safety and security of the facility. Two (2) of the provisions in Non-Compliance are related to classification and custodial placement. One (1) provision in Non-Compliance relates to responding to grievances. One (1) non-compliant provision relates to maintenance issues. The remaining non-compliant provision relates to mental health care. The lack of additional progression and, in some cases, regression is due to a failure to follow the policies and procedures that have been put in place. It has been exacerbated by the lack of staff, but many of the provisions are not reliant on security staffing. The specific areas are addressed in this report.

## A.      Summary of Compliance

The requirements of the Consent Judgment represent correctional practice recognized as required for the operation of a Constitutional jail system. While there is some flexibility in addressing the mandates, achieving substantial compliance with the Consent Judgment, and Stipulated Agreements are necessary to bring OPSO and its correctional facilities into adherence with Constitutional requirements. The Consent Judgment contains 174 separately rated provisions. While they are separately rated, they are often intertwined. For example, effective implementation of a policy requires not only



the drafting of a suitable policy, but appropriate training on the policy and enforcement of the policy. Enforcement of the policy is contingent on assessing whether the policy is being followed which requires supervision, analysis of incidents and data, and objective confirmation of compliance. A meaningful annual review of the adequacy of the policy does not just mean determining whether the wording of the policy should be changed but also includes evaluating adherence to the policy and whether the objectives of the policy are being met. Such a review requires objective data collection and analysis, and the development of and adherence to corrective action plans. While appropriate policies have been developed, the objective data collection, and the analysis and development of corrective action plans have been lacking thus far. While the CAB has been established under Sheriff Hutson, the collection and analysis of data has not progressed to a meaningful level. The CAB was instrumental in the development of the corrective actions plans now required by court order, but the challenge has proven to be the execution of the corrective action plans in a timely and thorough manner. Thus far, implementation and adherence to the corrective actions plans filed with the Court has not been sufficient to bring OPSO into at least partial compliance with each provision; much less substantial compliance. The particulars as to each provision are addressed in this report.

The goal is substantial compliance with all of the provisions of the Consent Judgment. There has not been improvement in the number of provisions in non-compliance as there are now eight (8) provisions in non-compliance (4.6%) as opposed to six (6) provisions (3.5%) in non-compliance in Report #22, five (5) provisions (2.9%) in Report #21, nine (9) provisions (5.1%) in Report #20, eleven (11) provisions (6.3%) in Report #19, twelve (12) provisions (6.8%) in Report #18, seventeen (17) provisions (9.7%) in Report #17; and five (5) (2.9%) provisions in Report #16. However, in Report #15, none of the provisions were in non-compliance. Substantial compliance was achieved for sixty-eight (68) of the provisions (39.1%). Ninety-eight (98) of the provisions are in partial compliance (56.3%).

Under the authority of the Independent Compliance Director, OPSO made material progress as indicated by the movement of non-compliance to partial compliance to substantial compliance for over half of the provisions. At different times during the duration of the Consent Judgment, including in some areas in this report, there has been



regression in the progress towards compliance. As will be addressed in individual areas, OPSO has shown regression from the progress in some provisions due to failure to consistently follow and enforce policies and procedures and to provide meaningful training. OPSO has also shown improvement in other provisions.

During this monitoring period, there was a significant slippage in the timely reporting of incidents including those involving the use of force. The failure to report incidents makes any data collected on institutional violence unreliable and further hampers decision making to reduce institutional violence. For instance, review of incident reports and disciplinary reports continues to clearly indicate that much of the violence is perpetrated by an identifiable group of inmates. This data should be harvested and made available to OJC leadership for making decisions. Without a methodological way of analyzing incidents, OJC relies on haphazardly coming up with a list of the inmates involved in multiple incidents. Towards the very end of the monitoring period, OPSO finally began using a housing unit where the door locks had been properly retrofitted to house problematic inmates and separate them from the general population. There were multiple discussions during the compliance period about reestablishing a close custody housing unit including the criteria for placement of inmates in the close custody unit, appropriate reviews of continued placement, makeup of the board conducting the reviews, and the restrictions on inmates in the close custody housing unit. Now that the close custody unit has become a reality, data should be collected and analyzed to determine its effectiveness at reducing institutional violence. Part of that analysis should be determining whether inmates housed on the disciplinary and close custody units commit rule violations, and whether the failure to follow policies and procedures by staff contributed.

**Table 1 – Summary of Compliance – All Compliance Reports[1]**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA/Other | Total |
|---|---|---|---|---|---|
| #1 – December 2013 | 0 | 10 | 85 | 76 | 171 |
| #2 – July 2014 | 2 | 22 | 149 | 1 | 174 |
| #3 – January 2015 | 2 | 60 | 110 | 2 | 174 |
| #4 – August 2015 | 12 | 114 | 43 | 4 | 173 |
| #5 – February 2016 | 10 | 96 | 63 | 4 | 173 |
| #6 – September 2016 | 20 | 98 | 53 | 2 | 173 |



| | | | | | |
|---|---|---|---|---|---|
| #7 – March 2017 | 17 | 99 | 55 | 2 | 173 |
| #8 – November 2017 | 23 | 104 | 44 | 2 | 173 |
| #9 – June 2018 | 26 | 99 | 46 | 2 | 173 |
| #10 – January 2019 | 65 | 98 | 8 | 2 | 173 |
| #11 – September 2019 | 103 | 66 | 5 | 0 | 174 |
| #12 – May 2020 | 118 | 56 | 0 | 0 | 174 |
| #13-- November 2020 | 111 | 59 | 4 | 0 | 174 |
| #14—May 2021 | 100 | 67 | 7 | 0 | 174 |
| #15—November 2021 | 97 | 77 | 0 | 0 | 174 |
| #16—May 2022 | 95 | 72 | 5 | 0 | 174 |
| #17—December 2022 | 80 | 77 | 17 | 0 | 174 |
| #18—July 2023 | 76 | 86 | 12 | 0 | 174 |
| #19—December 2023 | 68 | 95 | 11 | 0 | 174 |
| #20—June-July 2024 | 73 | 92 | 9 | 0 | 174 |
| #21—December 2024 | 72 | 97 | 5 | 0 | 174 |
| #22—July 2025 | 70 | 98 | 6 | 0 | 174 |
| #23—January 2026 | 68 | 98 | 8 | 0 | 174 |

With the entry of the Stipulated Order in June 2024, seven new supplemental provisions have been added. The status of compliance (February 2015, April 2015, and June 2024) is as follows:

**Table 2 – Status of Compliance with 2015 and 2024 Stipulated Agreements**

| Compliance Report/Date | Substantial Compliance | Partial Compliance | Non-Compliance | NA | Total |
|---|---|---|---|---|---|
| August 2015 | 21 | 12 | 1 | 0 | 34 |
| February 2016 | 21 | 12 | 1 | 1 | 34 |
| September 2016 | 26 | 7 | 1 | 0 | 34 |
| March 2017 | 28 | 4 | 1 | 1 | 34 |
| November 2017 | 21 | 11 | 1 | 1 | 34 |
| June 2018 | 23 | 8 | 2 | 1 | 34 |
| January 2019 | 28 | 5 | 0 | 1 | 34 |
| September 2019 | 28 | 5 | 0 | 1 | 34 |
| May 2020 | 28 | 5 | 0 | 1 | 34 |
| November 2020 | 32 | 2 | 0 | 0 | 34 |
| May 2021 | 32 | 2 | 0 | 0 | 34 |
| November 2021 | 32 | 2 | 0 | 0 | 34 |
| May 2022 | 32 | 2 | 0 | 0 | 34 |
| December 2022 | 32 | 2 | 0 | 0 | 34 |
| July 2023 | 32 | 2 | 0 | 0 | 34 |
| December 2023 | 29 | 5 | 0 | 0 | 34 |



| | | | | |
|---|---|---|---|---|
| June-July 2024 | 29 | 5 | 0 | 0 | 34 |
| December 2024 | 30 | 11 | 0 | 0 | 41 |
| July 2025 | 30 | 11 | 0 | 0 | 41 |
| January 2026 | 31 | 10 | 0 | 0 | 41 |

**B.    Opportunities for Continued Progress**

The Monitors summarize below the areas identified in preparation of this report regarding OPSO's current level of compliance with the Consent Judgment.

**1.    Foundational Work** - The essential, core work required to achieve compliance includes:

- Policies and Procedures – OPSO completed the essential policies and procedures. Most of the policies, especially the more consequential ones require an annual review. The required reviews and necessary updates continued to be cumbersome due to a lack of coordination and communication within OPSO and with the parties and the Monitors. There were instances where the Policy Manager was left out of the loop in the development and revision of policies. In addition to the creation and/or revision of policies, it is essential that there be development, approval, and implementation of lessons plans and training that correspond with each of the policies. OPSO's policy governing its written directive system, if adhered to, would significantly improve the policy/procedure process. OPSO, as part of its corrective action plans, has offered training, including roll call training, for areas where it has been found that the execution of policy is lacking. However, the training is often on an ad hoc basis as opposed to being part of a coherent training plan. Adherence to the policies, procedures, and training is essential. While the full implementation of fully staffed and functioning CAB and JCT will be helpful through its objective auditing of policy adherence, the consistent enforcement of policies is a role which must be performed by the supervisors at all levels. Too often the failure to follow policy is blamed on the lack of staff or training. Neither is an acceptable excuse. Whether it is lack of supervision, lack of staff, or inadequate training, the result of failure to follow policy is often harmful to staff and/or inmates and still is not adequately being addressed.



COMPLIANCE REPORT # 23                                    11

- <u>Inadequate staffing</u> – OPSO has continued to hire staff but has made little progress due to the large number of terminations and resignations. There is an adage that an agency cannot hire its way out of a staffing shortage; retention is the key. During CY 2021, OPSO lost significant ground in that it hired 97 new staff members and lost 177 staff members through resignation, termination, and retirement. During CY 2022, OPSO hired 136 new staff members and lost 185 staff members through resignation, termination, and retirement. During CY 2023, OPSO hired 265 new staff members and lost 136 staff members through resignation, termination, and retirement. During CY 2024, OPSO hired 200 new staff members and lost 141 staff members through resignation, termination, and retirement. These staff members reflect staff across all operations of the OPSO; not solely the jail operation. Of the 200 staff members hired during CY of 2024, approximately two-thirds (134) were assigned to jail operations. This is an improvement over CY 2023 when it was less than half. However, 115 of the 141 staff members who left employment during CY 2024, were assigned to security functions in OJC. Thus, over 80% of the retirements, resignations, and terminations were assigned to security functions in the OJC. This resulted in a net gain of 19 new staff members assigned to jail operations. It should be noted that this does not mean 19 new recruits/deputies as it includes intake clerks and corrections monitoring technicians. During the first six months of 2025, 139 staff were hired of which 102 were assigned to jail operations. Seventy-six staff members were lost through resignation, termination, and retirement of which 52 were assigned to jail operations. This resulted in a net gain of 50 security staffing assigned to jail operations. However, during the second six months of 2025, hiring did not occur for three of the six months and the hiring in the month of October was only 3 individuals. The decision to shut down the hiring practice made absolutely no sense and undermined what few gains that had been made. The total number of persons hired in the second six months was 41. In addition to the 76 individuals who left employment in the first six months of 2025, 108



COMPLIANCE REPORT # 23                                          12

individuals left during the second six months of 2025. The result was a net loss of 4 employees for the year. More importantly to compliance with the Consent Judgment, 33 of the individuals hired during the monitoring period were assigned to jail operations, but 85 of the individuals who left the agency were assigned to jail operations. This resulted in a net loss in jail operations staff of 52 individuals which erased the gain accomplished during the first half of 2025. The number of staff assigned to the housing areas of the facilities (OJC and TMH) continues to be extremely inadequate to comply with the Consent Judgment. Given the lack of staff, it is the opinion of the Monitors that significant amounts of scheduled overtime of the current staff will continue to be required to staff the housing units at even a minimally acceptable level. Mandatory overtime of two shifts per pay period (14 days) was implemented in mid-September 2024. During the monitoring period, OJC leadership moved more towards voluntary overtime as it found continuing mandatory overtime was proving to be difficult to maintain due to staff fatigue. The requirement that units within the OPSO outside of OJC assist in staffing OJC has been formalized through the Emergency Staffing and Augmentation Plan (ESAP). The ESAP has resulted in the provision of deputies from outside OJC to assist in critical area such as escorts for the mental health and medical staff but has not resulted in additional staff working in the housing units; especially on the night shift and weekends. The outside unit that has contributed the most to filling the void is the Investigative Services Bureau (ISB). However, there has not been sufficient participation by other outside units to supplement security in housing units to any meaningful degree. During the monitoring period, there continued to be a significant contribution to alleviating the staffing shortage from deputies assigned to courthouse security and the civil division. Towards the end of the monitoring period, they began to help cover shifts in the evening and on weekends. During the frequent site visits by the monitoring team, there continue to be housing units for which there is not a staff member present in the housing unit. The staff who were



COMPLIANCE REPORT # 23                                        13

present were often tasked with manning two housing units and/or the control room despite the Consent Judgment requiring one deputy/recruit physically on each unit for direct supervision. Further, almost daily, assigned staff leave housing units and control pods unattended for meal breaks and other duties. The clearest example of what can occur during a meal break is the escape on May 16, 2025. One corrections monitoring technician (CMT) was assigned to the control module for housing units 1C-D. No deputies were assigned to the housing unit. When the CMT went on her lunch break, there was no staff assigned to any of the three posts for housing unit 1C-D as no one relieved her. The inmates took advantage of the absence of staff and forced the cell doors open to allow them to gather in the cell from which they made their escape. OPSO has been encouraged to require staff to notify their supervisors if they are leaving their post and to require the supervisor to assign a relief staff member during their absence.

The Stipulation and Order entered by Judge Africk in June 2024, mandates that the four specialty housing units be staffed 24/7, including breaks. Despite the mandate, these four specialty housing units are frequently unstaffed. The JCT conducts audits of the staffing of these units. The audits continue to confirm that the units were being left unstaffed or that the staff was in the control pod as opposed to being in the housing unit. If used properly, these audits provide useful information to OJC leadership to make staffing deployment decisions and provide notice of the lack of adherence to policy.

Salaries for recruits and deputies as a result of the budget request submitted in the 2023 budget, but OPSO's request to further raise salaries for recruits and deputies in 2024 and 2025 were not approved by the City Council. While OPSO made strides towards increasing the number of staff hired for OJC for the first three years Sheriff Hutson was in office, no hires for OJC took place for five months (September 2025-January 2026). Retention of those OJC staff has proven difficult, and OJC has does not have



enough staff to allow all housing units to be properly staffed. While OPSO hires directly for some of the non-OJC assignments (courthouse security, civil), there are still a number of staff continuing to transfer out of OJC or to specialty units within OJC such as the Special Response Team (SRT) and the training academy. This is concerning to the Monitors for two reasons: (1) it lessens the level of experience within OJC and (2) a higher percentage of male staff were transferred than female staff which exacerbated the disparate ratio of male staff to female staff within the OJC.  OPSO is strongly encouraged to continue its review of the deployment of staff. It is apparent that sufficient staff are not actually present in the areas where the need is most critical, staffing the housing units; especially on the night shift and weekends. Along with redeployment of staff has to be the accountability of the supervisors to ensure the staff is physically present in the housing units. The level of staffing on the night shift and weekends continues to create a dangerous situation.

Training – Employee training for security staff, both pre-service and in-service, has made progress over time, but it has proven difficult to staff OJC while allowing staff to attend the Academy for their annual training and the training necessary to move from a Recruit to Deputy. In 2021, OPSO reinstated the practice of assigning new deputies to a training officer during the first three weeks of assignment to OJC (field training program), but enforcement and follow-through has been sporadic during the compliance period. A field training program needs to be fully implemented with follow up as to the impact the program has on turnover. The program, if allowed to be fully implemented, is likely to result in a reduction of turnover and a reduction in rule violation by new recruits.

Supervision—Safe operation of OPSO's facilities requires an adequate number of sufficiently trained first line and mid-management supervisors and clear lines of authority and responsibility.  Captains and lieutenants have been deployed in an effort to cover the shifts on a continuous basis but there are still shifts where the numbers of supervisors is not adequate.



2.    **Medical and Mental Health Care** – This is the third monitoring period for which Wexford has been the contracted provider for medical and mental health services. The Medical and Mental Health Monitors report that challenges remain in the provision of basic care, staffing, and recordkeeping, as well as the continued need for improved collaboration with custody/security staffing. The Monitors continue to be concerned about key leadership positions being unfilled and the practice of having staff take on additional duties under an interim title. While the abrupt termination of the Medical Director did not occur during the compliance period (it occurred on March 25, 2026), it is of great concern. There continues to be a concern about the vast majority of medical care being provided by Licensed Practical Nurses (LPN) as opposed to Registered Nurses (RN). There were also questions raised as to whether the Nurse Practitioners (NP) were receiving the appropriate level of supervision from the physicians. The placement of male inmates on suicide watch in the Temporary Mental Health Facility (TMH) appears to have resulted in an improvement of supervision of these inmates, but the quantity and quality of the suicide watches documented is difficult to verify due to the manner in which the footage from the surveillance system is stored at TMH. On occasion, inmates are on suicide watch in OJC to prevent those who are housed in disciplinary housing from manipulating their housing assignment. Improvement in the deputies' knowledge of their duties to perform and document suicide watches has continued, but turnover among the deputies assigned has still resulted in inconsistency with how suicide watches were performed and documented; resulting in inconsistency of the reporting of data. An additional issue is that the mental health staff assigned to do suicide watches are required to leave the housing unit when there is no deputy present. The number of security staff assigned to 2A and the disciplinary unit (3C/3D) has improved, but they are still unstaffed at least 15% of the time. This is also the third monitoring period where psychiatrists from LSU provided some of the psychiatric mental health care. There are concerns as to whether the quantity, and, perhaps the quality, of psychiatric care has declined with the new contractor as there is more of reliance on



psychiatric NPs as opposed to psychiatrists. An important part of the long-term solution to the lack of compliance with the Consent Judgment in the areas of medical and mental health is the design and construction of Phase III, a specialized building which will contain an infirmary and housing for inmates with acute mental health issues. For instance, having security staff escorting each psychiatrist or other mental health professional to interview inmates is addressed in the design of Phase III as the psychiatrists and other mental health staff will be able to interview inmates in an environment which is much safer for both staff and inmates and will not require a deputy to be assigned to each mental health professional for security.  The City extensively renovated portions of TDC (now referred to as TMH or Temporary Mental Health) as a stop gap measure. OPSO utilized all of the TMH units during this monitoring period, but the failure to fully utilize the capacity of TMH results in a backlog of inmates with acute mental health issues and the housing of inmates with acute mental health issues and other serious mental health issues continuing to be housed in OJC which is inadequate for the housing of these inmates. Even with TMH, the facilities within OJC to house and to provide individual and group programming for inmates with mental health issues are inadequate and create security and safety issues for both staff and inmates. The addition of a mesh barrier on the mezzanine level of the sub-acute mental health housing unit has greatly reduced the incidents where those inmates attempt or threaten to jump from over the mezzanine railing on that particular unit.

3.    **Inmate Safety and Protection from Harm** - Providing a safe and secure jail continues to be a challenge.

- <u>Violence and Contraband</u> – There were significant incidents of violence occurring within the facilities during the monitoring period; including inmate-on-inmate assaults and assaults on staff. The level of violence in the facility continued to be at high levels during this monitoring period. Some of the inmates continue to be emboldened in their refusal to follow the rules and obey the orders of the security staff. Very concerning is that both staff and inmates continue to relay to the Monitors that there continue to be



inmates who are acting as "tank bosses" and are extorting other inmates and requiring payment for protection or stealing commissary from other inmates. In order to gain control of this situation, OPSO finalized the plan to reestablish a housing unit in which these inmates can be housed with adequate security measures, i.e., adequate supervision, limited time out of cell, proper restraints when out of cell, and no access to items that can be used as weapons and began implementation at the end of the monitoring period. Of concern is the number of inmate made weapons that are discovered in the housing areas; including the disciplinary and close custody unit. Most often, the inmate-on-inmate assaults occurred when there was no deputy stationed in the housing unit. Due to the locks on some of the doors not working properly, inmates are often able to force the doors open and gain access to their victims. During the monitoring period, there was significant progress in retrofitting the locks on the swing doors (as opposed to slider doors) which began to reduce the ability of inmates to "pop" the doors. It is concerning that inmates continue to fashion weapons from items found in the jail during the prolonged periods of time when the housing unit are without supervision. As sources of contraband (such as the light supports in the utility closets and the cabinets at the front of the day room) were identified and appeared to have been eliminated, the inmates then discovered a new source of material from which to fashion weapons. For example, inmates pry off the metal sheeting around the windows to fashion weapons. The brooms and mops, the facility provides for cleaning, often end up in the inmates' cells and are used as weapons as inmates are not supervised when cleaning with the exception of the inmate crews utilized to clean the showers. In reality, few, if any, of the sources of contraband would be available to the inmates if the staff followed policies regarding supervision and limiting access to materials. OPSO has increased the number of targeted and random shakedowns resulting in the removal of weapons, pills, narcotics, and other contraband from the housing units. Still, inmates are often observed smoking illegal substances and lighting



wicks from electrical outlets and using broken tablets to create a spark. Inmates continue to start fires on the housing units. Disorder and non-compliance with the institutional rules cause staff to use force to gain control and compliance. While the force used may be reasonable in response to the threat, if appropriate security measures were taken in the first place (such as placing restraints on high-risk inmates before the inmate is allowed to exit the cell), the force used to regain control would probably not be necessary. There is inadequate use of de-escalation techniques before resorting to force, including examples of using OC spray without adequate de-escalation and/or in retaliation against inmates. There is still a failure to have mental health staff involved in de-escalation even though a large percentage of the inmates involved in the use of force are on the mental health caseload. Concerning is clearly unreasonable or unnecessary uses of force are found to be acceptable when reviewed at multiple levels at OPSO. The Use of Force Review Board's (UOFRB) role in addressing unreasonable and unnecessary uses of force is important and the length of time it takes for an incident to be reviewed by the UOFRB improved during the compliance period. However, the UOFRB is often unable to review an incident because the information was not properly assembled by the supervisor who prepared the original use of force report. Also concerning is the number of incidents which clearly involved the use of force for which no use of force report is written. Changes were made during the compliance period to rely more heavily on the UOFRB for minor uses of force so that FIT could concentrate on the investigation of more serious uses of forces including questionable uses of force. However, the change did not have the desired resort due to the length of time it took for a case to be referred to FIT. The situation still frequently occurs that the staff involved is no longer employed by the time the incident is reviewed due to have been terminated for misconduct including improper use of force or has had multiple other uses of force by the time the review by the UOFRB takes place.



- <u>Inmate Classification</u> – The inmate classification process stalled during this compliance period. Continued attention is needed to ensure that housing decisions and placements are consistent with OPSO policies and objective classification principles. Acquiescence to inmates or security staff, such as moving inmates to reside with their allies or accommodating staff to avoid problematic inmates, continues. The housing audit reports indicated that both supervisors and pod deputies moved or allowed inmates to change cell assignments. Further, the Classification Unit and Central Control staff were not notified of the moves. OPSO policy and procedures for clearing separations that prevent inmates from being housed together were followed. However, notable was the failure to conduct timely protective custody and administrative segregation reviews. Recordkeeping has been problematic, i.e., inconsistent, slow, and inaccurate. Credible auditing needs to focus on identifying issues and correcting placements. During this compliance period, although the housing audits were completed, the videos of the audits indicated that the housing audit process remains inconsistent and problematic.

4.    <u>Inmate Grievances</u> –Timeliness and adequacy of responses are still not acceptable. The trend data from the grievance system is now available to assist in identifying problems to be addressed, but there has not been adequate follow-through on addressing the issues identified. During the compliance period, the kiosks by which to file grievances were replaced and most inmates were issued tablets upon which they can file grievances. This resulted in a huge surge in grievances and a corresponding backlog. The option of paper grievances is still available to those who do not have access to kiosks or tablets. The paper grievance process requires the Grievance Staff hand out and pick up paper grievances. It is hampered by the lack of security staff to allow them on the housing units.

5.    <u>Incident Reporting</u> –The accurate, timely reporting of incidents continues to be an area of concern. This problem existed before the cyberattack in September 2025. However, the cyberattack resulted in reports having to be handwritten and then typed into the computer system.  There remain serious incidents for which no



report or no timely report is prepared by OPSO staff, including incidents involving the serious injury of inmates, use of force, and drug overdoses. The Monitors and counsel for the Plaintiffs review the medical records, particularly the emergency room routes and walk-in clinic, for medical treatment related to incidents. Numerous unreported incidents are detected by these reviews. OPSO used to review the same, but such a review, if done at all by OPSO, has become very sporadic. The excuse given was that the sergeant responsible in the CAB stopped receiving the route and clinic logs. There was no logical explanation given as to why she did not follow-up or make her supervisor aware or why the supervisor did not follow up when he was told numerous times by the Lead Monitor that the review was not taking place. Reports are often incomplete and do not provide the necessary information for the reader to determine what occurred and why it occurred. The report will often indicate that a supplemental report will be written, but none can be located. The incident types are frequently miscategorized, including a significant number of uses of force. It is particularly concerning that incomplete reports and miscategorized have been reviewed by and approved by a supervisor. OPSO began implementation of a corrective action plan nearly two years ago to address timeliness and thoroughness of reports which includes training and remedial action including discipline. The corrective action plan has resulted in mixed results as far as improvement of timeliness of reports and the thoroughness of the reports. A large part of the problem seems to be the incorrect categorization of reports when written. There are numerous reports where the narrative details a use of force, but the categorization does not indicate force was used. Reports will describe an assault by an inmate on another inmate or the assault on a staff member and it will be incorrectly characterized as "other" or "inmate." Not only does the mischaracterization present an issue for the Monitors when reviewing reports, but it also makes the gathering of accurate data and the analysis of data on incidents more difficult for OPSO. The miscategorization, when detected by OPSO, is usually found by the JCT when it audits reports. While the JCT is to be commended, it is the job of the supervisors in the OJC to catch these errors upfront and the job of the CAB to detect these errors when preparing the weekly



report to the Monitors. The Monitors and parties receive reports electronically, which has improved the timeliness of provision of completed reports for the first three months of the monitoring period, but the provision of reports came to a virtual standstill for several months after the cyberattack.

6.  **Jail Management System –** An integral part of the jail's operational improvement is tied to an effective jail management system. Such capacity provides on-demand, routine, and periodic data to inform critical leadership and management decisions. Despite the passage of many years, there has not been a suitable system fully implemented. OPSO indicated that the JMS would "go live" in May 2025, but it did not do so until April 2026. The adequacy of the training provided to staff before the new JMS was put in place is questionable. Another key component missing is the need to be able to electronically verify that security checks are taking place in a timely fashion.

7.  **Sanitation and Environment Conditions** – Challenges remain regarding the public health and inmate/staff safety risks. The inability to fill support positions identified in OPSO's staffing analysis negatively impacts the ability of OPSO to sustain compliance with the requirements of the Consent Judgment and align with accepted correctional practice. OPSO instituted a special team to clean the showers and floors of the housing units in response to the Court's orders in June 2024. The failure to consistently clean the showers and floors is detailed later in this report. The main issue appears to be the failure to have a backup plan when the one security staff assigned to the task is absent due to training or leave. In addition, sanitation and cleanliness of the cells and housing areas are not solely the responsibility of the special cleaning team. The supervisors and unit deputies have the first responsibility for ensuring inmates keep their cells and dayroom areas clean and uncluttered. The level of cleanliness of cells and housing areas showed improvement during the compliance period but still has a great deal of room for improvement.

8.  **Youthful Inmates** –Youthful offenders were housed in the OJC during the monitoring period. Although the number of male youthful offenders usually does not exceed 20, it requires an entire housing unit to be used for these inmates. Each



housing unit is designed to hold 60 inmates. Thus, in the male youthful offender unit, over two-thirds of the capacity cannot be utilized without violating classification principles. When female youthful offenders are housed, they are housed at TMH as it is the only housing option where they can be somewhat separated from adult inmates. In addition, the housing of youthful offenders presents special challenges when it comes to services and mental health care.

9. **Inmate Sexual Safety** – OPSO underwent its required audit of compliance with the Prison Rape Elimination Act of 2003 (PREA) and passed in September 2019. Continued internal collaboration among OPSO security, classification, and the medical/mental health provider is needed for the assessments of inmates' potential vulnerability to sexual assault. Due to the long time that inmates are housed in the IPC and intake units, inmates of various PREA designations continued to be housed in the same housing unit without an appropriate plan to keep them separate during time out of cell. Commingling of inmates of various PREA designations occurs on ten of the housing units. OPSO cannot rely on an audit that is five years old to demonstrate compliance with PREA. OPSO had a mock PREA Audit conducted in 2024. OPSO was to have a PREA audit in 2025, but it did not occur as the decision was made by OPSO not to fund the audit.

10. **Compliance, Quality Reporting, and Quality Improvement** – An essential element of inmate safety is OPSO's timely review of all serious incidents as well as of non-violent incidents to determine if there are trends and/or patterns. This ensures assessment of root causes and the development, implementation, and tracking of corrective action plans to address the causes. This activity focuses on resolving problems. OPSO has begun to undertake this function and has begun to identify some of the systemic issues. However, it is not done consistently and what is done is likely based on faulty data due to the failure to timely report incidents occurring in the jail system. Reliable data needs to be obtained, and systemic issues timely and routinely identified. The next step will be to determine solutions for the systemic issues and implement them. Failure to address the systemic issues will continue to create risks to institutional safety and security. The administration at OPSO has dedicated more time and knowledgeable resources to quality



improvement. The corrective action plans (CAP)were finalized as a result of Judge Africk's order, but adherence is lacking. While there was a concerted effort when the CAP was first formalized, the progress since then has been little. The challenge will be for the OPSO to hold the staff accountable for not complying with the CAP including timely completion of tasks. Adherence to the CAPs must be a priority of the entire administration.

11.   **Stipulated Agreements 2015 and 2024**– The section on the Stipulated Agreements of 2015 has been expanded to aid OPSO in reviewing its on-going compliance with the two Stipulated Agreements from 2015 and the Stipulated Agreement of June 2024 which added seven new provisions. <mark>Eleven (six of the seven new provisions) provisions are in partial compliance</mark>. Beginning with Report #21, compliance with the Stipulation and Order of June 2024 was added.

12.   **Construction Projects** –

- Phase III –Monthly meetings of the Executive Committee have been held and have provided information to the parties and the Monitors. The construction and occupation of Phase III are critical to the provision of mental and medical health services in accordance with the Consent Judgment. Regular court intervention has been required to keep the project moving forward. The project has reached 90.75% completion, based on the status report the City filed with the Court in January 2026. It is imperative that OPSO fully develop and implement a transition plan for the occupation of Phase III.

C.   **Review Process of Monitors' Compliance Report #23**

A draft of this report was provided to OPSO, Counsel for the Plaintiff Class, and the Department of Justice (DOJ) on May 6, 2026.  Comments were provided by Counsel for Plaintiffs/DOJ on May 20, 2026, and OPSO on June 1, 2026. The comments submitted by OPSO were limited as the administration responsible for the conditions described in Report #23 is no longer in office. Wexford was offered the opportunity to provide comments through OPSO. OPSO submitted limited comments on behalf of Wexford. The Monitors considered the comments of the parties in finalizing Report #23.



**D.      Communication with Stakeholders**

The Monitors are committed to providing as much information as possible regarding the status of OPSO's efforts to comply with all orders of the Court. During the monitoring period, OPSO honored the request of the Monitors to provide a link to the Monitors' reports on the OPSO website, but it was not kept current.

**E.      Recommendations**

Over the years, the Monitors have provided multiple recommendations and suggestions to OPSO to assist in achieving and maintaining compliance with the Consent Judgment. The purpose of the recommendations continues to be to assist OPSO in achieving and maintaining compliance; not to change the requirements of the Consent Judgment. There are recommendations and suggestions included within the body of this report.

**F.      Conclusions and Path Forward**

OPSO has been operating under the provisions of the Consent Judgment since June 2013; monitoring began in Fall 2013. During the previous leadership of Director Hodge, significant improvements were acknowledged by the Monitors. Sheriff Gusman resumed the role of full responsibility for bringing OPSO into compliance with the Consent Judgment in August 2020. Sheriff Gusman was defeated in the election held in December 2021. Sheriff Hutson was sworn in as Sheriff in May 2022. A suitable Chief of Corrections was appointed in July 2024 when Chief Mallett joined OPSO. Sheriff Hutson was defeated in the election held in November 2025 but remained in office for the entire compliance period.

The same deficiencies pointed out in previous reports by the Monitors continue to exist and are not resolved. When OJC was placed back under the authority of the Sheriff, there were 118 provisions in substantial compliance. As of this report, there are ==only 70 provisions in substantial compliance.== Serious incidents and harm to inmates continue to occur. OPSO has made some efforts to identify and address sources of contraband, but the Monitors encountered inmates smoking marijuana and narcotics in the housing units without fear of consequences. Weapons have frequently been fashioned from various materials within the OJC. Dangerous medication is frequently found during cell shakedowns. The medication distribution process was changed during the monitoring



COMPLIANCE REPORT # 23

period, and the new process appears to be a significant improvement in the ability of inmates to hoard medication. However, it creates other issues as it requires taking inmates out of the housing area. There continues to be incidents of overdosing.

There continues to be an emphasis on OPSO's data collection. Data collection and analysis is key to problem solving with a goal of a sustainable reduction in inmate-on-inmate assaults, inmate-on-staff assaults, uses of force, contraband, and property damage. Development of corrective action plans has taken place in accordance with the Court's order, but there is limited adherence to them. The Court's order in June 2024 requires monthly reports on progress to the parties and Monitors and quarterly reports on progress to the Court. Follow-through on implementation is essential. The Monitors continue to be hopeful that improvement will take place with the emphasis placed on data collection and analysis by OPSO.

The Monitors remain committed to the Court and the parties to collaborate on solutions that will result in significant improvement towards compliance with the provisions of the Consent Judgment and future achievement of constitutional conditions.

**The Monitors again thank and acknowledge the leadership, guidance, and support of The Honorable Lance M. Africk and The Honorable Michael B. North.**



**A.    Protection from Harm**

**Introduction**

This section of the Consent Judgment addresses core correctional functions including the use of force (policies, training, and reporting), identification of staff involved in uses of force through an early intervention system, safety and supervision of inmates, staffing, incidents and referrals, investigations, pre-trial placement of inmates in the facility, classification, the inmate grievance process, safety of inmates from sexual assault, and inmates' access to information.

The Consent Judgment requires that OPSO operate the facility to assure inmates are "reasonably safe and secure." Based on objective review of data, the facility has shown improvement in inmate and staff safety over the life of the Consent Judgment, but significant incidents that result in serious injury to inmates and staff continue to occur which confirmed that the facility is not reasonably safe and secure. Concerning is that inmates continue to fashion weapons out of items available in the jail including brooms, mops, and buckets provided by the jail and pry metal from around the windows and doors to manufacture knives or shanks. Inmate on inmate assaults often happen with no staff present to prevent the incident from occurring or to intervene to stop the incident. These are often incidents and uses of force which result in injuries severe enough to require hospitalization. This would be far less likely to have occurred if the facility was properly staffed, and the staff were properly supervising the inmates and conducting themselves in accordance with policy. Steps were taken during the compliance period to begin securely house inmates who are identified as being frequently involved in violence, contraband, and disruption of the facility incidents.

Reaching and sustaining compliance with provisions of the Consent Judgment, particularly this section, relies on the collection, analysis, and corrective action planning using accurate and reliable data. The Monitors encourage OPSO to continue efforts to build its capacity to collect and analyze relevant accurate data, draw supportable conclusions to inform decisions throughout the organization, develop corrective action plans, implement corrective action plans, and hold staff accountable for non-adherence to corrective action plans and policies. As OPSO's capacity to collect, analyze, plan, and implement is enhanced, the ability to achieve and maintain compliance will be



strengthened. Without an enhancement in capacity and dedication to making and implementing informed decisions, OPSO is unlikely to achieve and maintain compliance.

The underreporting of incidents to the Monitors and parties has continued to exist during the monitoring period. In the past, OPSO had someone review the daily medical logs for inmates taken to the clinic for treatment subsequent to an altercation or a use of force, as well as the transport logs of inmates routed to the hospital with trauma-related injuries to cross check them against reported incidents. The review often found omissions. This review did not occur with regularity, if at all, during the compliance period. The excuse given was that the sergeant assigned to the CAB who is tasked with doing the reviews stopped receiving the required documentation from Wexford. No explanation was offered as to why the sergeant did not follow up with Wexford or inform her supervisor of the failure to receive the reports. There was also no explanation why her supervisor (the head of CAB) did not discover the issue despite repeated complaints by the Lead Monitor to him that the review was not taking place. The time required for this review and the completeness of reports is directly related to the failure of supervisors to ensure reports are being written and being written thoroughly. While OPSO claims it has increased its efforts to discipline supervisors and deputies who fail to comply with the reporting policies resulting in late, incomplete, or missing incident reports, the documentation does not support the claim.

The Lead Monitor reviewed all reported incidents for the monitoring period in preparation of this report. The following charts compare the totals for the calendar years CY 2018-CY 2025. Given that the system for reporting incidents has proven to be unreliable, in the past, it was unclear whether a particular decline or increase was the result of reporting errors as opposed to an actual decline in a type of reportable incident. Given the small number of reports received during the compliance period; especially the second half of the compliance period after the cyber-attack, it is very likely the declines were more likely the result of not reporting incidents and/or not forwarding the incident reports to the Monitors. There is particularly true as to assaults and medical.



**Table 3 - All OJC Reported Incidents for CY 2018-CY 2025**

| | Inmate/ Inmate Assault | Inmate Staff Altercation | Use of Force | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Slip/Falls/ Injury | Medical | Contraband | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2018** | 442 | 64 | 260 | 47 | 2 | 78 | 48 | 69 | 262 | NA | 106 | 15 |
| **2019** | 440 | 117 | 358 | 42 | 0 | 82 | 6 | 47 | 145 | NA | 302 | 6 |
| **2020** | 309 | 139 | 372 | 35 | 3 | 21 | 1 | 64 | 64 | NA | 351 | 1 |
| **2021** | 293 | 124 | 311 | 17 | 1 | 20 | 1 | 42 | 43 | NA | 350 | 0 |
| **2022** | 351 | 71 | 229 | 36 | 2 | 45 | 6 | 39 | 35 | NA | 248 | 10 |
| **2023** | 636 | 139 | 316 | 30 | 0 | 34 | 81 | 60 | 178 | NA | 554 | 41 |
| **2024** | 735 | 155 | 409 | 37 | 0 | 57 | 229 | 212 | 175 | 623 | 562 | 34 |
| **2025** | 488 | 113 | 366 | 32 | 1 | 22 | 156 | 152 | 68 | 146 | 496 | 33 |



In CY 2021, the number of reported inmate on inmate assaults, inmate/staff altercations, and uses of force declined slightly. The rate of inmate-on-inmate assaults in CY 2022 increased by 20% over CY 2021. The rate of inmate-on-inmate assaults in CY 2023 increased by 45% over CY 2022. The rate of inmate-on-inmate assaults in CY 2024 increased 13% over CY 2023. Inmate-on-inmate assaults were down in the first six



COMPLIANCE REPORT # 23

29

months of 2025, due to the unreliability of the data for two-thirds of the compliance period, it is difficult to judge how much of the drastic reduction is accurate. The number of contraband incidents reached an all-time high in CY 2023 also; a 123% increase from CY 2022 to CY 2023. The number of incidents involving contraband in CY 2024 essentially remained the same as the number of contraband incidents in CY 2023. During the previous compliance period (January-June 2025), the number of incidents involving contraband in CY 2025, was on pace to set a new record high and a 23% increase. The number ended up being lower, but, again, this may be due to the underreporting of the seizure of contraband after the cyberattack. While it is to be expected that increased cell and unit searches that have taken place will result in a high number of incidents of contraband, it continue to call into question what steps need to be taken to keep inmates from gaining access to contraband in the first place. Many of the inmate injuries or slip and falls are suspected to, in actuality, be the result of an inmate-on-inmate assault that was not observed by staff and that inmates were afraid to report. Of concern is the underreporting of incidents which calls into question whether the data, if accurate, would reflect an even higher level of violence and contraband. The severe drop in number of reports for September 2025-December 2025 seem to be result of underreporting as opposed to being reflexive of a true decline in incidents.

**Table 4 –All OJC Reported Incidents by Type by Month CY 2018-CY 2025**





COMPLIANCE REPORT # 23                                                        30

|      | Jan | Feb | March | April | May | June | July | August | September | October | November | December | Total |
|------|-----|-----|-------|-------|-----|------|------|--------|-----------|---------|----------|----------|-------|
| **2018** | 92  | 96  | 112 | 121 | 124 | 144 | 116 | 132 | 112 | 113 | 105 | 129 | **1396** |
| **2019** | 123 | 93  | 105 | 112 | 117 | 129 | 113 | 152 | 94  | 137 | 144 | 113 | **1432** |
| **2020** | 107 | 113 | 98  | 109 | 84  | 144 | 98  | 106 | 67  | 75  | 109 | 110 | **1220** |
| **2021** | 125 | 80  | 78  | 109 | 77  | 97  | 91  | 70  | 78  | 113 | 89  | 72  | **1079** |
| **2022** | 77  | 88  | 66  | 50  | 55  | 66  | 67  | 51  | 93  | 137 | 115 | 119 | **984** |
| **2023** | 165 | 106 | 126 | 124 | 143 | 195 | 184 | 174 | 181 | 198 | 196 | 176 | **1968** |
| **2024** | 286 | 184 | 210 | 224 | 320 | 235 | 298 | 269 | 305 | 262 | 235 | 214 | 3042 |
| **2025** | 244 | 155 | 184 | 187 | 198 | 216 | 153 | 185 | 84  | 70  | 87  | 111 | 1874 |

**Assessment Methodology**

Dates of visits by Lead Monitor:

- July 9-10, 2025
- July 22-23, 2025
- July 28-31, 2025
- September 15-17 (accompanied by Monitor Poole)
- October 13-15, 2025
- November 17-19, 2025
- December 15-17, 2025

Materials reviewed:

- Materials reviewed include the Consent Judgment, OPSO policies and procedures, use of force reports, incident reports, and investigations conducted by Investigative Services Bureau-Internal Affairs Division (ISB-IAD), investigations conducted by ISB-Criminal Division (ISB-Criminal), investigations conducted by ISB-Inmate Division, training materials, shakedown logs, OPSO self-assessment, Wellpath self-assessment, and post logs.

Interviews:

- Interviews included the Sheriff, Chief of Staff, command staff, jail supervisors, Chief of Corrections, Administrative Colonel of Jail, Operations Colonel of Jail, classification manager and staff, director of training, Wellpath staff, and various



supervisors of units within ISB. Inmates were interviewed by the Monitors onsite for the visit. The Monitors also attended security-related meetings.

## A. 1. Use of Force Policies and Procedures

*A. 1. a. OPSO shall develop, implement, and maintain comprehensive policies and procedures (in accordance with generally accepted correctional standards) relating to the use of force with particular emphasis regarding permissible and impermissible uses of force.*

*A. 1. b. OPSO shall develop and implement a single, uniform reporting system under a Use of Force Reporting policy. OPSO reportable force shall be divided into two levels, as further specified in policy: Level 1 uses of force will include all serious uses of force (i.e., the use of force leads to injuries that are extensive, serious or visible in nature, including black eyes, lacerations, injuries to the mouth or head, multiple bruises, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct, and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious. Level 2 uses of force will include all escort or control holds used to overcome resistance that are not covered by the definition of Level 1 uses of force.*

*A. 1. c. OPSO shall assess, annually, all data collected regarding uses of force and make any necessary changes to use of force policies or procedures to ensure that unnecessary or excessive use of force is not used in OPP. The review and recommendations will be documented and provided to the Monitor, DOJ, and SPLC.*

Findings:

A. 1. a.  Partial Compliance

A. 1. b.  Partial Compliance

A. 1. c.  Partial Compliance

Observations:

The current OPSO use of force policies were effective as of May 2016. OPSO conducted an annual review of the UOF policy in 2024. Changes were submitted in March 2024, but the changes were found to be unacceptable as the UOF policy no longer complied with the requirements of the Consent Judgment. OPSO, the Monitors, and the parties met on suitable revised policies. Those changes were finalized during the compliance period. While there are policies, the failure to fully adhere to the policy results in A.1.a. remaining in Partial Compliance. One of the most frequent violations of policy has to do with the failure to attempt de-escalation, including the utilization of mental health staff, before using force. The Stipulation and Order of June 2024 now specifies that OPSO security is to notify mental health staff of all non-spontaneous uses of force before they happen whenever possible. The purpose is for mental health staff to assist in de-escalating the situation. There is a proper definition for de-escalation in the proposed revision of the UOF policies. The next steps are to incorporate it into the training of staff and hold staff accountable if it is not being followed. There are numerous



examples of the situation being escalated, as opposed to de-escalated by staff, in retaliation for an inmate's actions for disobeying an order or for having thrown a substance on the staff from a locked cell which often does not constitute an immediate risk to staff or other inmates.

The reporting system, if followed, would comply with the requirements of A.1.b., However, during the compliance period, there were 70 incidents which clearly involved a use of force for which no use of force was reported. Having a reporting system which is not followed, a significant portion of the time, does not constitute Substantial Compliance. Thus, the rating for this provision has been lowered to Partial Compliance. There continues to be misclassification of uses of force between Level 1 and Level 2 uses of force. The use of OC spray, pepper ball guns, and any other intermediate weapon is a Level 1 use of force. Level 2 is reserved for escort and control holds.

The Use of Force Review Board (UOFRB) continued to meet weekly during the compliance period. A new form was implemented to standardize UOFRB documentation. The UOFRB has reduced the backlog which resulted in reviewing cases closer to the time they occurred, but it is still over a month or more between the incident and the review. As a result, problematic staff often have continued contact with inmates. Consistency in membership is essential to identifying trends; the membership of the UOFRB continued to be stable with proper leadership during the compliance period. There still needs to be analysis of patterns and trends and corrective action. As importantly, if use of force reports are not written, there is no mechanism for having those uses of force reviewed by the UOFRB.

While there is improvement in the timeliness of holding of the UOFRB reviews, this section remains in Partial Compliance as the reality is that the failure to identify incidents as involving the use of force undermines the purpose of the UOFRB as the incidents incorrectly categorized are not reviewed. It is also unclear the role that the Force Investigation Team (FIT) now plays in the investigation of questionable uses of force. It is recommended that the next annual review be much more robust and based on accurate data and the analysis of that data.

## A. 2. Use of Force Training

*A. 2. a. OPSO shall ensure that all correctional officers are knowledgeable of and have the knowledge, skills, and abilities to comply with use of force policies and procedures. At a minimum, OPSO shall*



*provide correctional officers with pre-service and annual in-service training in use of force, defensive tactics, and use of force policies and procedures. The training will include the following:*
>    *(1) instruction on what constitutes excessive force;*
>    *(2) de-escalation tactics; and*
>    *(3) management of prisoners with mental illness to limit the need for using force.*

*A. 2. b. OPSO shall ensure that officers are aware of any change to policies and practices throughout their employment with OPP. At a minimum, OPSO shall provide pre-service and annual in-service use of force training that prohibits:*
>    *(1) use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
>    *(2) use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors;*
>    *(3) use of force against a prisoner after the prisoner has ceased to offer resistance and is under control;*
>    *(4) use of force as punishment or retaliation; and*
>    *(5) use of force involving kicking, striking, hitting, or punching a non-combative prisoner.*

*A. 2. c. OPSO shall randomly test five percent of the correctional officer staff on an annual basis to determine their knowledge of the use of force policies and procedures. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.*

Findings:

A. 2. a.  Substantial Compliance

A. 2. b.  Partial Compliance

A. 2. c.  Substantial Compliance

Observations:

The Monitor reviewed the training materials, testing documentation, and the supplemental documentation submitted by training staff for the rating period and interviewed the Training Captain and Training Coordinator present on the day of the inspection. It should be noted that this rating period covers the third and fourth quarters of 2025. However, training statistics are reported on a calendar year basis. It should be noted that OPSO elected to change the format for the annual in-service training requirements for CY2024 from offering training on a single topic scheduled for a one-week period with multiple classes throughout the week to offering week-long, 50-hour, in-service training blocks covering all topics required by the Consent Judgment as well as supplemental training topics offered by OPSO in furtherance of POST training requirements. As noted in reports #21 and #22, the Training Captain had reported issues with attendance during the first quarter of 2025 but noted the scheduling/attendance of staff for in-service improved significantly as the training year progressed.

Documentation provided by the Academy reflected completion rates of 96.32



COMPLIANCE REPORT # 23

34

percent, a slight decline from the 99 percent reported for report #22 for each of the three training topics covered under this section (Use of Force, Defensive Tactics, Use of Force Policies and Procedures). Given OPSO's staffing challenges, the slight decline still exceeds the 95 percent goal and therefore warrants a continued rating of Substantial Compliance for IV.A.2.a.

During the inspection interview, the Training Captain again noted that the scheduling difficulties previously mentioned are persistent. The Monitor continues to recommend that the current policy of allowing individual staff members to sign up for training plays a significant role in lower attendance in the first part of the calendar year as well as staff not reporting to training due to scheduling conflicts and the staffing needs within the jail on any given day. The Monitor continues to recommend that OPSO consider making line supervisors solely responsible for registering their staff for the required in-service training throughout the training year. In the Monitor's opinion, this would significantly reduce scheduling conflicts, make the most of limited Academy resources, and allow senior leaders to hold line supervisors accountable in supporting the training requirements. Alternatively, OPSO should consider giving registration authority to the Training Academy which would assign training dates to individuals required to attend the training specified by the Consent Judgement. This could be accomplished by several methods such as "birth month", percentage of available students per shift/assignment, etc., to lessen the impact on jail operations and provide predictability for class attendance throughout the year.

The Monitor continues to support the 50-hour format as a more effective training experience for both the participants and the training staff as the participants are able to focus solely on learning and retaining the information presented throughout the week. The Training Academy continues to incorporate the training topics required by the Consent Judgment into the 2025 POST Level 2 curriculum to minimize the scheduling impact on OPSO security functions.

The Monitor has, in the past, observed that the Academy staff have maintained detailed, comprehensive, and up-to-date training files. For Report #21, the Monitor reviewed over 40 individual staff training records and found the files were not up-to-date and the filing system was lacking organization. For this rating period, the Monitor found



that the work on updating the individual training folders is continuing but is still lacking significantly. While the condition of the individual files are of concern, physical sign-in sheets for the required courses are now well organized and maintained and the digital training records (Target Solutions/POST training records) that reflect attendance at the required classes appeared to be substantially maintained as of the date of the inspection.

A thorough review of the use of force reports during the monitoring period reveals that the need for additional training which emphasizes de-escalation and use of force avoidance continues to exist. Reports indicate that staff often have difficulty dealing with inmates with mental health issues and inmates who are intent on engaging staff in a hostile manner. Reports also indicate that staff involved in use of force often do not report the use of force to their supervisors and/or the supervisors do not complete the necessary documentation. While the reporting of use of force is covered more specifically in IV. A. 3., it bears noting that supervisory training on expectations regarding use of force needs to be strengthened. Also, given some very problematic incidents in which staff observed inappropriate uses of force and did not stop or report the same, it is strongly suggested that the duty to intervene and report continued to be emphasized.

Under A. 2. c., OPSO is required to randomly test 5% of the correctional officer staff (deputies/recruits) on the use of force policies and procedures. The purpose of the testing is to measure the knowledge of use of force policies and procedures **outside of the classroom setting**. OPSO provided documentation of the required 5% random testing of staff outside the classroom for CY2025 and actually exceeded the minimum requirement by testing a total of 64 employees. The rating for IV.A.2.c is raised to Substantial Compliance for Report #23. Once again, the last test approved by Monitor Frasier was on April 21, 2021. It is recommended that the test be reviewed to determine if a new test needs to be developed for review and approval.

The Monitor continues to review documentation and randomly interview staff regarding the content and quality of the training received throughout the year.

### A. 3. Use of Force Reporting

*A. 3. a. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination.*
*A. 3. b. OPSO shall ensure that sufficient information is collected on uses of force to assess whether staff members complied with policy; whether corrective action is necessary including training or discipline; the effectiveness of training and policies; and whether the conditions in OPP comply with this Agreement. At a minimum, OPSO will ensure that officers using or observing a Level 1 use of force*



*shall complete a use of force report that will:*

(1) *include the names of all staff, prisoner(s), or other visual or oral witness(es);*

(2) *contain an accurate and specific account of the events leading to the use of force;*

(3) *describe the level of resistance and the type and level of force used, consistent with OPP use of force; policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

(4) *describe the weapon or instrument(s) of restraint, if any, and the manner of such use be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

(5) *describe the nature and extent of injuries sustained by anyone involved in the incident;*

(6) *contain the date and time when medical attention, if any, was requested and actually provided;*

(7) *describe any attempts the staff took to de-escalate prior to the use of force;*

(8) *include an individual written account of the use of force from every staff member who witnessed the use of force;*

(9) *include photographs taken promptly, but no later than two hours after a use of force incident, of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in the use of force incident;*

(10) *document whether the use of force was digitally or otherwise recorded. If the use of force is not digitally or otherwise recorded, the reporting officer and/or watch commander will provide an explanation as to why it was not recorded; and*

(11) *include a statement about the incident from the prisoner(s) against whom force was used.*

*A. 3. c. All officers using a Level 2 use of force shall complete a use of force report that will:*

(1) *include the names of staff, prisoner(s), or other visual or oral witness(es);*

(2) *contain an accurate and specific account of the events leading to the use of force;*

(3) *describe the level of resistance and the type and level of force used, consistent with OPP use of force policy and procedure, as well as the precise actions taken by OPSO staff in response to the incident;*

(4) *describe the weapon or instrument(s) of restraint, if any, and the manner of such use;*

(5) *be accompanied by a prisoner disciplinary report, if it exists, pertaining to the events or prisoner activity that prompted the use of force incident;*

(6) *describe the nature and extent of injuries sustained by anyone involved in the incident;*

(7) *contain the date and time when medical attention, if any, was requested and actually provided; and*

(8) *describe any attempts the staff took to de-escalate prior to the use of force.*

*A. 3. d. OPSO shall require correctional officers to notify the watch commander as soon as practical of any use of force incident or allegation of use of force. When notified, the watch commander will respond to the scene of all Level 1 uses of force. When arriving on the scene, the watch commander shall:*

(1) *ensure the safety of everyone involved in or proximate to the incident;*

(2) *determine if any prisoner or correctional officer is injured and ensure that necessary medical care is provided;*

(3) *ensure that personnel and witnesses are identified, separated, and advised that communications with other witnesses or correctional officers regarding the incident are prohibited;*

(4) *ensure that witness and subject statements are taken from both staff and prisoner(s) outside of the presence of other prisoners and staff;*

(5) *ensure that the supervisor's use of force report is forwarded to IAD for investigation if, upon the supervisor's review, a violation of law or policy is suspected. The determination of what type of investigation is needed will be based on the degree of the force used consistent with the terms of this Agreement;*

(6) *If the watch commander is not involved in the use of force incident, the watch commander shall review all submitted use of force reports within 36 hours of the end of the incident, and shall specify his findings as to completeness and procedural errors. If the watch commander believes that the use of force may have been*



COMPLIANCE REPORT # 23                    37

*unnecessary or excessive, he shall immediately contact IAD for investigation consideration and shall notify the warden or assistant warden; and*

(7) *All Level 1 use of force reports, whether or not the force is believed by any party to be unnecessary or excessive, shall be sent to IAD for review. IAD shall develop and submit to the Monitor within 90 days of the Effective Date clear criteria to identify use of force incidents that warrant a full investigation, including injuries that are extensive or serious, visible in nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.), injuries requiring hospitalization, staff misconduct (including inappropriate relationships*

*with prisoners), and occasions when use of force reports are inconsistent, conflicting, or otherwise suspicious.*

*A. 3. e. Ensure that a first-line supervisor is present during all pre-planned uses of force, such as cell extractions.*

*A. 3. f. Within 36 hours, exclusive of weekends and holidays, of receiving the report and review from the shift commander, in order to determine the appropriateness of the force used and whether policy was followed, the Warden or Assistant Warden shall review all use of force reports and supervisory reviews including:*

(1) *the incident report associated with the use of force;*

(2) *any medical documentation of injuries and any further medical care;*

(3) *the prisoner disciplinary report associated with the use of force; and*

(4) *the Warden or Assistant Warden shall complete a written report or written statement of specific findings and determinations of the appropriateness of force.*

*A. 3. g. Provide the Monitor a periodic report detailing use of force by staff. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

(1) *a brief summary of all uses of force, by type;*

(2) *date that force was used;*

(3) *identity of staff members involved in using force;*

(4) *identity of prisoners against whom force was used;*

(5) *a brief summary of all uses of force resulting in injuries;*

(6) *number of planned and unplanned uses of force;*

(7) *a summary of all in-custody deaths related to use of force, including the identity of the decedent and the circumstances of the death; and*

(8) *a listing of serious injuries requiring hospitalization.*

*A. 3. h. OPSO shall conduct, annually, a review of the use of force reporting system to ensure that it has been effective in reducing unnecessary or excessive uses of force. OPSO will document its review and conclusions and provide them to the Monitor, SPLC, and DOJ.*

Findings:

A. 3. a.  Partial Compliance

A. 3. b.  Partial Compliance

A. 3. c.  Partial Compliance

A. 3. d.  Partial Compliance

A. 3. e.  Partial Compliance

A. 3. f.  Partial Compliance

A. 3. g.  Partial Compliance

A. 3. h.  Partial Compliance

Observations:



As to provision A. 3. a., the use of force policy requires all uses of force to be reported timely and completely and sets out the potential discipline if the policy is not followed. The Monitors identified 70 incidents, over the six-month compliance period, during which force was used, but for which no use of force report was generated. Thus, the rating continues to be in Partial Compliance and is dangerously close to Non-Compliance.

Provision A. 3. b. is in Partial Compliance due to the number of use of force reports that are not submitted or are incomplete or inadequate. The use of force policy includes the provisions required by the Consent Judgment, but lack of adherence still occurs. The Monitor provided a checklist of the report requirements to assist supervisors in ensuring reports include all necessary items. A review of those checklists and accompanying reports indicates that the required information is still found to be missing from the use of force reports such as what led to the incident, details of actions taken during the use of force, and resolution of the incident. Seldom do reports include an articulation of any de-escalation tactics, a description of injuries sustained, and when medical attention was provided. No proof was provided that deputies and supervisors are being held accountable for failure to include required information. Provision A. 3. c. requires less information as it is a lesser level of force, but the deficiencies are the same as those noted for A. 3. b. and thus it is in Partial Compliance.

There continues to be a failure on the part of first line supervisors and the watch commanders to consistently comply with the requirements of the Consent Judgment (IV. A. 3. d.) as to their specific duties and the time requirement for performance of these duties under the policies. The use of force report is to be prepared by the end of the shift or at least within 24 hours of the incident. OPSO audits revealed that this criteria was met between 21% and 80% during the monitoring period with an average of 40%. However, these numbers would be lower if the incidents for which no use of force report was prepared were included. As for the Watch Commander's responsibilities, the Consent Judgment requires submission of the packet to the Assistant Warden/Deputy Chief of Corrections within 36 hours of the incident. OPSO's audits revealed that compliance with the 36-hour provision (not the quality of the packet) ranged between 40% and 91% during the monitoring period for an average of 70%. The JCT conducts audits targeting



the 36-hour reporting compliance and provides the results to OPSO administration. Accountability for failure to comply with policy appears lacking.

A. 3. e. requires the presence of a supervisor for planned uses of force. One of the main reasons for this provision is to allow for de-escalation to be attempted before force is carried out. A CAP was put in place regarding what was considered to be a planned use of force and there has been improvement in recognition of what constitutes a planned use of force. OPSO only categorized seven incidents as planned uses of force for this monitoring period. To be clear, when the Special Response Team (SRT) is deployed to handle a situation, it will almost always be a planned use of force as opposed to a spontaneous use of force. Three of the incidents identified as being a planned use of force were not planned uses of force. During the four use of force incidents which were correctly identified as involving a planned use of force, a supervisor was present and deescalation was attempted. The issue appears to be the failure to properly identify which incidents should be considered a planned use of force. Until that is corrected, the provision will remain in Partial Compliance.

One of the OJC Colonels conducted the review of the use of force during the monitoring period required by A. 3. f. OPSO's audit found that the review of the use of force by the Colonel was made within thirty-six hours between 20% and 71% of the time (for an average of 48%). The Monitor agrees that the thirty-six-hour period begins when the report is approved by the watch commander. The plain language of the Consent Judgment that states the review must take place "within 36 hours, exclusive of weekends and holidays". This provision remains in Partial Compliance.

OPSO relies on the semi-annual report issued by FIT for documentation as to compliance with IV. A. 3. g. While the FIT semi-annual report for January 2025-June 2025 was provided with the documentation for the compliance tour, the semi-annual FIT report for July 2025-December 2025 was not provided until the end of February 2026. Upon review of both FIT reports, it is clear that this information does not include all uses of force which occur involving inmates of Orleans Parish. At most, it contains information on uses of force referred to FIT for investigation. Even the information provided did not contain all of the required information for compliance with IV. A. 3. g. (3) and (5). The information for A. 3. g. (6) and (7) were provided by separate memorandum but are



suspect due to the number of uses of force for which no use of force report was prepared. Thus, this section continues to be in Partial Compliance.

The annual review of use of force incidents for CY 2024 was conducted February 20, 2025, and the one for CY 2025 was conducted February 24, 2026. Neither one contained all of the items required by IV. A. 3. h. in order to warrant a rating of substantial compliance. The CY 2025 focused on the number of investigators as opposed as the reduction of unnecessary and excessive force. Issues such as the failure to report use of force, timely comply with the Consent Judgment regarding the timeliness of review, and the lack of de-escalation that were not addressed. Also not addressed are how frequent uses of force would not be needed if policy was followed. Another major issue is that OPSO is not capturing all of the uses of force due to the failure to properly report the incident as a use of force, thereby, triggering the use of force review process. As noted above, the Monitors identified 70 uses of force during the compliance period for which a use of force report was not prepared. Therefore, the compliance rating remains at partial compliance.

### A. 4. Early Intervention System ("EIS")

*A. 4. a. OPSO shall develop, within 120 days of the Effective Date, a computerized relational database ("EIS") that will document and track staff members who are involved in use of force incidents and any complaints related to the inappropriate or excessive use of force, in order to alert OPSO management to any potential problematic policies or supervision lapses or need for retraining or discipline. The Chief of Operations Deputy, supervisors, and investigative staff shall have access to this information and shall review on a regular basis, but not less than quarterly, system reports to evaluate individual staff, supervisor, and housing area activity. OPSO will use the EIS as a tool for correcting inappropriate staff behavior before it escalates to more serious misconduct.*
*A. 4. b. Within 120 days of the Effective Date, OPSO senior management shall use EIS information to improve quality management practices, identify patterns and trends, and take necessary corrective action both on an individual and systemic level. IAD will manage and administer EIS systems. The Special Operations Division ("SOD") will have access to the EIS. IAD will conduct quarterly audits of the EIS to ensure that analysis and intervention is taken according to the process described below. Command staff shall review the data collected by the EIS on at least a quarterly basis to identify potential patterns or trends resulting in harm to prisoners. The Use of Force Review Board will periodically review information collected regarding uses of force in order to identify the need for corrective action, including changes to training protocols and policy or retraining or disciplining individual staff or staff members. Through comparison of the operation of this system to changes in the conditions in OPP, OPSO will assess whether the mechanism is effective at addressing the requirements of this Agreement.*
*A. 4. c. OPSO shall provide, within 180 days of the implementation date of its EIS, to SPLC, DOJ, and the Monitor, a list of all staff members identified through the EIS and corrective action taken.*
*A. 4. d. The EIS protocol shall include the following components: data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation, and audit.*
*A. 4. e. On an annual basis, OPSO shall review the EIS to ensure that it has been effective in identifying concerns regarding policy, training, or the need for discipline. This assessment will be based in part on*



*the number and severity of harm and injury identified through data collected pursuant to this Agreement. OPSO will document its review and conclusions and provide them to the Monitor, who shall forward this document to DOJ and SPLC.*

Findings:

A. 4. a.  Partial Compliance

A. 4. b.  Partial Compliance

A. 4. c.  Partial Compliance

A. 4. d.  Partial Compliance

A. 4. e.  Partial Compliance

Observations:

Due to unreliability of the electronic EIS, OPSO abandoned the original system and fashioned an alternative version within the AS400. A FIT staff member manually monitors the database to prepare a list of employees who have been involved in three of more uses of force in a ninety-day period. It does include staff against whom a complaint of inappropriate or excessive force has been made such as by inmate grievance or a family member of an inmate. Not much else is done with the list except for its compilation of names and whether the use of force was found to be justified or not justified on an individual basis as opposed identifying patterns and trends and taking corrective action.

OPSO has provided its documentation to the Monitors as to the names of the staff members who are flagged for use of force. However, given that at least 70 incidents occurred for which no use of force report was prepared, any compilation of names is suspect. Again, no review of staff alerted under the EIS was documented or provided except to individual incidents. OPSO acknowledges that the reviews did not occur. Having alerts with no follow up negates the value of gathering the data. As there was no documentation of review by the command staff as required by the Consent Judgment, A. 4. a., A. 4. b, and A. 4. c. remain in partial compliance. Continued questionable and inappropriate uses of force by the same staff members and with the same inmates calls into question whether the EIS is being utilized to improve management quality practices, identify patterns and trends, and take necessary corrective action as required. Section A.4.d. is in partial compliance as the EIS protocol lists the required elements, but there is no supervisory assessment nor intervention.

On February 20, 2025, the EIS review for CY 2024 was conducted. There was no



review for CY 2025 provided with the compliance tour documentation or afterwards. For CY 2024, it appears from the notes that all that was done was the presentation of the number of staff members who alerted the system. There did not appear to be any evaluation of the data; much less an in-depth discussion of the items required by IV. A. 4. e. The review should consist of more than noting that the EIS was triggered. It involves assessing the effectiveness of the EIS which was not performed. Therefore, IV. A .4. e. remains in partial compliance.

## A. 5. Safety and Supervision

*A. 5. a. Maintain security policies, procedures, and practices to provide a reasonably safe and secure environment for prisoners and staff in accordance with this Agreement.*
*A. 5. b. Maintain policies, procedures, and practices to ensure the adequate supervision of prisoner work areas and trustees.*
*A. 5. c. Maintain policies and procedures regarding care for and housing of protective custody prisoners and prisoners requesting protection from harm.*
*A. 5. d. Continue to ensure that correctional officers conduct appropriate rounds at least once during every 30- minute period, at irregular times, inside each general population housing unit and at least once during every 15-minute period of special management prisoners, or more often if necessary. All security rounds shall be documented on forms or logs that do not contain pre-printed rounding times. In the alternative, OPSO may provide direct supervision of prisoners by posting a correctional officer inside the day room area of a housing unit to conduct surveillance.*
*A. 5. e. Staff shall provide direct supervision in housing units that are designed for this type of supervision. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.*
*A. 5. f. Increase the use of overhead video surveillance and recording cameras to provide adequate coverage throughout the common areas of the Jail, including the Intake Processing Center, all divisions' intake areas, mental health units, special management units, prisoner housing units, and in the divisions' common areas.*
*A. 5. g. Continue to ensure that correctional officers, who are transferred from one division to another, are required to attend training on division-specific post orders before working on the unit.*
*A. 5. h. Continue to ensure that correctional officers assigned to special management units, which include youth tiers, mental health tiers, disciplinary segregation, and protective custody, receive eight hours of specialized training regarding such units on prisoner safety and security on at least an annual basis.*
*A. 5. i. Continue to ensure that supervisors conduct daily rounds on each shift in the prisoner housing units and document the results of their rounds.*
*A. 5. j. Continue to ensure that staff conduct daily inspections of cells and common areas of the housing units to protect prisoners from unreasonable harm or unreasonable risk of harm.*
*A. 5. k. Continue to ensure that staff conduct random monthly shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.*
*A. 5. l. Provide the Monitor a periodic report of safety and supervision at the Facility. These periodic reports shall be provided to the monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will provide the following information:*

> (1)  *a listing of special management prisoners, their housing assignments, the basis for them being placed in the specialized housing unit, and the date placed in the unit; and*
>
> (2)  *a listing of all contraband, including weapons seized, the type of contraband, date of seizure, location, and shift of seizure.*

<u>Findings:</u>



A. 5. a.  Partial Compliance

A. 5. b.  Substantial Compliance

A. 5. c.  Partial Compliance

A. 5. d.  Non-Compliance

A. 5. e.  Partial Compliance

A. 5. f.   Partial Compliance

A. 5. g.  Substantial Compliance

A. 5. h.  Substantial Compliance

A. 5. i.   Non-Compliance

A. 5. j.   Non-Compliance

A. 5. k.  Partial Compliance

A. 5. l.   Partial Compliance

Observations:

OPSO has worked hard to finalize policies, procedures, and post orders. Having words written on paper without implementation of those policies, procedures, and practices is insufficient for substantial compliance. Policies and procedures must be adhered to and followed for them to be "maintained", and substantial compliance achieved. Practices, even if not included in policies and procedures, must adhere to the standard also. The consequences of the failure to adhere to the requirements of the various policies in this section were on display in the escape of May 16, 2025. Policies were not followed, security checks were not made, surveillance video was not viewed in real time, inmates were not supervised, supervisors did not make their rounds, inspections were not performed, and inmates were able to gain access to dangerous materials which allowed them to cut bars.

Provision A. 5. a. remains in partial compliance as the policies exist but are not consistently followed. There is adequate supervision of inmate working areas to result in substantial compliance as to A. 5. b. The level of violence continues to be at an unacceptable level. It should be noted that the Lead Monitor actually reads every incident report sent by OPSO. The Lead Monitor often finds that incident reports involving assaults are often not properly categorized by OPSO. Thus, if OPSO is relying on the categorization of incidents for its analysis, the analysis is based on the improper



categorization that routinely underreports assaults and altercations. There was a monthly average of 24 reported inmate-on-inmate assaults/altercations in CY 2021. That number rose to 27 in CY 2022 and nearly doubled as it rose to 53 in CY 2023. The number continued to increase in CY 2024 to a monthly average of 61. The monthly average for inmate-on-inmate assaults for the first six months of CY 2025 was 52. The monthly average for inmate-on-inmate assaults for the second six months of CY 2025 was 29. Quite frankly, this decrease appears to be more the result of underreporting during the months of September-December 2025 after the cyberattack when staff had to handwrite reports. This is indicative that OPSO has not substantially complied with the requirement that the facility be reasonably safe for staff and inmates, and that the facility continues not to be safe. The recent numbers reported continue to be suspect given the systematic underreporting of reportable incidents and the number of inmate-on-inmate assaults that are likely undetected due to the lack of staff in the housing areas. While the Monitors are well aware that violent incidents occur in jail facilities, the level currently reflects partial compliance with the obligation to provide a reasonably safe and secure environment. Incidents of violence continue to occur in the housing units for protective custody inmates. A properly classified and operated protective custody housing unit should have one of the lower, if not the lowest, level of violence in a correctional facility. OPSO, at the end of the compliance period, began to review how inmates are selected for protective custody housing to lessen the likelihood that violent inmates will continue to manipulate the classification process and gain access to vulnerable inmates. Until it is shown that inmates in protective custody status are not being victimized by inmates manipulating the classification system, A. 5. c. will remain in Partial Compliance.

## Table 5 CY 2018-June 2025 OJC Reported Incidents



| 2018 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Altercation | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contra-band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 13 | 0 | 38 | 7 | 2 | 0 | 6 | 2 | 3 | 9 | 9 | NA | 3 | 92 |
| February | 10 | 0 | 28 | 6 | 4 | 0 | 14 | 2 | 10 | 5 | 15 | NA | 2 | 96 |
| March | 21 | 0 | 37 | 7 | 5 | 0 | 4 | 3 | 11 | 18 | 5 | NA | 1 | 112 |
| April | 22 | 0 | 39 | 9 | 4 | 0 | 4 | 3 | 12 | 22 | 5 | NA | 1 | 121 |
| May | 24 | 0 | 52 | 0 | 5 | 1 | 0 | 5 | 8 | 19 | 10 | NA | 0 | 124 |
| June | 26 | 0 | 46 | 7 | 5 | 0 | 6 | 7 | 3 | 32 | 9 | NA | 3 | 144 |
| July | 20 | 0 | 30 | 4 | 4 | 0 | 9 | 3 | 3 | 30 | 13 | NA | 0 | 116 |
| Aug | 27 | 0 | 39 | 3 | 3 | 0 | 13 | 2 | 6 | 30 | 6 | NA | 3 | 132 |
| Sept | 14 | 0 | 33 | 6 | 2 | 0 | 7 | 5 | 4 | 35 | 6 | NA | 0 | 112 |
| Oct | 28 | 0 | 32 | 9 | 5 | 0 | 3 | 0 | 2 | 26 | 7 | NA | 1 | 113 |
| Nov | 21 | 0 | 31 | 6 | 5 | 0 | 5 | 8 | 3 | 18 | 7 | NA | 1 | 105 |
| Dec | 34 | 0 | 37 | 0 | 3 | 1 | 7 | 8 | 4 | 18 | 14 | NA | 3 | 129 |
| Total | 260 | 0 | 442 | 64 | 47 | 2 | 78 | 48 | 69 | 262 | 106 | 0 | 18 | 1396 |

| 2019 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contra-band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 0 | 40 | 1 | 2 | 0 | 15 | 3 | 7 | 14 | 14 | NA | 0 | 123 |
| February | 29 | 0 | 26 | 7 | 2 | 0 | 13 | 1 | 0 | 4 | 11 | NA | 0 | 93 |
| March | 26 | 0 | 25 | 4 | 1 | 0 | 6 | 1 | 2 | 16 | 21 | NA | 3 | 105 |
| April | 26 | 0 | 28 | 7 | 1 | 0 | 3 | 0 | 3 | 15 | 27 | NA | 2 | 112 |
| May* | 22 | 12 | 36 | 11 | 6 | 0 | 13 | 0 | 2 | 11 | 25 | NA | 1 | 117 |
| June | 26 | 7 | 55 | 9 | 4 | 0 | 13 | 0 | 2 | 16 | 23 | NA | 0 | 129 |
| July | 31 | 13 | 50 | 15 | 5 | 0 | 6 | 0 | 3 | 8 | 13 | NA | 0 | 113 |
| Aug | 37 | 26 | 32 | 17 | 6 | 0 | 7 | 1 | 8 | 20 | 35 | NA | 0 | 152 |
| Sept | 31 | 18 | 32 | 4 | 3 | 0 | 2 | 0 | 1 | 10 | 24 | NA | 0 | 94 |
| Oct | 37 | 21 | 38 | 15 | 4 | 0 | 1 | 0 | 7 | 18 | 33 | NA | 0 | 137 |
| Nov | 33 | 17 | 55 | 12 | 7 | 0 | 0 | 0 | 6 | 5 | 42 | NA | 0 | 144 |
| Dec | 33 | 23 | 23 | 15 | 1 | 0 | 3 | 0 | 6 | 8 | 34 | NA | 0 | 113 |
| Total | 358 | 137 | 440 | 117 | 42 | 0 | 82 | 6 | 47 | 145 | 302 | 0 | 6 | 1432 |

| 2020 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contra-band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 29 | 18 | 31 | 8 | 4 | 0 | 3 | 0 | 1 | 7 | 35 | NA | 0 | 107 |
| February | 33 | 17 | 35 | 12 | 2 | 0 | 0 | 1 | 3 | 13 | 29 | NA | 1 | 113 |
| March | 31 | 19 | 24 | 9 | 1 | 0 | 1 | 0 | 3 | 6 | 35 | NA | 0 | 98 |
| April | 45 | 29 | 25 | 19 | 7 | 0 | 0 | 0 | 4 | 1 | 24 | NA | 0 | 109 |
| May | 37 | 26 | 24 | 11 | 1 | 0 | 1 | 0 | 6 | 3 | 12 | NA | 0 | 84 |
| June | 22 | 16 | 28 | 13 | 4 | 2 | 1 | 0 | 5 | 12 | 63 | NA | 0 | 144 |
| July | 21 | 8 | 22 | 9 | 1 | 0 | 2 | 0 | 4 | 5 | 47 | NA | 0 | 98 |



| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Aug** | 22 | 23 | 22 | 8 | 2 | 1 | 4 | 0 | 11 | 4 | 31 | NA | 0 | **106** |
| **Sept** | 24 | 14 | 16 | 12 | 2 | 0 | 2 | 0 | 8 | 4 | 9 | NA | 0 | **67** |
| **Oct** | 35 | 18 | 24 | 10 | 2 | 0 | 1 | 0 | 3 | 3 | 14 | NA | 0 | **75** |
| **Nov** | 33 | 19 | 28 | 10 | 5 | 0 | 2 | 0 | 9 | 5 | 31 | NA | 0 | **109** |
| **Dec** | 40 | 25 | 30 | 18 | 4 | 0 | 4 | 0 | 7 | 1 | 21 | NA | 0 | **110** |
| **Total** | **372** | **232** | **309** | **139** | **35** | **3** | **21** | **1** | **64** | **64** | **351** | **0** | **1** | **1220** |

| 2021 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contra- band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 38 | 34 | 32 | 20 | 1 | 0 | 0 | 0 | 3 | 3 | 32 | NA | 0 | 125 |
| February | 27 | 12 | 30 | 14 | 2 | 0 | 1 | 0 | 2 | 5 | 14 | NA | 0 | 80 |
| March | 16 | 10 | 24 | 7 | 4 | 0 | 0 | 0 | 5 | 4 | 24 | NA | 0 | 78 |
| April | 24 | 17 | 27 | 10 | 2 | 0 | 1 | 1 | 2 | 4 | 45 | NA | 0 | 109 |
| May | 21 | 12 | 31 | 7 | 0 | 0 | 0 | 0 | 3 | 1 | 23 | NA | 0 | 77 |
| June | 34 | 18 | 25 | 15 | 0 | 1 | 0 | 0 | 4 | 4 | 30 | NA | 0 | 97 |
| July | 22 | 11 | 22 | 10 | 0 | 0 | 6 | 0 | 8 | 3 | 31 | NA | 0 | 91 |
| Aug | 18 | 13 | 19 | 7 | 0 | 0 | 5 | 0 | 2 | 4 | 20 | NA | 0 | 70 |
| Sept | 28 | 19 | 18 | 6 | 3 | 0 | 1 | 0 | 1 | 7 | 23 | NA | 0 | 78 |
| Oct | 31 | 21 | 22 | 8 | 0 | 0 | 1 | 0 | 6 | 3 | 52 | NA | 0 | 113 |
| Nov | 27 | 12 | 21 | 7 | 2 | 0 | 4 | 0 | 4 | 1 | 38 | NA | 0 | 89 |
| Dec | 25 | 11 | 22 | 12 | 3 | 0 | 1 | 0 | 2 | 4 | 17 | NA | 0 | 72 |
| Total | 311 | 190 | 293 | 124 | 17 | 1 | 20 | 1 | 42 | 43 | 350 | 0 | 0 | 1079 |

| 2022 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contra- band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 22 | 12 | 22 | 5 | 1 | 0 | 0 | 0 | 4 | 4 | 29 | NA | 0 | 77 |
| February | 26 | 21 | 18 | 10 | 3 | 0 | 1 | 0 | 4 | 0 | 31 | NA | 0 | 88 |
| March | 15 | 8 | 24 | 1 | 2 | 0 | 4 | 0 | 4 | 3 | 20 | NA | 0 | 66 |
| April | 12 | 6 | 28 | 3 | 1 | 0 | 6 | 0 | 4 | 1 | 1 | NA | 0 | 50 |
| May | 15 | 10 | 24 | 3 | 5 | 0 | 3 | 0 | 4 | 2 | 4 | NA | 0 | 55 |
| June | 22 | 15 | 31 | 2 | 2 | 2 | 5 | 1 | 2 | 2 | 4 | NA | 0 | 66 |
| July | 15 | 6 | 36 | 5 | 3 | 0 | 1 | 1 | 1 | 7 | 6 | NA | 1 | 67 |
| Aug | 15 | 12 | 24 | 1 | 0 | 0 | 1 | 0 | 3 | 2 | 8 | NA | 0 | 51 |
| Sept | 27 | 18 | 30 | 7 | 5 | 0 | 3 | 0 | 6 | 3 | 20 | NA | 1 | 93 |
| Oct | 23 | 16 | 55 | 8 | 9 | 0 | 2 | 0 | 2 | 7 | 37 | NA | 1 | 137 |
| Nov | 13 | 6 | 26 | 11 | 4 | 0 | 10 | 1 | 3 | 3 | 45 | NA | 6 | 115 |
| Dec | 24 | 11 | 33 | 15 | 1 | 0 | 9 | 3 | 2 | 1 | 43 | NA | 1 | 119 |
| Total | 229 | 141 | 351 | 71 | 36 | 2 | 45 | 6 | 39 | 35 | 248 | 0 | 10 | 984 |



| 2023 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Medical (AKA slip/falls/ injury) | Contra- band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 24 | 17 | 34 | 9 | 2 | 0 | 5 | 2 | 6 | 15 | 75 | NA | 0 | **165** |
| February | 19 | 14 | 30 | 4 | 4 | 0 | 1 | 4 | 4 | 15 | 28 | NA | 2 | **106** |
| March | 14 | 7 | 46 | 9 | 2 | 0 | 5 | 8 | 1 | 7 | 40 | NA | 1 | **126** |
| April | 18 | 12 | 42 | 9 | 2 | 0 | 2 | 3 | 5 | 6 | 39 | NA | 4 | **124** |
| May | 21 | 12 | 43 | 11 | 2 | 0 | 1 | 5 | 1 | 15 | 52 | NA | 1 | **143** |
| June | 36 | 23 | 62 | 16 | 1 | 0 | 1 | 8 | 7 | 25 | 49 | NA | 3 | **195** |
| July | 32 | 20 | 66 | 18 | 5 | 0 | 4 | 4 | 8 | 20 | 35 | NA | 4 | **184** |
| Aug | 27 | 15 | 67 | 14 | 1 | 0 | 7 | 11 | 5 | 12 | 37 | NA | 5 | **174** |
| Sept | 25 | 19 | 67 | 15 | 1 | 0 | 0 | 4 | 6 | 14 | 53 | NA | 2 | **181** |
| Oct | 44 | 37 | 64 | 10 | 5 | 0 | 3 | 7 | 7 | 12 | 44 | NA | 9 | **198** |
| Nov | 31 | 18 | 67 | 13 | 3 | 0 | 1 | 15 | 4 | 23 | 45 | NA | 7 | **196** |
| Dec | 25 | 21 | 48 | 11 | 2 | 0 | 4 | 10 | 6 | 14 | 57 | NA | 3 | **176** |
| Total | **316** | **215** | **636** | **139** | **30** | **0** | **34** | **81** | **60** | **178** | **554** | **0** | **41** | **1968** |

| 2024 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Slip / Fall / Injury | Contra- band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 27 | 23 | 45 | 23 | 2 | 0 | 3 | 14 | 8 | 15 | 64 | 86 | 3 | **286** |
| February | 24 | 17 | 35 | 9 | 1 | 0 | 2 | 7 | 21 | 9 | 32 | 46 | 5 | **184** |
| March | 22 | 14 | 39 | 5 | 4 | 0 | 7 | 21 | 16 | 6 | 50 | 43 | 5 | **210** |
| April | 16 | 12 | 44 | 11 | 0 | 0 | 2 | 7 | 19 | 24 | 34 | 70 | 1 | **224** |
| May | 40 | 21 | 70 | 16 | 2 | 0 | 7 | 10 | 30 | 13 | 79 | 68 | 4 | **320** |
| June | 24 | 15 | 72 | 6 | 2 | 0 | 1 | 12 | 18 | 15 | 42 | 49 | 3 | **235** |
| July | 49 | 25 | 69 | 16 | 4 | 0 | 9 | 29 | 29 | 20 | 38 | 54 | 5 | **298** |
| Aug | 27 | 10 | 79 | 22 | 5 | 0 | 7 | 21 | 12 | 18 | 56 | 37 | 2 | **269** |
| Sept | 54 | 36 | 76 | 14 | 7 | 0 | 6 | 31 | 7 | 15 | 58 | 54 | 1 | **305** |
| Oct | 42 | 12 | 80 | 13 | 5 | 0 | 6 | 28 | 23 | 21 | 33 | 38 | 3 | **262** |
| Nov | 49 | 25 | 57 | 12 | 4 | 0 | 2 | 27 | 14 | 9 | 36 | 48 | 1 | **235** |
| Dec | 35 | 13 | 69 | 8 | 1 | 0 | 5 | 22 | 15 | 10 | 40 | 30 | 1 | **214** |
| Total | **409** | **223** | **735** | **155** | **37** | **0** | **57** | **229** | **212** | **175** | **562** | **623** | **34** | **3042** |

| 2025 | Use of Force | Inmate Misconduct FLD/FFD | Inmate/ Inmate Assault | Inmate Staff Assault | PREA | Death | Attempt Suicide/ Ideation | Internal Escape | Criminal Damage | Slip / Fall / Injury | Contra- band | Medical | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 34 | 7 | 70 | 13 | 4 | 0 | 3 | 24 | 26 | 11 | 63 | 19 | 4 | **244** |
| February | 28 | 11 | 45 | 9 | 1 | 0 | 2 | 18 | 14 | 5 | 34 | 15 | 1 | **155** |
| March | 38 | 18 | 45 | 19 | 2 | 0 | 1 | 14 | 13 | 8 | 40 | 21 | 3 | **184** |
| April | 34 | 15 | 45 | 13 | 5 | 0 | 0 | 17 | 17 | 6 | 53 | 13 | 3 | **187** |
| May | 52 | 26 | 51 | 10 | 2 | 0 | 3 | 17 | 15 | 5 | 53 | 13 | 3 | **198** |



COMPLIANCE REPORT # 23

48

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **June** | 44 | 23 | 53 | 15 | 5 | 0 | 1 | 12 | 24 | 9 | 53 | 16 | 5 | **216** |
| **July** | 30 | 13 | 40 | 5 | 6 | 0 | 4 | 14 | 18 | 11 | 29 | 11 | 2 | **153** |
| **Aug** | 37 | 20 | 47 | 8 | 2 | 0 | 5 | 13 | 0 | 4 | 61 | 21 | 4 | **185** |
| **Sept** | 19 | 12 | 20 | 6 | 2 | 0 | 1 | 8 | 2 | 2 | 22 | 7 | 2 | **84** |
| **Oct** | 19 | 11 | 16 | 4 | 0 | 0 | 1 | 8 | 3 | 3 | 19 | 4 | 1 | **70** |
| **Nov** | 10 | 4 | 24 | 6 | 1 | 0 | 0 | 4 | 7 | 1 | 36 | 2 | 2 | **87** |
| **Dec** | 21 | 8 | 32 | 5 | 2 | 0 | 1 | 7 | 13 | 3 | 33 | 4 | 3 | **111** |
| **Total** | **366** | **168** | **488** | **113** | **32** | **0** | **22** | **156** | **152** | **68** | **496** | **146** | **33** | **1874** |

Review of the significant incidents during the monitoring period indicates that the failure of staff to follow policy consistently continues to be a serious impediment to effective supervision of the inmates. Staff continue to leave inmates unsupervised for hours and allow them to have access to materials by which to fashion weapons and bypass the security systems including the locking mechanisms on the cell doors. Many of the inmate-on-inmate assaults occur because staff allow inmates out of their cells and leave them unsupervised, or inmates are able to manipulate the locks on their cells to open them. There are inmates who repeatedly do not follow the rules of OJC including assaulting other inmates, assaulting staff, destroying property, starting fires, smoking, possession of dangerous contraband and/or threatening self-harm. OPSO used to house many of those inmates in a high security unit but chose to abandon this practice shortly after Sheriff Hutson took office. During the compliance period, OPSO made significant strides as the locks on the cell doors which have swinging doors were replaced. All of the high-risk inmates have now been moved off of the first floor. The first floor, as indicated by the escape in May 2025, is not appropriate for the housing of high-risk inmates as the door are slider doors subject to easier manipulation. OPSO, during the compliance period, reimplemented the use of a high security specialty housing units for inmates whose behavior warrants their movement being restricted. It would be beneficial to develop individual behavioral management plans for these inmates that include specific security measures to be used when these inmates are allowed out of their cells. Such plans, if carried out routinely and consistently followed by all staff, would likely reduce the level of violence in the facility. The upgrade to the locks on two of the housing units (3C/3D) allowed for a proper high security unit to be established.

OPSO continues to not timely conduct and document security rounds (30 minutes



or 15 minutes depending on the unit) nor perform direct supervision surveillance consistent with the requirements of the Consent Judgment or OPSO policy.

Direct supervision requires surveillance of all of the inmates and cannot be properly performed by sitting behind a desk or in the control module. It requires walking around the unit, looking into the individual cells, and actively engaging with the inmates. Staffing in the housing units was observed to be inadequate throughout the OJC during the monitoring tour. A review of documentation of shift rosters confirmed that staff are often assigned to cover three posts (the two housing units and control module). Often the only person assigned is a CMT who does not have the training nor authority to conduct security checks in the housing units. This practice is particularly prevalent on the night shift. A review of the log of security checks and shift rosters reveals TMH was the one area which appeared to have sufficient staff and consistently conducted security rounds. Review of incident reports revealed that units were often unstaffed, including many mandatory posts. If staff are not present, it is impossible to make the required rounds. While there are some notations of rounds in the logbooks and on the security check form, this is insufficient proof that the security checks actually occurred and requires watching hours of video to verify. Review of video footage after an incident often reveals that security checks are not being conducted and/or inadequately conducted even if recorded in the logbook. The JCT audits security check forms with video footage but has almost exclusively performed the audits on the four housing units which the June 2024 Stipulation and Order required to be staffed all of the time. A simple review of the documentation provided indicates that there are often gaps of two or more hours in between security rounds. During the onsite monitoring visit, Monitors reviewed the logbooks. At most, in the majority of the units, an adequate security check was only performed when a physical count of the inmates took place; at most, twice in a twelve-hour shift. The rest of the "checks" were no more than looking about the housing unit without leaving the deputy station, or, even more troubling, the control station which is located outside of the housing unit. OPSO's audits found that, during the compliance period, of the required security checks, 54% were performed on the mental health unit, 76% were performed on the juvenile unit, 42% were performed on the protective custody unit, 39% were performed on the disciplinary/administrative segregation unit,



and 41% were performed on other units. In the Stipulation and Order of June 2024, the Court specifically ordered OPSO to staff four housing units (mental health (2A), youthful offenders (2C), protective custody (2D), and disciplinary (3C)). OPSO's data indicates that it has not made significant progress on staffing these four specific housing units all of the time. Even with a court order specifically stating that the four housing units are to be staff 24/7 and security checks are to be made every 30 minutes, OPSO has not consistently abided by the Court's order. The audits by JCT often found that deputies were often on the units but did not conduct the security checks. Given the level of failure to perform security checks and lack of staff assigned to direct supervision, OPSO continues to be in noncompliance with IV. A. 5. d. The most vivid example of the consequences of failure to staff housing units and to conduct security checks is the escape on May 16, 2025, where the escape went undetected at least seven hours due to the failure to assign a deputy or conduct a single security check on 1D between at least midnight and shift change.

While not specifically required by the language of the Consent Judgment, if OPSO were able to provide a reliable system to allow for rounds, by both deputies and supervisors, to be recorded electronically, it would be extremely helpful in obtaining and demonstrating compliance. Not only would it allow supervisors to quickly determine whether rounds were being conducted in a timely manner, it would allow for OPSO to audit compliance and address non-adherence. OPSO has indicated that an electronic system will be implemented in May 2026.

All twenty-four (24) of the housing units in OJC are designed for direct supervision. At the time of the drafting of the Consent Judgment the design of OJC was known. The Consent Judgment requires that staff provide direct supervision in housing units that are designed for this type of supervision. Thus, continual presence of a deputy in each housing unit at OJC and TMH is mandatory under the Consent Judgment. OPSO has taken the position that OPSO gets to determine which housing posts are mandatory and routinely does not assign mandatory staff to each housing unit. In addition, deputies are frequently absent from even the housing units designated by OPSO as mandatory. More often than not, one deputy is assigned to two or more housing units. The harm that results from not having a deputy in each pod, especially when inmates are out, is evident by the repeated serious incidents occurring when there is no deputy on the unit, including



those resulting in serious injury and/or necessitating hospital routes and the escape of May 16, 2025. Thus, IV. A. 5. e. remains in Partial Compliance.

Regarding overhead video surveillance and recording cameras for OJC (A. 5. f.), there has been a significant investment in cameras. There are two uses of the video surveillance system. One is to allow for areas to be viewed remotely from central control or elsewhere so as to detect issues when no staff is present. As learned from the escape of May 16, 2025, there is no systematic process whereby housing units which are unstaffed are viewed remotely. The other is to be able to retrieve the video footage to investigate an incident or confirm whether staff are appropriately performing tasks such as security checks, suicide watch, and housing audits. During the monitoring tour, it was discovered that OPSO could not retrieve video that was over three months old. No explanation was offered for why video footage was no longer available as it had been in the past. This not only hinders monitoring activity, but it is also likely a violation of Louisiana's law regarding public record retention. Until this issue is corrected, IV. A. 5. f. will be rated as being in Partial Compliance. Supervisors have improved on pulling video as required by the Use of Force policy. Deputies are now issued body worn cameras which is helpful as the body worn cameras provide audio in addition to video.

There were multiple transfers within the corrections division during the compliance period as the staff transferred to security assignments were in-house (transfers between IPC, OJC, and TMH). Staff who changed positions underwent a field training program. Section IV. A. 5. g. continues to be in substantial compliance.

OPSO began providing training on special management housing units to all recruits and through in-service mandatory training in 2024. Given that over 90% of the OJC security staff have received the required annual eight (8) hours of training for all of the deputies assigned to specialized units was provided, IV. A. 5. h. remains in Substantial Compliance.

OPSO assesses itself as being in Partial Compliance with IV. A. 5. i. which requires supervisors to conduct daily rounds and record them. No documentation was provided to support this assertion. In its December 2025 compliance report, OPSO claimed that captains conducted 100% of their rounds, lieutenants conducted 82% of their rounds, and sergeants conducted 40% of their rounds, but no documentation to back up these



assertions was provided and no documentation as to the other five months was provided at all. Looked at in the most favorable light, the first level of supervisors, sergeants failed to conduct 60% of their required checks. When supervisors fail to perform their required security checks, it sets an unacceptable example for the line staff. Stating the policy and asserting partial compliance without proof is insufficient. Thus, IV. A. 5. i. continues to be in non-compliance. Supervisors are required to sign off on the round sheet completed by the pod deputy, but this does not provide proof that the supervisor conducted daily rounds. OPSO is encouraged to continue the focus on supervisors' rounds and hold those who fail to conduct them accountable. As the electronic recording of security checks is implemented, supervisors should be provided with the means to electronically record their security checks.

The only proof of the daily inspections of housing units as required by VI. A. 5. j. submitted were seven days of inspection forms for October 2025 and five days of inspection forms for December 2025. Thus, VI. A. 5. j. continues to be in Non-Compliance. Proper inspections by the deputies and the supervisors would likely result in the discovery of the destruction of items that are part of the jail to fashion weapons and attempts by inmates to override the jail security systems including door locks. It is essential that the inspections be thorough and that corrective actions are taken to address the inspection findings. Training was provided on how to properly conduct an inspection. However, training without implementation is insufficient to satisfy the requirements of the provision.

Random monthly shakedowns to prevent inmates from possessing dangerous contraband are required. Proof provided indicates that the number and quality of shakedowns being conducted continues to improve. OPSO provided documentation which consisted of the results of unit shakedowns and incidents involving contraband. The data provided would indicate that there were units that were not shaken down at all during the compliance period, or, at most, shaken down once. The data provided did allow the Monitor to conclude that OPSO remains in Partial Compliance with A. 5. k.  Most of these were conducted by the ISB or the SRT. There continues to be significant incidents involving contraband including the manufacturing and use of weapons fashioned from the jail itself. The review of contraband reports clearly indicates reoccurring issues and



that the number of contraband incidents continue to be high. The number of drug overdoses occurring is a direct reflection of the failure to prevent introduction of illicit drugs into the facility and the failure to perform timely and appropriate searches to remove the illicit drugs. There continues to be an issue of inmates hoarding medication; particularly suboxone.  Reports demonstrate that inmates are fashioning weapons out of items in the jail which are then used to assault other inmates. Reports and the site visit reveal that inmates are smuggling in marijuana and narcotics to smoke. Some of these items come through the mail, but there is a significant issue of staff smuggling in contraband and the failure to detect narcotics being brought in by inmates following their arrest. Inmates returning from court also constitutes a source of illegal drugs. This indicates the need to analyze the data and develop a corrective action plan to reduce, if not stop, the hoarding of medication, the fashioning of weapons, and the flow of contraband into the facility. Failure to conduct shakedowns on a proactive basis is directly related to the violence in the facility.

The documentation provided for A. 5. l. includes the special population reports required, but not the list of all contraband required including the required information. Thus, A. 5. l. is now in Partial Compliance.

## A. 6. Security Staffing

*A. 6. a. OPSO shall ensure that correctional staffing and supervision is sufficient to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Facility, consistent with constitutional standards.*

> *(1)     OPSO shall achieve adequate correctional officer staffing in the following manner: Within 90 days of the Effective Date, develop a staffing plan that will identify all posts and positions, the adequate number and qualification of staff to cover each post and position, adequate shift relief, and coverage for vacations. The staffing plan will ensure that there is adequate coverage inside each housing and specialized housing areas and to accompany prisoners for court, visits and legal visits, and other operations of OPP and to comply with all provisions of this Agreement. OPSO will provide its plan to the Monitor, SPLC, and DOJ for approval. The Monitor, SPLC, or DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.*
>
> *(2)     Within 120 days before the opening of any new facility, submit a staffing plan consistent with subsection (1) above.*
>
> *(3)     Within 90 days after completion of the staffing study, OPSO shall recruit and hire a full-time professional corrections administrator to analyze and review OPP operations. The professional corrections administrator shall report directly to the Sheriff and shall have responsibilities to be determined by the Sheriff. The professional corrections administrator shall have at least the following qualifications: (a) a bachelor's degree in criminal justice or other closely related field; (b) five years of experience in supervising a large correctional facility; and (c) knowledge of and experience in applying modern correctional standards, maintained through regular participation in corrections-related conferences or*



*other continuing education.*

(4) *Provide the Monitor a periodic report on staffing levels at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include the following information:*

    i. *a listing of each post and position needed;*

    ii. *the number of hours needed for each post and position; a listing of staff hired and positions filled;*

    iii. *a listing of staff working overtime and the amount of overtime worked by each staff member;*

    iv. *a listing of supervisors working overtime; and*

    v. *a listing of and types of critical incidents reported*

*A. 6. b. Review the periodic report to determine whether staffing is adequate to meet the requirements of this Agreement. OPSO shall make recommendations regarding staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

<u>Findings:</u>

A. 6. a.  Non-Compliance

A. 6. b.  Partial Compliance

<u>Observations:</u>

The level of staffing assigned is extremely insufficient to adequately supervise inmates and allow for the safe operation of the facility; especially on the night shift and on weekends. There have been insufficient security staff over the past few monitoring periods, and it continues at a level where OPSO struggles to staff the facility and cover basic functions. OPSO's staffing reports document that some mandatory posts (particularly the four housing units for which there is a specific court order) are being filled on a more consistent basis, but not at a level to warrant partial compliance. Numerous incident reports and investigations reveal posts were not constantly staffed, which resulted in a high rate of violence and allowed the escape of May 16, 2025, to occur and go undetected for over seven hours. OPSO has now put in place the Emergency Staffing and Augmentation Plan (ESAP), which has resulted in staff being available for medical escorts and attorney visitation. The ESAP has not directly resulted in increased coverage of the housing units, but, when used appropriately, has freed up the staff assigned to the housing units from having to do escort duties. While OPSO has updated its staffing plan, a significant portion of the positions detailed in it are vacant. The deployment of staff is sufficiently inconsistent and insufficient to result in IV. A. 6. a. (1) and IV. A. 6. a. (2) continuing to be in non-compliance. For the monitoring period, there was a Chief of Corrections whose background, education, and experience fulfilled the requirements of provision IV. A. 6. a. (3). Thus, it is in substantial compliance. Paragraph



IV. A. 6. a. (4) is in substantial compliance, as monthly reports are produced to document the hiring and termination of employees. The Stipulated Agreement also provides for bi-monthly reports regarding hiring. Paragraph 7. a. of the Stipulated Agreement of February 11, 2015, requires monthly reporting. Given the improvement shown in the implementation of the staffing plan through the use of overtime and the ESAP, A. 6. a. is in Partial Compliance, but the continued implementation of an adequate staffing plan will be required to maintain that status.

OPSO has now provided a periodic review of the staffing plan. What has not been provided are the recommendations to the Monitor as to how OPSO will enact the staffing plan given that a significant portion of the positions detailed in the staffing plan are vacant. Section A. 6. b. remains in partial compliance. OPSO has provided some compelling data as to the inadequacy of salaries. The Monitors suggest that this data be reflected in the recommendations and be provided to the Monitors and the New Orleans City Council as it is the funding agency for OPSO. The Monitors also suggest that OPSO consider the mandating of overtime for OPSO staff who are not assigned to OJC to work at OJC.

## A. 7. Incidents and Referrals

*A.7.a.   OPSO shall develop and implement policies that ensure that Facility watch commanders have knowledge of reportable incidents in OPP to take action in a timely manner to prevent harm to prisoners or take other corrective action. At a minimum, OPSO shall do the following:*

*A.7.b.   Continue to ensure that Facility watch commanders document all reportable incidents by the end of their shift, but no later than 24 hours after the incident, including prisoner fights, rule violations, prisoner injuries, suicide attempts, cell extractions, medical emergencies, found contraband, vandalism, escapes and escape attempts, and fires.*

*A.7.c.   Continue to ensure that Facility watch commanders report all suicides and deaths no later than one hour after the incident, to a supervisor, IAD, the Special Operations Division, and medical and mental health staff.*

*A.7.d.   Provide formal pre-service and annual in-service training on proper incident reporting policies and procedures.*

*A.7.e.   Implement a policy providing that it is a disciplinary infraction for staff to fail to report any reportable incident that occurred on his or her shift. Failure to formally report any observed prisoner injury may result in staff discipline, up to and including termination.*

*A.7.f.   Maintain a system to track all reportable incidents that, at a minimum, includes the following information:*

*(1)      tracking number;*
*(2)      the prisoner(s) name;*
*(3)      housing classification and location;*
*(4)      date and time;*
*(5)      type of incident;*
*(6)      injuries to staff or prisoner;*
*(7)      medical care;*
*(8)      primary and secondary staff involved;*
*(9)      reviewing supervisor;*
*(10)     external reviews and results;*



      *(11)     corrective action taken; and*
      *(12)     administrative sign-off.*

*A.7.g.  Ensure that incident reports and prisoner grievances are screened for allegations of staff misconduct, and, if the incident or allegation meets established criteria in accordance with this Agreement, it is referred for investigation.*

*A.7.h.  Provide the Monitor a periodic data report of incidents at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A.7.i. The report will include the following information:*
      *(1)     a brief summary of all reportable incidents, by type and date;*
      *(2)     a description of all suicides and in-custody deaths, including the date, name of prisoner, and housing unit;*
      *(3)     number of prisoner grievances screened for allegations of misconduct; and*
      *(4)     number of grievances referred to IAD or SOD for investigation.*

*A.7.j.  Conduct internal reviews of the periodic reports to determine whether the incident reporting system is ensuring that the constitutional rights of prisoners are respected. Review the quarterly report to determine whether the incident reporting system is meeting the requirements of this Agreement. OPSO shall make recommendations regarding the reporting system or other necessary changes in policy or staffing based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

A. 7. a.  Partial Compliance

A. 7. b.  Partial Compliance

A. 7. c.  Substantial Compliance

A. 7. d.  Substantial Compliance

A. 7. e.  Partial Compliance

A. 7. f.  Substantial Compliance

A. 7. g.  Substantial Compliance

A. 7. h.  Substantial Compliance

A. 7. i.  Substantial Compliance

A. 7. j.  Substantial Compliance

Observations:

      OPSO has long had a policy on incidents and referrals that sets out the process for documenting and referring incidents. What has been lacking is a sufficient process to ensure all reportable incidents are being documented and that all incident reports are complete, prompt, and accurate. Watch commanders are required to be notified of any incident occurring and document the incident in their shift log. However, review of the routes of inmates and medical clinic walk-in logs indicates that a number of incidents are not resulting in an incident report or inclusion in the shift log. Whether that is because the watch commander is not being made aware of the incident or is aware and is failing to



record it is unclear. However, it occurred during the monitoring period with sufficient regularity to warrant a reduction in the rating to Partial Compliance of A.7.a. OPSO has been repeatedly warned that a corrective action plan addressing the issue would be necessary to maintain substantial compliance. No such corrective action plan was developed or implemented.

OPSO implemented a process where an OPSO staff member reviewed the "routes" of inmates with serious medical or trauma injuries to the hospital emergency room and the OPSO clinic walk-in logs and compared them to the reports received. The sergeant assigned did not do the review adequately, if at all, during the compliance period. The excuse was that she did not receive the logs from the medical contractor. No explanation as to why she and/or her supervisor failed to follow up was provided. The lack of review and follow-through on items found to be unreported results in IV. A. 7. b. remaining in partial compliance. Having a process for capturing incidents for which no reports were written is absolutely essential.

During this reporting period, several attempts at suicide were reported within an hour to the proper persons; thus IV. A. 7. c. is in substantial compliance. Documentation on preservice training and annual training on report writing was provided; IV. A. 7. d. is in substantial compliance.

OPSO still does not consistently hold supervisors and security staff accountable for the late reports. Documentation of discipline for a variety of rule violations was provided but not organized in a way for the Monitor to determine if any staff were disciplined for not timely filing incident reports. A spreadsheet of the Internal Affairs Division, which was produced as documentation for another provision, but it appears to be incomplete. OPSO's own documentation indicates that reports are often not timely filed. Failure to consistently hold staff accountable results in IV. A. 7. e. continuing to be in partial compliance.

OPSO has transitioned to the AS 400 system to track the information required in IV. A. 7. f.  and is in substantial compliance. OPSO runs the risk of this provision being downgraded to partial compliance due to the high number of reports that are misclassified. After the compliance period, the new Jail Management System was implemented. The Monitor is very concerned that the new system does not provide the



required data in the reports provided to the Monitor.  The analysis is still inadequate and often does not result in measures which would correct the problem being identified. The next step is utilizing the analysis to make required changes in policy and procedure. OPSO remains in substantial compliance with A. 7. g.; incidents and grievances are reviewed for misconduct and referred for investigation where appropriate. The Monitors were provided with a semi-annual report of incidents that now, with the supplementation by the daily/weekly reports, contains all of the required information and, thus, IV. A. 7. h. and i. are in substantial compliance. OPSO performed an assessment of whether the reporting system meets the requirements of the Consent Judgment and is given substantial compliance for IV. A. 7. j. as OPSO is now beginning to address the lack of timeliness.

## A. 8.  Investigations

*A. 8. a. Maintain implementation of comprehensive policies, procedures, and practices for the timely and thorough investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement. Investigations shall:*

> (1) *be conducted by persons who do not have conflicts of interest that bear on the partiality of the investigation;*
>
> (2) *include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and*
>
> (3) *include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.*

*A. 8. b. Continue to provide SOD and IAD staff with pre-service and annual in-service training on appropriate investigation policies and procedures, the investigation tracking process, investigatory interviewing techniques, and confidentiality requirements.*

*A. 8. c. Ensure that any investigative report indicating possible criminal behavior will be referred to IAD/SOD and then referred to the Orleans Parish District Attorney's Office, if appropriate.*

*A. 8. d. Provide the Monitor a periodic report of investigations conducted at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement.*

*A. 8. e. The report will include the following information:*

> (4) *a brief summary of all completed investigations, by type and date;*
>
> (5) *a listing of investigations referred for administrative investigation;*
>
> (6) *a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and*
>
> (7) *a listing of all staff suspended, terminated, arrested, or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.*

*A. 8. f. OPSO shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:



A. 8. a.  Partial Compliance

A. 8. B.  Partial Compliance

A. 8. c.  Partial Compliance

A. 8. d.  Partial Compliance

A. 8. e.  Partial Compliance

A. 8. f.  Partial Compliance

Observations:

The Investigative Services Division (ISB) is responsible for: the Criminal Investigation Division (investigates possible criminal activity by inmates), Internal Affairs Division-Criminal (investigates possible criminal activity by staff), the FIT (investigates use of force by staff), the Internal Affairs Division-Administrative (investigates possible violation of policies by staff), and the Intelligence Unit (provides information and intelligence regarding activities that have taken place or may take place in the jail or support activities).

The timeliness and the quality of the investigations produced by ISB was sporadic during this compliance period. There continue to be FIT investigations finalized without having interviewed any witnesses and relying on short self-serving statements by the deputy involved. There were several serious incidents involving inmates where the investigation was extremely limited and then closed because the inmate victim declined to cooperate. Also of serious concern was the assignment of investigators to investigations who had conflicts of interest which could be perceived as bearing on their impartiality in the investigation. Thus, IV. A. 8. a., remains in partial compliance.

The Monitor acknowledges that investigating incidents of inmate-on-inmate assaults, sexual assaults, staff on inmate assaults, etc. with a goal of seeking indictments is appropriate. Inmates should be held accountable when they commit criminal acts while in the jail facility. The same holds true for staff who commit criminal acts whether it be the smuggling of contraband or assault on inmates. The overall goal is to create a safe jail. In a jail setting, investigations play a critical role in protecting inmates from inappropriate and/or illegal staff actions, protecting inmates from each other, protecting staff from inappropriate and/or illegal inmate actions, and ensuring policy is followed. Continued emphasis is needed on the goal of investigations to prevent future incidents through



analysis of the policy, procedures, training, supervision, and physical plant contributors to the incident. This function cannot and should not be performed by ISB alone. Also, troubling is how seldom does ISB recognizes the other factors which contributed to an incident such as failure to follow policy and/or includes them in the investigation reports. The collaboration between ISB and OJC and the opportunity to address the root causes of incidents appeared to digress during the compliance period and continued to have room for improvement.

ISB did not provide documentation regarding training during CY 2025. The Monitor is aware of past training, but due to the failure to provide current training, the rating of IV. A. 8. b. has been reduced to partial compliance.

Documentation as to what investigation revealed possible criminal activity by staff and whether they were referred to the Orleans Parish District Attorney's Office was not provided. The Monitor is aware of some of the cases due to having received notification of the arrest of staff members for misconduct, but not able to determine if all were referred, Thus, the rating of A. 8. c. has been reduced to partial compliance. The Monitors remain concerned about the frequent refusal by the district attorney to follow through with filing cases related to indecent exposure by inmates towards staff and assaults on staff due to the throwing of urine and feces by inmates on staff. ISB did not provide reports in substantial compliance with IV. A. 8. d., e. and f. What was provided was incomplete; particularly the report regarding investigation by the Internal Affairs Unit. Providing spreadsheets which are often incomplete is not sufficient for substantial compliance. Thus, the rating IV. A. 8. d., e., and f. are in Partial Compliance.

### A. 9. Pretrial Placement in Alternative Settings

*A. 9. a. OPSO shall maintain its role of providing space and security to facilitate interviews conducted pursuant to the City's pretrial release program, which is intended to ensure placement in the least restrictive appropriate placement consistent with public safety.*
*A. 9. b. OPSO shall create a system to ensure that it does not unlawfully confine prisoners whose sole detainer is by Immigration and Customs Enforcement ("ICE"), where the detainer has expired.*

Findings:

A. 9. a.  Substantial Compliance

A. 9. b.  Substantial Compliance

Observations:

OPSO provided a memorandum noting that the pretrial program is managed by



the Criminal District Court, and that space is provided. OPSO also provided a memorandum that ICE detainers are only accepted for a specified list of offenses. OPSO maintained that it did detain any individuals under an ICE detainer during the compliance period. It does appear that one individual was released to ICE but was held under DOC authority. The memos are dated January 10, 2026, and signed by the Chief of Staff.

## A. 10. Custodial Placement within OPSO

Introduction:

OPSO designed and validated an objective classification system to assess and house OPSO inmates according to their threats to institutional safety and security. The automated classification system was implemented on January 15, 2015.[1] The 2024 OPSO draft staffing plan set the classification unit staffing at 21 FTEs.[2]

As of December 31, 2025, the Classification Unit's staffing comprised one classification manager, three shift supervisors, and nine classification specialists.[3]

All staff members have been given NCIC clearance and passwords. Nonetheless, the accounts/logins of three staff members were suspended because they were on leave or had lost their passwords. NCIC coverage is not available for the 1st Platoon, Squad A. However, as the criminal history records were included in the classification intake folders, information required to review the rap sheets and input any relevant attachments were available to Squad A.

An automated housing assignment process (HUAP) identifies housing options for inmates based on their custody level, gender, special population status, PREA designations, enemies, and associates. Special population tags identify individuals for suicide observation, suicide watch, medical housing/isolation, academic education, or special diets. (As needed, men with acute mental health or medical needs go directly to 2A or 2B, respectively. Individuals identified for suicide watch and female youthful

---

[1] Hardyman, Patricia L. (2015). "Design and Validation of an Objective Classification System for the Orleans Parish Sheriff's Office: Final Report." Hagerstown, MD: Criminal Justice Institute, Inc.

[2] Mallett, Jeworski. (February 8, 2025). "Orleans Parish Jail Post & Coverage Plan– February 8, 2025" Orleans Parish, LA: Office of the Sheriff. Page 2 of 12.

[3] During the Fall of 2022, OPSO created the option or the classification staff to become deputy recruits. Two individuals opted to remain civilian classification specialists, the remaining nine are "recruits." For the purposes of this report, the classification line staff are referred to as "Classification Officers" and the shift supervisors are referred to as "Shift Supervisors."



offenders are housed in TMH.) As of October 20th, OPSO converted the roll-in to general population pods.  Following the initial classification, the classification specialist assigns the individual to a general or special population pod based on the individual's custody level, PREA designations, age, and needs (medical, mental health, protective custody, or administrative segregation status).

With the elimination of Roll-In pods in October, we anticipated that wait times between booking and movement from IPC to an OJC/TDC/TMH bed would decrease. During this Compliance Period, the IPC transfer time was 23.1 hours. During the previous Compliance Period, the wait time was 33.5 hours.

The OPSO automated housing process assigns enemies and associates to separate pods to prevent institutional violence and disruption. While tension between the Classification Unit, security, and ISB staff appears to have diminished, security and ISB staff remain reluctant to share information with the Classification Unit regarding neighborhood cliques, gang involvement, enemies, associates, and other housing-separation requirements. Acquiescence to inmates' requests to move to reside with their associates or to accommodate security staff's "suggestions" for inmate moves continues unabated. In fact, the housing audit reports suggest the number of security-initiated moves increased during this Compliance Period.  Classification staff routinely accepts the security staff's suggestions and inmate requests with little to no analysis to determine whether inmates are attempting to manipulate their housing assignments or whether staff are avoiding problematic inmates.

Use of "ALL" custody and PREA designations continues to apply to the special population units, including Mental Health (Acute and Sub-Acute), Protective Custody, Disciplinary, Segregation, and Medical. The OJC pods for housing women (1C and 1D) are "ALL" custody and PREA designations."[4] Adherence to the custody and PREA designations during the out-of-cell times is vital. The short-term tradeoff of the custody and PREA separations creates more violence and disruption in the long term. With the recent increase in the OPSO population, most OJC pods are operating at capacity. The exception is the OJC 2C (male, youthful offenders).[5]  The number of men assigned to the

---

[4] As previously noted, TDC B3-E houses minimum custody women with no immediate medical or mental health needs and at low-risk for institutional predation and vulnerability (Non-Victims/Non-Predators).
[5] In mid-April 2024, OJC 2-C became the youthful offender pod (i.e., males less than or equal to 17 years.) The



mental health stepdown (MHSD) pod decreased during this review period.  During this review period, the ADP of men identified as needing MHSD services was 40.2, compared to 48.6 during the previous six-month period (January – June 2025).  As of December 31, 2025, 25 of the 58 MHSD beds (OJC 2B) were empty.

OPSO reduced it use of TDC B-4E as an over-flow unit for minimum custody men. (As of July 1, 2025, the pod housed 56 inmates. By December 31st, TDC B-4E housed only 22 inmates (43 vacancies)). As both TDC dorms (B3-W and B4-E) house low/medium custody, non-victim/non-predator (NV/NP) men, to maximize its limited staffing, OPSO might consider combining these two dorms. On the other hand, B3-E houses low- to medium-custody women, NV/NP. As of December 31, 2025, B3-E housed only 18 women (ADP was 28.2). Thus, while B3-E is underutilized, if B3-E were closing and the women moved back to OJC, it would quickly overcrowd the two OJC female pods (1C and 1D). Further, housing women of all custody levels and PREA designations into two pods would create greater risks for the low-risk women (i.e., low/medium custody, NV/NP). One option would be to move some of the low-risk women currently housed in OJC to TDC B3-E.

During this Compliance Period, the classification day-shift supervisor circulated a daily housing matrix with the current OJC, TMH, and TDC populations. The matrices reflect fluctuations in the OPSO population. Isolation for COVID-19 was relatively rare. According to the OPSO Special Population Reports for the period from July 1, 2025, to December 31, 2025, two male residents were identified as having COVID-19. (COVID-19 patients were transferred to TDC to minimize the spread of the virus throughout the system.)

IPC staff rely on the custody and PREA assessments completed by the Classification Unit to assign individuals in the IPC/Booking area to holding cells for sleeping and lockdown during counts. IPC staff assign known predators, high/maximum custody, and individuals with isolation or mental health needs to cell 1026, 1025, 1032, or 1033. Known predators/victims, high/maximum custody, medical isolation, and individuals with mental health needs are assigned to cells 1026, 1025, 1032, and 1033.

---

youthful offender pod reduced housing options for adults. (During this compliance period, the average daily population of youthful offenders was 23.4.)



A review of the housing rosters indicated that staff did not always adhere to these rules. Some housing rosters indicated that high, medium, and low custody individuals were assigned to the same IPC cell.  OPSO did not establish a standardized capacity rating for the IPC holding cells during the monitoring period.  At best, the "larger" IPC cells (i.e., 1029, 1030, 1031, and 1037) accommodate seven to ten individuals. Inmates are forced to sleep on the floor, often without a mattress. There is only one cell (1013) for low- and medium-custody women.  Unclassified individuals, as well as those awaiting a medical or mental health assessment, are directed to the holding cells.

In light of the continued increase in the OPSO population, OPSO has explored various population management strategies.  During the first six months of 2025, on average 41 OPSO inmates were housed out of parish (OOP).[6]  In contrast, during the latter half of 2025, on average, 63.5 inmates were housed out of the parish. While placing inmates out of the parish provides flexibility, the OPSO must continue to monitor and enter any status changes (e.g., criminal charges, warrants, bonds) and disciplinary infractions among out-of-parish populations into its JMS.  These data are essential for ensuring the accuracy of the individuals' custody, vulnerability, and predation designations on their return to OPSO custody.

During this Compliance Period, the Classification Unit conducted housing audits to verify the integrity of the housing assignments designed by the Classification staff. However, staff did not complete monthly audits for all OPSO housing units. Further, many audit reports were incomplete or unclear.

Assessment Methodology:

Compliance was assessed using multiple data sources and activities, including a review of the OPSO and JMS daily population, classification statistical reports and data files, housing matrices, and staffing rosters. The OPSO documents included monthly statistical and protective custody status reports. Analyzed were custody assessment, override, attachment, and enemy refusal data downloaded from the AS400. The statistical reports tracked pending custody assessments, daily population and IPC counts, placement

---

[6]OOP housing included Plaquemines Parish, Saint Charles, Saint James, Saint Tammany, Jefferson Parish, LA DOC, and Hunt/Hank. The increase in the number of OOP inmates was due, at least in part, to the escape of 10 inmates from OJC in May 2025. Upon their re-arrest, the escapees, as well as the individuals charged with aiding the fugitives, were housed outside the Parish.



errors, the stock population, and monthly custody trends. Our January 12 to 15, 2025, on-site activities included:

- Meetings with OPSO classification and facility administrative staff;

- Review of video footage of administrative reviews;

- Review of OJC security videos of housing audits; and

- Examination of the protective custody placement and status reports.

The reviews primarily focused on the Classification Unit's activities and data from July 1, 2025, through December 31, 2025. Some analyses examined trends over 12 to 24 months to identify fluctuations due to seasonal variation.

Summary:

OPSO substantially complies with three of the eight Custodial Placement sections of the Consent Judgment (Sections b, g, and h). Sections a and c are rated as Partial Compliance. Sections d, e, and f are rated as Non-Compliance.

Findings:

A. 10. a.  Partial Compliance

A. 10. b.  Substantial Compliance

A. 10. c.  Partial Compliance

A. 10. d.  Non-Compliance

A. 10. e.  Non-Compliance

A. 10. f.  Partial Compliance

A. 10. g.  Substantial Compliance

A. 10. h.  Substantial Compliance

***IV.A.10. a. OPP shall implement an objective and validated classification system that assigns prisoners to housing units by security levels, among other valid factors, in order to protect prisoners from unreasonable risk of harm. The system shall include consideration of a prisoner's security needs, the severity of the current charge, types of prior commitments, suicide risk, history of escape attempts, history of violence, gang affiliations, and special needs, including mental illness, gender identity, age, and education requirements. OPSO shall anticipate periods of unusual intake volume and schedule sufficient classification staff to classify prisoners within 24 hours of booking and perform prisoner reclassifications, assist eligible DOC prisoners with re-entry assistance (release preparation), among other duties.***

Finding:

Partial Compliance

Observations:



Compliance with Section IV.A.10. a. remained in Partial Compliance during this review period.  During this Compliance Period, Unit staffing included one classification manager, three shift supervisors, and nine classification specialists. The shift supervisors oversee the classification specialists, process housing transfers, complete custody reviews, conduct housing audits, and address classification-related grievances. The classification specialists complete custody and predation/vulnerability (PREA) assessments and assign inmates to pod and cell accordingly. The Classification Manager oversees the housing audits, reviews protective custody/administrative segregation placements, assesses the accuracy of custody assessments, and conducts monthly training for Classification Unit staff.  The classification manager was on leave in October and November; she left the position in December.  Thus, for most of the compliance period, the classification manager position was vacant.  (An interim classification manager was appointed in the last week of December.)  In addition, two classification specialists resigned, and one was placed on temporary leave. Thus, staffing was unstable during this compliance period.

Section A. 10. a. is rated as Partial Compliance for two reasons:

1) **Housing Matrix:** The elimination of Roll-In pods in October was a significant step forward because it shifted initial classification housing assignments to inmates' needs and risks rather than "status."  The special population pods (Mental Health, Medical, TMH, TDC, Disciplinary, Segregation, and female units) comprise the classification system. The OPSO matrix allows for all custody levels and PREA statuses within these pods. According to the December 31, 2025, Housing Matrix, 11 of the 32 OPSO living units housed individuals across all custody levels, vulnerabilities, potential for predatory behavior, and special population statuses.

    The TMH treatment teams assign patients to cells according to their mental health needs with little regard for their custody or PREA status. (Known enemies live in separate pods.) The "treatment level" determines the housing assignments, activities, and out-of-cell times. While this practice may support the individuals' treatment plans, the classification system is compromised.



Given the size and configuration of the OJC and TDC/TMH, we recognize that pods with multiple custody levels and PREA designations are unavoidable. However, OPSO appears to favor "ALL CUSTODY ALL STATUS" pods despite inadequate security staffing and out-of-cell schedules that allow for mixing high-risk inmates. Of particular concern was the failure of special-population units to maintain separations for out-of-cell activities.

OPSO installed new cell locks and food ports and revised the housing matrix accordingly. High-risk/high-custody inmates were relocated from the first floor to the second and third floors. The administrative segregation and protective custody policies were revised. Pod 3-C now houses inmates in administrative segregation or disciplinary status. Revisions to the OJC housing matrix included:

| Pod | Previous Mission | Custody | Current Mission | Custody |
|-----|------------------|---------|-----------------|---------|
| 1A | Male Roll In | Med/High | Male General Population | Low/Med |
| 1B | Male Roll In | Low/Med | Male General Population | Low/Med |
| 1D | Female – Roll-Ins | All | Female General Population | All |
| 1E | Male Roll In | Low/Med | Male General Population | Low/Med |
| 2D | Male General Population | Low/Med | Male General Population | Med/High |
| 2F | Male General Population | Low/Med | Male Protective Custody | All |
| 3A | Male General Population | High | Male General Population | Low |
| 3D | Male Disciplinary | Med/High | Male General Population | Med/High |
| 3F | Male General Population | Med/High | Male General Population | High |

2) **Classification staff control of housing assignments**: The housing audits completed during this Compliance Review Period indicated an increase in the number of inmates not in the cell or bunk assigned by the classification staff. (For a detailed discussion of the housing audit process and findings, see section IV. A. 10. f. of this report.) However, the custody assessment and housing comments indicated that the security staff directed housing assignments by repeatedly calling or emailing to specify the pod and cell to which an inmate should be assigned, or by moving inmates without notifying the Classification Unit. Despite an average daily population of 42 individuals, PC placement and reviews were not conducted during October–December 2025. While OPSO created folders to document PC placement



COMPLIANCE REPORT # 23                                    68

and inmate reviews regarding PC status as of the end of December, no in-person reviews were conducted.  Documentation of the reason(s) and investigation of the risks associated with the individual's vulnerability were missing from most of the "new/undated" protective custody files.  OPSO still did not know why the individuals were in protective custody. This is unacceptable and likely to result in security staff and inmates continuing to manipulate housing assignments, facilitating gang/clique activity and inmate-on-inmate violence.

The new Classification Manager, once appointed, must work closely with other OJC Divisions to facilitate information sharing and build trust. As the OPSO rebuilds the Classification Unit, it should consider strategies for using the security staff's knowledge of local cliques, checking in with inmates during their rounds or audits, and addressing inmate grievances.

***A.10.b. Prohibit classifications based solely on race, color, national origin, or ethnicity.***

Finding:

Substantial Compliance

Observations:

The custody assessments consider objective risk factors validated for OPSO male and female inmates. The individual's race is not among these objective risk factors. Classification specialists consider the individual's custody level, vulnerability designation, age, and charges to select a cell and bed from those identified by the JMS automated housing program as appropriate for the individual. To track this element of the Consent Judgment, OPSO created a monthly statistical report that records the race and gender of individuals by housing location.

The OPSO "Housing By Race" reports suggested that race was not a factor in OJC general population housing assignments. With a few exceptions, the number of Black and white inmates in each OPSO general housing unit was consistent with the overall racial distribution among the OPSO inmate population. By contrast, the racial distribution across the special population units has not always reflected the OPSO population (see Figures 1 and 2). The proportion of Black males within the total male inmate population has remained relatively constant. Between October 2024 and December 2025, 86.6% of



the male OPSO population identified as Black. However, as shown in Figure 1, the percentage of Black males assigned to the special population pods fluctuated during this review period. Furthermore, as illustrated in Figure 2, the average percentage of Black males assigned to a special population pod exceeded the overall percentage of Black males within the OPSO population for each month during this Compliance Period. Notably, the percentage of Black males transferred out-of-parish (OOP) increased. In October 2024, only 83.3% of the OOP male inmates were Black; by December 2025, 95.0% of the OPSO male inmates housed out-of-parish were Black.



Figure 1: Percentage of Black Males Assigned to Special Population Units – Oct 2024 – December 2025.



Figure 2: Percentage of Black Males Assigned to Special Population Units vs. OSPO Male Black Population – July 1, 2025 – December 31, 2025 (DIS = Disciplinary Pod; TMH = Temporary Mental Health; OOP = Out-of-Parish; Honor = Honor Dorm (4C); and PC = Protective Custody.)



*A.10.c Ensure that the classification staff has sufficient access to current information regarding cell availability in each division.*

Finding:

Partial Compliance

Observations:

The OPSO automated housing assignment process (HUAP) considers an individual's custody level, gender, special population status, PREA designations, enemies and associates, and available OJC beds to recommend an appropriate bed assignment. Housing tags identify inmates on suicide observation, suicide watch, medical, mental health, alcohol/drug detoxification protocol, gang affiliation, special diets, and school participation. With the absence of a classification manager for much of this compliance period, the designated mission/per pod within the AS400 was not updated routinely to match the hardcopy housing matrix.   With the multiple changes to the housing matrix, the mismatch created questions and confusion as the mission of the respective OJC pods.

The OPSO daily population report lists the units, cells, and beds offline for maintenance or staffing, as recorded in the AS400. The reliability of the AS400 data for cells/pods offline within the housing module has improved. However, the classification staff rely on maintenance reports from security and maintenance staff. The current matrix was posted in the work areas of the classification specialists. The specialists reported receiving a daily email copy of the matrix.  Two notices listing pods to which the specialists were NOT to assign inmates were posted in the classification specialists' work area. Neither notice was dated. When asked about the contradictory lists, the classification manager/shift supervisor was unable to identify the date or source of the postings.

Classification specialists track all pending bed assignments to prevent housing errors due to delays between the inmate's housing assignment and the physical transfer of the individual to the designated pod/cell. These manual lists and notes direct the housing assignments. Overall, during this compliance review period, the classification staff had access to automated and manual information regarding current bed availability throughout OJC, TDC, and TMH.

As previously noted, three of the classification staff members lack the required clearance and passwords to access the NCIC and Louisiana criminal record systems. NCIC coverage is unavailable for the 1st platoon, Squad A. Classification staff indicated that the



full rap sheets are available in the classification folders. For initial classification assessments, classification specialists review these rap sheets in the folders and verify the NCIC system for out-of-state convictions. Classification staff did not have access to the Louisiana criminal record system during September and October due to the cyberattack.

*A. 10. d. Continue to update the classification system to include information on each prisoner's history at OPSO.*

Finding:

Non-Compliance

Observations:

As shown in Figure 3, the monthly custodial reports provided by OPSO indicated:

- **Percent Initial Custody Assessments**: During this Compliance Period, the Classification Unit completed initial custody assessments for 82.0% of the inmates booked into OJC. This rate is a marginal decrease from that observed for the previous Compliance Review Period (84.7%).

- **Percent Within 8 Hours:** During this Compliance Period, the percentage of initial classifications completed within the first eight hours of booking ranged from 20.8% (July) to 83.5% (December). During this Compliance Period, the initial custody assessment was completed within eight (8) hours for only 50.0% of individuals. Staff completed the custody assessment within 8.01 - 24 hours for 23.5% of individuals. During this Compliance Period, nearly three-quarters (76.0%) of detainees remained in the booking area for 24 hours before the initial custody assessment was completed. Given the OPSO classification policy to complete the initial custody assessment within eight hours of the individual's booking, the expectation is that 95% of initial assessments will be completed within **eight** hours of booking. Thus, while OPSO rebounded from 20.8% (July) to 83.5% (December), the completion rate fell short of the standard set based on OPSO policy.





*Figure 3: Rates and Completion Time for Initial Custody Assessments Completed January 2024 – December 2025*

The OPSO Areas of Non-Compliance Action Plan (dated 6/12/2024 at 9:55 PM) requires staff to "Ensure that initial custody assessments are completed within the first 8 hours of booking for at least 95% of residents." Even if this standard had been achieved, completing the "initial custody assessments" within the first eight hours of booking addresses neither the long "wait times" in IPC/Booking nor the failure to maintain adequate separation and service of individuals within the IPC/Booking cells. The initial classification process provides the custody and PREA designations to the IPC staff. However, OPSO must address the process by which individuals are: 1) assigned to the IPC/Booking cells to ensure separations by custody and PREA designations; and 2) monitored and prioritized for beds and services to expedite transfers from IPC to a "long-term" bed. The average wait time from booking to transfer to an OJC housing location is 23.1 hours. However, nearly 40% (39.8%) of individuals booked into IPC remain in the Booking area for 24 hours or longer. Unclassified, high, medium, and low custody individuals were housed together in the relatively small IPC cells, and high-risk/needs individuals languished with minimal services and supervision. (See Figure 4 for the monthly OPSO bookings between January 2024 and December 2025.)



COMPLIANCE REPORT # 23

73



*Figure 4: Number of OPSO Bookings Per Month – January 2024 – December 2025*

The rationale for scheduling or clustering cells for joint out-of-cell times remains unclear. Security staff reported exchanging information regarding intra-pod conflicts and tensions. All agreed that intelligence sharing is essential for identifying and maintaining inmate separations. However, neither the security nor ISB staff share intelligence regarding these local "cliques" and conflicts with the Classification Unit, except as ad hoc requests for housing transfers. The simple statement, "ZZZZ XXX can't live on this pod." does not provide the classification staff with sufficient information to place the individual in a different housing unit. Thus, the transfer process is repeated again and again, multiplying the workload for the limited classification and escort staff.

Regardless of the staffing patterns, pod mission, and schedules, the sub-standard practice of mixing custody/vulnerable inmates during out-of-cell activities must be discontinued as soon as possible, particularly within the high-risk pods, i.e., mental health, protective custody, and youthful offenders.  A straightforward option is to list the custody level and key separation tags on the housing rosters. Furthermore, adherence to housing assignments by the Classification Unit is crucial for maintaining inmate separations and institutional safety and security.

**Custody Overrides:** Previous compliance reports have highlighted the risks associated with overriding the scored custody levels for housing purposes. As shown in Figure 5, during the Compliance Period from October 2024 to December 2025, the most



frequently cited reason for a discretionary custody level override was to transfer "Potential Victim/Potential Predators" from Minimum to Medium custody. As shown in Figure 5, during this Compliance Period, 78% of the overrides resulted in individuals being moved from minimum to medium custody due to their "Potential Predator" or dual status as both Potential Predator and Potential Victim.  The other frequently cited reason for overriding the scored custody level was "Security." These overrides included individuals with serious/high-profile charges, a history of escape, or DOC sentences. Nearly 20% (19.6%) of the custody overrides were for security reasons.



Figure 5: Custody Override Reasons – October 2024 – December 2025

The July 2025 – December 2025 classification stock population reports indicated that staff overrode the scored custody level for ~1.6% of the men and 1.2% of the women. (See Figure 6.) These rates are significantly lower than the recommended range of 5 - 15 percent.[7]  As shown in Figure 5, most of the overrides were related to the individual's PREA status. Continued tracking of the discretionary overrides for housing purposes remains essential as the ADP increases.

On the other hand, as shown in Figure 6, the percentage of custody assessments affected by a mandatory override (OPSO policy restrictions) increased slightly during this compliance period. The custody level for over 50% of inmates (men, 54.9%; women,

---

[7] Patricia L. Hardyman and Austin, James (2021). *Objective Prison Classification: A Guide For Correctional Agencies. 2nd Edition.* Washington, D.C.: National Institute of Corrections.



47.6%) was affected by one or more of the OPSO mandatory restrictors. Based on the findings and recommendations from the 2024 revalidation report, OSPO revisited its mandatory restrictions. As of the end of this Compliance Period, updates to the classification module within the JMS were delayed due to the Cyberattack. As rollout of the new JMS system is anticipated for February 2025, updates to the AS400 have been postponed.



Figure 6: Mandatory and Discretionary Override Rates by Gender: January 2024 – December 2025

**Enemy Separation Reviews:** As part of the Compliance Report #14 review, we observed housing overrides for "inmate refusal of enemies" to facilitate housing decisions. Staff dismissed inmate-to-inmate conflicts to expedite transfer requests between pods. In response to the Monitors' and Plaintiff attorneys' questions, OPSO revised its Inmate Classification Procedures (7020) to include rules for resolving an "Inmate Refusal of Enemy." These Procedures require detailed documentation of the reviews and quarterly audits to ensure the separation review process works as intended and to make recommendations for adjustments as needed. OPSO developed screens and reports in the AS400 to document and track the separation reviews as per the Inmate Classification Procedures (7020). In March 2022, the classification manager provided training on the new procedures, screens, and interview form.  The previous classification manager discontinued the use of "Inmate Enemy Refusals."  The interim classification manager has no plans for restarting the practice.



**Custody Reviews:** The Classification Monitor List (List) is an ad hoc report identifying inmates for whom a custody review is due. Custody reassessment reasons include a regular 60/90-day reassessment, a status change, or an event within their jail records, such as an amended charge(s), bail reduction, disciplinary infraction, detainer lodged/lifted, or a new sentence. The number of inmates on the list fluctuates as inmates return from court, move through the booking process, and the like. Staff are responsible for completing all pending custody reviews during their shift.



**Figure 7:   Number of Pending Custody Assessments per Month by Reason – October 2024 - December 2025**

The number of pending custody assessments vacillates daily. During this Compliance Review Period, the number of pending initial custody assessments ranged from 0 to 32; the number of pending custody reassessments ranged from 0 to 29.  Figure 7 provides the average number of initial and custody reviews/month from October 2024 through December 2025. The average number of pending custody assessments/day during this Compliance Period was – initial assessments = 6.9 and custody reassessments = 8.2. As shown in Figure 8, the number of pending assessments fluctuated, but remained relatively low. The wait time for a pending assessment ranged from .05 and 264 hours. The average wait time for the custody assessment varied by the type of assessment During this Compliance Review Period, the average wait time for an initial classification



once the name appeared on the classification monitor list was 6.6 hours. In contrast, the average wait time for a custody review was 12.9 hours.

As part of the transition of health care services from Wellpath to Wexford, OPSO and Wexford information and technology (IT) staff worked together to identify the data elements within the Wexford medical and mental health records required for scoring the PREA assessments and housing assignments, and then to rebuild the linkages between the OPSO and Wexford information systems. We verified the data exchange process as part of the onsite compliance review. The medical and mental health data required to score the PREA risk factors and track individuals on the medical and mental health caseloads are uploaded to the AS400 every 15 minutes. Thus, the data required for the initial and subsequent custody reviews and housing assignments are available.

On the other hand, data to track inmates on the mental health caseload appear unreliable. Accurate data on assaults against individuals on the mental health caseload were unavailable for this Compliance Period. As shown in Figure 8, OPSO disciplinary reports indicated that only two (4) inmate-on-inmate battery incidents involved individuals on the mental health caseload during this Compliance Period. Given the average number of inmate-on-inmate battery/assaults (16.3/month), these numbers appear to underreport the victimization of individuals on the mental health caseload. Note, these data reflect Disciplinary Code 101 (battery) and Code 102 (assault) infractions in which the perpetrator was found guilty. A review of the OPSO-reported incidents suggests a much higher rate of inmate-on-inmate assaults. (See Table 3 of this Compliance Report.)  As previously noted, OPSO, Wexford, and Beacon will need to work together to develop reliable, accurate data for tracking assaults on prisoners with mental illness.



COMPLIANCE REPORT # 23



Figure 8: Victimization of Inmates on the Mental Health Caseload - January 2024 – December 2025

Figure 9 provides the number of attachments to record criminal history data input by the classification staff between January 2024 and December 2025. Figure 10 illustrates the percentage of initial custody assessments for which an attachment was input. These data indicate that in December 2024, staff resumed inputting attachments for the custody assessments. The number of attachments input increased each month, peaking at 165 in May 2025. However, in June, an attachment was input for only 81 custody assessments. The reason for the 50% drop in June is unclear, as the number of custody assessments completed in June was slightly higher than in May 2025. (The classification staff completed 678 initial custody assessments in June vs. 663 in May 2025.)  During this Compliance Period, the number of attachments declined significantly from September through November. This was likely related to staff's limited access to computers and the internet following the cyberattack. In December, the number of attachments jumped to 180.

As previously noted, OPSO has made strides to ensure staff have access to the NCIC system, and the classification manager emphasized the importance of the attachments during the monthly classification in-service trainings. Continued monitoring of these data to ensure the classification staff systematically review the criminal rap sheets and input all non-Orleans Parish convictions in the JMS is essential.





Figure 9: Number of Attachments Input by Classification Staff – January 2024 – December 2025

Figure 10: Percentage of Initial Custody Assessments for Which an Attachment was Created – January 2024 – December 2025

The variance in the number of attachments entered per classification specialist remains a concern. The data indicated that Squad A (day shift) entered no attachments during the review period. In contrast, Squad B (day shift) entered 34.4% of the attachments. When asked about the disparity, we learned that the NCIC logins/passwords for Squad A – the classification specialist and the supervisor – were inactive. As previously noted, IPC staff include the NCIC rap sheets in the classification folders created during the booking process. Thus, Squad A had access to the rap sheets. Therefore, it was unclear why the attachments were created.



Thus, while OPSO made strides for inputting the non-Orleans criminal history required to score the custody factors, vulnerability, and predation factors: 1) all staff have access to the NCIC criminal history system, 2) the booking folders include the rap sheets, 3) multiple training sessions emphasized the importance and process for inputting attachments in the JMS; and 4) audits to double-check to verify the required attachments.[8] The number of attachments entered remains problematic. Staff entered attachments for only 14.0% of the custody assessments, and there were inconsistencies among staff regarding the number of attachments input.

The final point of concern for Section d centers on the placement and review of inmates assigned to administrative segregation or protective custody placements. As of November 6, 2025, OPSO implemented administrative segregation/restriction housing for male inmates. According to the OPSO November and December Special Population reports, six males were tagged as "ADSEG" in November and 16 in December. However, administrative segregation folders were available for only nine of the individuals tagged as "ADSEG." Of concern was the confusion about which individuals the Review Board had reviewed and placed on administrative segregation. When asked about the missing folders, we learned that some of the individuals "tagged" as administrative segregation were not placed on administrative segregation by the Administrative Review Board. Thus, it appeared that the Review Board and Security and Classification staff were not communicating or coordinating the restrictive housing placements.

The new "ADSEG" folders were a major improvement over the previous files. The folders were well organized, with separate sections for placement reasons, disciplinary history, criminal history, classification and housing, mental health, and placement/7-day reviews. Thank you.  Unfortunately, the respective sections were not complete for all individuals; for example, documentation of the placement reason(s) and the Review Board assessments was missing.  The ADSEG hearing videos were encouraging. The Review Board reviewed the placement reasons, removal requirements, and conditions of confinement with the individual. Each member — Chair, Classification, Discipline, Mental Health, and Security — contributed to the review. The only major concern was that the hearing assessment form appeared to have

---

[8] As the classification manager did not review the accuracy of the custody assessments during this compliance period, the "missing" attachments were not identified.



been designed for PC reviews; it focused on the individual's vulnerabilities rather than on the threat(s) to institutional safety and security or on a behavioral plan for release from restrictive housing.

In addition, the classification staff compiled new folders to document the Protective Custody placements and reviews for individuals on protective custody as of December 31, 2026. However, the required PC placement assessments or 7/30-day reviews were not conducted for this compliance review period. The Administrative Review Board was scheduled to restart the PC reviews during the week of January 18 – 24th.

The rating for this section (d) regressed from partial to non-compliance based on the 1) failure to conduct the protective custody reviews; 2) absence of full documentation of the use of administrative segregation; 3) number/inconsistency of the criminal history attachments; and 4) the initial custody assessment was completed within the required eight hours for only 50.0% of the individuals.

***A.10.e. Continue competency-based training and access to all supervisors on the full capabilities of the OPSO classification and prisoner tracking system.***

Finding:

Non-Compliance

Observations

Although the annual training for all classification staff was due in August, there was no documentation of any competency-based training during this compliance period. Further, there was no documentation of any in-service training meetings to address questions or issues.

***A.10.f. Conduct internal and external review and validation of the classification and prisoner tracking system on at least an annual basis.***

Finding:

Partial Compliance

Observations:

Compliance for this section focused on three types of audits: housing (checking the integrity of inmate housing assignments), internal (verifying the accuracy of custody, PREA, and housing designations), and statistical validation of the OPSO objective classification system. For this Compliance Period, Section f is rated as partial compliant



because documentation of housing audits was missing for several pods for multiple months.  Furthermore, the classification manager did not conduct monthly audits of the accuracy of the custody assessments.

**Housing Audits – Checking the Veracity of the Inmate Housing Assignments**

Documentation was provided for 61% of the required housing audits for this compliance review. July was the only month during which staff audited all OJC, TDC, and TMH pods. Audit documentation was not provided for:

| Month | Pod(s) | Auditor Comments |
|---|---|---|
| August | OJC 1 A - F | No audit documentation. |
| | OJC 3 A - F | No audit documentation. |
| | TDC | No audit documentation. |
| | TMH | No audit documentation. |
| September | TDC | No audit documentation. |
| | TMH | No audit documentation. |
| October | OJC 1 A - F | No audit documentation. |
| | OJC 3 A - F | No audit documentation. |
| November | OJC 1 A - F | No audit documentation. |
| | OJC 2 A - F | No audit documentation. |
| No audit documentation. | | No audit documentation. |
| | OJC 3 A - F | |
| | OJC 4 A - F | No audit documentation |
| December | TDC | No audit documentation. |
| | TMH | No audit documentation. |

During this Compliance Period, the absence of security staff (deputy or supervisor) did not appear to be a major barrier, as a few of the audit reports indicated "No Deputy" but also provided a count of housing errors and noted which inmates were in the wrong cells. The internal audits identified multiple issues of concern. Perhaps more troubling than the number of missing audits was the number of housing errors observed. The audit reports indicated housing errors for 56.6% of the pods audited.  However, the corrective action reports/rosters for another 7.1% of the audits were missing or blank, so the number of housing errors could not be determined. The number of housing errors per report ranged from 0 to 42 individuals in the wrong cell or bed. The fourth-floor pods were particularly problematic, as one auditor observed, "Not able to verify where the inmates are sleeping. Most out of their bunks." In addition to the bed/cell errors, the TDC



audits indicated that a few inmates were in the wrong dorm. The final issue was auditor comments indicating that the security staff were aware of or had initiated the moves without contacting or consulting the classification unit. Comments included "Deputy aware of cell changes" and "Deputy was already aware of inmates in incorrect cells. XXXXX stated the changes were made by the ranking officer on day shift."

Monitor selected a random sample of audit reports to verify the audit process and then viewed the audit via the OJC camera system. However, the failure to record the audit time hampered our ability to locate and review the audits in the OJC video camera files. We recommend that auditors wear body cameras to record both audio and activity during audits and to extend the retention of video camera files from 3 to 9 months to ensure their availability for compliance reviews.

## Internal Audits – Checking the Accuracy of the Custody and PREA Assessments

The Classification Manager is responsible for assessing the accuracy of a random sample of at least ten custody/PREA assessments each month. There was no documentation of internal audits conducted by the Classification Manager during this Compliance Review Period.

## Revalidation of the Classification System – Assessing the Validity of the System

The University of Cincinnati Corrections Institute submitted a report on September 17, 2024, documenting the revalidation of the OPSO classification system.[9]  The revalidation of the classification system was completed three months ahead of the deadline set by the District Court in its June 2024 Order, addressing OPSO's failure to perform a timely revalidation of the system. The overall findings support the continued use of the OPSO custody and PREA assessment tools. OPSO has reviewed these recommendations, and the IT staff has updated the classification module within the AS400 to reflect the approved updates. However, due to the cyberattack and the pending transition to the new JMS, the recommended updates to the classification system were not implemented.

*A.10.g. Provide the Monitor a periodic report on classification at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months, thereafter, until termination of this Agreement. Each report will include the following information:*
>    *(1)  number of prisoner-on-prisoner assaults;*
>    *(2)  number of assaults against prisoners with mental illness;*

---

[9] D'Amato, Christopher and Chip Weir (September 17, 2024). "Revalidation of the Orleans Parish Classification System - 2024." Cincinnati, Ohio: University of Cincinnati Corrections Institute.



*(3) number of prisoners who report having gang affiliations;*
*(4) most serious offense leading to incarceration;*
*(5) number of prisoners classified in each security level;*
*(6) number of prisoners placed in protective custody; and*
*(7) number of misconduct complaints.*

Finding:

Substantial Compliance

Observations:

Daily population reports are received daily, indicating the number of inmates by location – OJC, TDC, TMH, and out-of-parish. In addition, as required under Section g, OPSO provided monthly custodial statistical reports regarding the custody assessments by type, gender, population, gang affiliation, discipline, and housing. These reports track the timeliness of the initial custody assessments, the custody distributions, cases due for a custody assessment, the prevalence of special populations, and the rates and types of disciplinary infractions. Section g is rated as Substantial Compliance because the required statistical data were provided. However, as noted below, there are significant questions about the reliability and validity of the data on gang involvement, inmate discipline, and the victimization of inmates with mental health needs. OPSO will need to review and upgrade its reporting processes to maintain compliance.

OPSO disciplinary data on the "*assaults against prisoners with mental illness*" suggest relatively few individuals on the mental health caseload are victims of assault or battery. However, the accuracy of these data is questionable as they reflect the inmate disciplinary process rather than institutional incident reports. Further, Wexford determined that it was dramatically undercounting the mental health caseload and not identifying all individuals on the mental health case within the JMS system.

For this compliance period, OPSO reported zero active "gang" members. The initial classification interview includes a question about "gang" membership or affiliation. Staff indicated that inmates rarely reveal their alliances. Previously, the Classification Unit relied primarily on information from the District Attorney's Office to identify inmate gang affiliations. The IPC Major indicated that OPSO no longer received information regarding gang affiliations or prosecutions from the District Attorney and recommended checking with the OPSO ISB Unit. This conversation was interesting, although circular. The ISB agent indicated that they track "gang" behaviors within OJC but quickly pointed out that Orleans Parish "gangs" were better described as dynamic neighborhood/ward-based



cliques. The ISB agent reported that they exchanged information with the NOPD. Yet, he was reluctant to share these data with the Classification Unit because, again, Orleans Parish "gangs" are dynamic neighborhood/ ward-based cliques.

On the other hand, OJC security staff report interviewing inmates about "ward or neighborhood-based cliques" and who can live with whom. In sum, it appears that ISB collects and shares information with NOPD, and that security staff requests housing assignments based on neighborhood associations. Yet neither ISB nor security staff shares intelligence with the Classification Unit. Thus, the classification staff transfers inmates from pod to pod in response to emails indicating, "This individual cannot live on XX pod." To maintain Substantial Compliance with Section g, OPSO must create a systematic process for collecting information on active "gangs/cliques," sharing this intelligence across its various divisions, and inputting this data into a standardized report available to the Classification Unit. It is hoped that new bridges between OPSO and NOPD will be built to allow for the sharing of gang intelligence.

Figures 11 and 12 provide the OPSO's monthly disciplinary data as recorded in the AS400. To account for short-term variations and seasonal trends, we reviewed 24 months of disciplinary data. As shown in Figure 11, disciplinary report rates have fluctuated over the last 24 months. During this Compliance Review Period, 18.4% of inmates received a disciplinary report, and 10.2% were found guilty of a major infraction.  These rates represent a significant drop from those observed during the previous Compliance Period – October 2024 to June 2025, during which 23.7% of inmates received a disciplinary report and 17.4% were found guilty of an infraction.  Why the decrease in the number of disciplinary reports? This is not clear, but it may well be a function of security staff having to handwrite reports due to the cyberattack. (The drop in the guilty rate may be a function of the fact that, as of the writing of this report, as shown in Figure 12, no final action has been recorded in the AS400 for 51.8% of the December reports and 25.4% of the November reports.) Figure 12 illustrates the rise in "open/not heard" reports for October through December. Unfortunately, the institutional violence and disruption, as indicated by the incident reports during this Compliance Period, have not decreased.





Figure 11: Rate of Disciplinary Infractions for the OPSO ADP – January 2024 – December 2025

Figure 12 shows the OPSO ADP (Average Daily Population) versus the number of disciplinary reports per month for January 2024 – December 2025.  During this Compliance Period, the ADP decreased from 1,485 to 1,262, a ~15% decline. However, the raw number of disciplinary reports heard dropped by 66%.  Thus, the number of reports does not appear to be linked to the ADP.



Figure 12: OPSO ADP vs. Number of Disciplinary Reports Heard: January 2024 - December 2025

Figure 13 illustrates the breakdown of the disciplinary infractions by type during this same period – July 2023 – June 2024. (These data reflect the most severe violation for which



COMPLIANCE REPORT # 23                                    87

the inmate was found guilty per disciplinary report.) During this Compliance Period, the number of predatory infractions (e.g., assaults or battery) ranged from 64 (August 2025) to 26 (November and December 2025), and the number of aggressive infractions (fights/threats) ranged from 52 (August 2025) to 19 (October 2025) per month. For this Compliance Period, the average numbers of predatory and aggressive infractions were 37.8 and 34.3 per month, respectively. The average number of assaults/fights per day was 4.96 (37.8 + 34.3 = 72.1/30 = 2.4/day).  During the previous Compliance Period, the average number of assaults/fights per day was 4.96.  Thus, based on the disciplinary data, the average number of aggressive and predatory behaviors per day decreased during this Compliance Period.

During this Compliance Period, as shown in Figure 13, the number of disruptive and management problem infractions decreased. The average number of management problem reports per month was 48.7, compared with 85.3 per month during July - December 2024. The rate of disruptive behavior reports during this Compliance Period was also low -- 23.2 per month during July - December 2025, compared with 26.5 disruptive reports per month during July - December 2024. However, as Figure 13 illustrates, these figures are skewed by the July and August data. The number of reports for each type of behavior decreased sharply in the latter four months of the Period, suggesting substantial changes in the reporting and review of institutional misconduct.



Figure 13: Most Serious Disciplinary Infraction/Report with Finding of Guilty: July 2023 – December 2025



*A.10.h. OPSO shall review the periodic data report and make recommendations regarding proper placement consistent with this Agreement or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

Substantial Compliance

Observations:

The Monitor receives the daily "Active Inmates by Location" reports and has access to the ad hoc Classification Monitor lists and various classification statistical reports. During this Compliance Period, multiple updates were made to the OPSO Housing Matrix. As of January 2023, the Classification staff has provided the matrices daily.  OPSO promptly responded to questions or issues raised throughout the Compliance Period.

There are significant concerns about the quality of the documentation for the protective custody reviews and both the housing and internal housing audits. These concerns were raised under Sections d and f, respectively. There are also concerns about the data and documentation provided for the Compliance Review. Multiple document requests and reports were required to generate accurate data for this Review.

## A. 11.  Prisoner Grievance Process

*A. 11. a. OPSO shall ensure that prisoners have a mechanism to express their grievances, resolve disputes, and ensure that concerns regarding their constitutional rights are addressed. OPSO shall, at a minimum, do the following:*

> (1) *Continue to maintain policies and procedures to ensure that prisoners have access to an adequate grievance process and to ensure that grievances may be reported and filed confidentially, without requiring the intervention of a correctional officer. The policies and procedures should be applicable and standardized across all the Facility divisions.*
> (2) *Ensure that each grievance receives appropriate follow-up, including providing a timely written response and tracking implementation of resolutions.*
> (3) *Ensure that grievance forms are available on all units and are available in Spanish and Vietnamese and that there is adequate opportunity for illiterate prisoners and prisoners who have physical or cognitive disabilities or language barriers to access the grievance system.*
> (4) *Separate the process of "requests to staff" from the grievance process and prioritize grievances that raise issues regarding prisoner safety or health.*
> (5) *Ensure that prisoner grievances are screened for allegations of staff misconduct and, if an incident or allegation warrants per this Agreement, that it is referred for investigation.*
> (6) *A member of the management staff shall review the grievance tracking system quarterly to identify areas of concerns. These reviews and any recommendations will be documented and provided to the Monitor.*

Findings:

A. 11. a. (1)  Substantial Compliance



A. 11. a. (2)   Non-Compliance

A. 11. a. (3)   Substantial Compliance

A. 11. a. (4)   Substantial Compliance

A. 11. a. (5)   Substantial Compliance

A. 11. a. (6)   Substantial Compliance

This review covered July 2025 through December 2025. For this review, the Monitor interviewed the Grievance staff, security staff and inmates while inspecting the housing units. Reports and data submitted by OPSO covering the rating period were also reviewed.

As noted during the previous inspection, a review of the documentation demonstrated that all inmate submissions continue to be reviewed by Grievance staff. Statistical information was provided on all categories. Both requests and grievances continue to be sorted by type. Specific grievances related to inmate safety, medical issues, PREA, etc., are documented to reflect the date received, inmate information, type of grievance, time of notification made to the appropriate staff member, and the staff member making the notification. OPSO implemented its electronic grievance system along with inmate tablets in the first quarter of 2025. With the exception of the months affected by the cyber-attack on the OPSO network (September through November), inmates were able to submit grievances electronically via the wall-mounted kiosks in the housing units as well as over their personal tablet. During the height of the effects of the cyber-attack, Grievance staff implemented the back-up paper system throughout the jail. System. While the Grievance staff made a commendable effort to ensure inmates' access to the manual grievance system, the total grievances received dropped by an average of 70 percent (463 vs 143) during the system outage (Jul/August/Dec vs Sep/Oct/Nov), The monthly average of grievances received for the corresponding period (Jul-Dec) in 2024 was 147 when the submissions were still largely manual. The data provided indicated that the substantial increase in grievances received monthly coincided with the full implementation of the electronic grievance system in April 2025 which made submitting a grievance by inmates substantially easier and readily accessible anytime the tablets were in use. Therefore, the Monitor has concluded that, while the reversion to the manual system during the cyber-attack/recovery, the inmates' ability to submit grievances were



not substantially impacted by the work-around. the Grievance staff continue to visit lockdown units twice daily to collect grievances from  inmates who cannot have a tablet. The Monitor again queried several inmates during the tour as to whether they could access the electronic grievance system and each inmate asked confirmed they could do so indicating the electronic system was again operating normally. mentioned above. For these reasons, the rating for A.11.a.(1) remains in Substantial Compliance.

For the analysis, the Monitor incorporated data from the current rating period into three charts and added simple linear trendline overlays to each grievance category listed. A fourth chart was added to graphically represent the number of grievances overall relative to the inmate population.

Despite having to manually document all grievances during the cyber-attack/recovery, Grievance staff once again provided detailed documentation as to their separate handling of the July 2025 through Dec 2025 inmate requests, grievances, and complaints related to inmate safety or health.

As this report covers the first full rating period with the electronic system in use, the Monitor notes the upward trend in the overall number of grievances submitted, the cyber-attack notwithstanding, appears to be hovering around 400 to 450 per month. Essentially, it is the Monitor's opinion that OPSO should expect this volume to be the "new normal" with the electronic reporting system. Opportunities for reducing this number lie with the timeliness and quality of grievance responses—it is the Monitor's experience that inmates who believe their issues aren't be addressed have a tendency to submit multiple grievances on the same topic. This is addressed later in this report.

The Monitor selected a 2 ½ year range for charts 1-3 below to demonstrate the up and downward trends for the various grievance categories and allow a year-over-year comparison of the July-December periods from 2023 through 2025. In general, most grievance categories were either stable or increasing slightly. Of note, the Miscellaneous, Commissary and Life-Threatening categories all show significant upwards trends, with Maintenance, Food Service and others either up slightly or remaining steady. On a positive note, the number of Medical grievances continued their downward trend, indicating the Medical contractor (Wexford) is having a positive impact at least in terms of the number of grievances.



**Chart 1**



With Chart 2, and as with previous reports, the Monitor continues to caution drawing any particular conclusions from the displayed trends and attributes any swings to the relatively small number of grievances in a given month for each category (less than 10 total). Of concern, the "Life Threatening" category has continued to increase with significant jumps in August and December during the rating period. The Monitor strongly recommends further analysis by OPSO to determine whether there is an identifiable root cause(s) for the spikes and the overall increase.



**Chart 2**



Chart 3 represents several categories, primarily inmate services and property/fund accounts. As with the categories in Chart 2, the Monitor cautions against drawing any conclusions as to long-term trends due to the relatively small number of grievances in each category overall.



**Chart 3**



Chart 4 breaks out the data for OPSO and Wexford overdue grievances. Wexford experienced a sharp decline in overdue grievance responses in July 2025 and reduced such occurrences to near zero through the balance of the reporting period indicating a proactive approach in dealing with the previous backlog. OPSO data, conversely, showed an increase of over 100% in the number of overdue grievances from July to December 2025. As a result, the rating for this section, IV.A.11.a(2), is decreased to Non-Compliance.



**Chart 4**



| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OPSO 10+ Days | 119 | 0 | 0 | 2 | 204 | 421 | 663 | 590 | 1318 | 1286 | 1318 | 1421 | | |
| Wexford | 15 | 0 | 0 | 0 | 213 | 353 | 131 | 0 | 0 | 1 | 2 | 1 | | |

In addition to that noted above, there were three items of note or concern for the Monitor that were still an issue during this inspection. First, there were still unsecured medical and grievance boxes in two TDC housing units. As OPSO intends to maintain the paper grievance system as a backup to the electronic system, the Monitor continues to recommend OPSO replace the lightweight metal receptacles in TDC with the same heavy-duty receptacles installed in OJC. The Monitor also recommends OPSO plan to install the same type of receptacles in the new housing units in Phase 3.  While still a manual process to retrieve and return paper grievances, the heavier boxes will ensure that medical requests and grievances can be submitted confidentially by the inmates. The Monitor noted the new kiosks were operational in every housing unit as well as the tablets where allowed.

Regarding the second issue from report #22 regarding the timely collection of paper grievances, particularly during the cyber-attack, a review of the paper grievance tracking log for the Sep-Nov period reflected a substantial increase in the number of paper grievances collected. It is the Monitor's opinion that the Grievance staff were consistent throughout the rating period in the collection and processing of paper grievances.

Third, and similar to the issues with the changeover from the previous electronic



system, roughly half of the data (Sep-Nov) was skewed downward in terms of total grievances submitted via the manual process as noted above. However, as with the system conversion, the Grievance section was able to devise work-around procedures and were able to produce the basic data and analysis for this period that they customarily provide to the Monitor as well as the OPSO leadership team.

As with the previous inspection, the Monitor to noted that grievance forms, both in English and Spanish, were available in the pod control rooms as were hard copies of the Inmate Handbook. Accordingly, subsection IV. A. 11. a. (3) remains in Substantial Compliance.

The Monitor again reviewed detailed documentation provided by Grievance staff for the rating period regarding the screening of grievances for staff misconduct. The documentation demonstrated that all inmate submissions are reviewed by Grievance staff and those regarding staff misconduct are separately documented for appropriate referral to the administrative level for follow-up. Grievance staff processed a total of 196 such staff misconduct related grievances for July through December 2025, a significant increase from the previous reporting period. The Monitor recognizes that a certain number of staff misconduct complaints (founded and unfounded) will always present themselves due to the nature of the environment. However, this increase presents another concern for the Monitor who strongly recommends OPSO perform an analysis to determine whether any commonalities exist among the grievances that may be addressable by training, leadership guidance, etc., or whether there may have been some change or error in the data from the previous report that showed a drastic decrease. Again, "zero complaints" is a laudable goal, the Monitor is not assessing the rise or fall of the number itself but the implementation and oversight of the process.  The Monitor looks forward to the next inspection and data submission from OPSO to identify whether this is a sustained trend or an anomaly.

Grievance staff continue to separately document grievances that require a specific referral to IAD, ISB, PREA, or FIT staff for review and investigation. Detailed information along with the date assigned and disposition is maintained as well as email transmission receipts. Grievances referred to IAD increased from 19 to 30. Grievances referred to ISB increased from decreased from 103 to 68—keeping in mind there was an additional three



months in the previous rating period, there was little actual decrease in the average number of ISB referrals on a quarterly basis.

The rating for IV. A. 11. a. (4) remains in substantial compliance. The documentation provided by OPSO Grievance staff indicates that "requests to staff" continue to be routinely separated from true grievances regarding inmate safety or health and are separately reported and tracked.

The rating for IV. A. 11. a. (5) remains in substantial compliance. The documentation provided by OPSO indicates that OPSO Grievance staff routinely screens inmate grievances for allegations of staff misconduct, appropriately reports suspected instances of staff misconduct and verifies the receipt of the notifications.

The Monitor reviewed the quarterly data for the rating period and found documentation of a substantive review of the information by senior OPSO staff along with recommended courses of action based on the analysis. This supports a Substantial Compliance rating for IV.A. 11. a. (6).

In specific regard to Item 5 of the June 17, 2024, Stipulation and Order by the Court, copied below, the Monitor found the following conditions as of the date of the inspection:

- OPSO has successfully implemented the new electronic kiosk and tablet system.
- The kiosks were observed to be operational and in use by inmates where tablets were not available, primarily for ordering commissary but with several additional features including the grievance module.
- OPSO provided a copy of the contract to the Lead Monitor and Plaintiffs upon its execution.

*5. Grievances (§ IV.A.11.a.(1), (3)). Within 90 days, OPSO shall secure a contract for the supply of electronic kiosks that can be used to file confidential grievances electronically in each housing unit. The electronic kiosks, that will replace the currently nonfunctioning kiosks, shall be installed in each of the housing units, and shall be in workable order and fully operational, within 180 days. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.*

## A. 12. Sexual Abuse

*A. 12. OPSO will develop and implement policies, protocols, trainings, and audits, consistent with the*



COMPLIANCE REPORT # 23                    97

*requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, including but not limited to, preventing, detecting, reporting, investigating, and collecting sexual abuse data, including prisoner-on-prisoner and staff-on-prisoner sexual abuse, sexual harassment, and sexual touching.*

Finding:

A. 12. Partial Compliance

Observations:

OPSO successfully completed its PREA audit in 2019. Passing a PREA audit that is now six years old is not considered as conclusory evidence of compliance. OPSO had stated that a PREA Audit was scheduled for 2025, but no proof of it having occurred was provided. Proof of training and policies were provided, and the review of the policies was completed during the compliance period and signed by Sheriff Hutson in January 2026. The only documentation regarding PREA investigations provided was for the months of October-December 2025. No proof as to implementing the other requirements of PREA including education of inmates was provided. This provision remains in partial compliance.

## A. 13.  Access to Information

*A. 13. OPSO will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding Facility disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse or assault; accessing medical and mental health care; emergency procedures; and sending and receiving mail; understanding the visitation process; and accessing the grievance process.*

Finding:

A.13.  Substantial Compliance

Observations:

The inmate handbook is available on the kiosk and on the tablets provided to inmates. As the handbook was provided was provided in several forms, the provision has remains in Substantial Compliance.

## B. Mental Health Care

*B. OPSO shall ensure constitutionally adequate intake, assessment, treatment, and monitoring of prisoners' mental health needs, including but not limited to, protecting the safety of and giving priority access to prisoners at risk for self-injurious behavior or suicide. OPSO shall assess, on an annual basis or more frequent basis, whether the mental health services at OPP comply with the Constitution. In order to provide mental health services to prisoners, OPSP, at a minimum shall:*

Overall, there is good work being done on the ground level to provide care to inmates at



OPSO. There is a lack of accountability and supervision for the care and treatment of inmates at OPSO. The lack of a functioning, qualified, and dedicated Health Services Administrator (HSA) is evident in the lack of necessary oversight for gaining compliance with the outstanding provisions.

Findings:

B. 1. a. Substantial Compliance

B. 1. b. Partial Compliance

B. 1. c. Partial Compliance

B. 1. d. Partial Compliance

B. 1. e. Partial Compliance

B. 1. f.  Partial Compliance

B. 1. g. Partial Compliance

B. 1. h. Partial Compliance

B. 1. i.  Partial Compliance

B. 1. j.  Partial Compliance

B. 1. k. Partial Compliance

B. 1. l.  Partial Compliance

***B.1.a. Develop and maintain comprehensive policies and procedures for appropriate screening and assessment of prisoners with mental illness. These policies should include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of services for each category of mental health needs.***

Finding:

Substantial Compliance

This provision is being graded SOLELY for having policies and procedures in place for screening and assessing prisoners with mental illness. These policies must be properly and timely maintained and updated when clinically appropriate. The implementation and continued challenges with the screening/assessment process, including delays and misses for medications being ordered, will be addressed in another provision. The policies in place include definitions of emergent, urgent, and routine mental health needs, as well as timeframes for the provision of service for each category.

Suggestions:

Continue to ensure policies are updated timely, at least annually. There should be a date stamp on policies when they are reviewed to ensure timeliness of review. The Monitor



COMPLIANCE REPORT # 23                                                        99

expects, since it was not done for this tour, to see an updated addition to the screening policy by the next site visit to ensure screenings and assessments which are interrupted by court or absence from the housing unit are addressed in a timely manner. This continues to be an outstanding issue of inmates going to court without receiving medication or being absent from the housing pod and merely being marked absent with no enforced process in place to ensure medication administration. This is critical to ensure timely operation and that no individual fails to be provided treatment. There should be an addition to the policy to ensure screenings and assessments which are interrupted by court or absence from the housing unit are addressed in a timely manner. If a clinician is scheduled to see an inmate and is unable for any reason, there needs to be clear directions as to when the mental health staff is required to return to complete the screening or assessment. It cannot be left to the discretion of the clinician to return or sign out to a follow up clinician. If the decision is the task is assigned to the following shift, ensure the contact is made and implement disciplinary actions if the process is not followed.

***B.1.b. Develop and implement an appropriate screening instrument that identifies mental health needs, and ensures timely access to a mental health professional when presenting symptoms require such care. The screening instrument should include the factors described in Appendix B. The screening instrument will be validated by a qualified professional approved by the Monitor within 180 days of the Effective Date and every 12 months thereafter, if necessary.***

Finding:

Partial Compliance

This provision includes IMPLEMENTATION of the screening instrument that identifies mental health needs and ENSURES timely access to a mental health professional during the screening process. The instrument used by Wexford identifies mental health needs, yet there remain delays, during the period in review, of patients not receiving timely access to the mental health profession based on the referral. While there have been improvements in urgent and routine referrals being seen timely, there is only 50% on time response rate for emergent referrals based on the CQI survey conducted in November 2025. Inmate x230 was booked into the jail on June 25, 2025 and an urgent referral was submitted. He was not seen by mental health until July 2, 2025. There is no alert in place or notification for a clinician to see someone who missed an initial screening or assessment appointment. It is currently assigned, at times, to the next clinician but this is not always completed.



COMPLIANCE REPORT # 23                              100

Continue to train and educate staff regarding the importance of proper referrals from intake. The mental health provider is again encouraged to bring data supporting 90% or more of all intakes receives timely mental health services to the site visit discussion including proof individuals are receiving medication timely and available records are reviewed. Merely saying it happens is not sufficient for substantial compliance. If time needs to be allotted during the site visit to review all intakes in the reporting period or there needs to be time set aside virtually for review with the Monitor, Wexford is encouraged to schedule this.

***B.1.c. Ensure that all prisoners are screened by Qualified Medical Staff upon arrival at OPP, but no later than within eight hours, to identify a prisoner's risk for suicide or self-injurious behavior. No prisoner shall be held in isolation prior to an evaluation by medical staff.***

Finding:

Partial Compliance

Suggestion:

*****CQI study to determine average length of stays, each month, in IPC for an individual with mental health concerns.

***B.1.d. Implement a triage policy that utilizes the screening and assessment procedures to ensure that prisoners with emergent and urgent mental health needs are prioritized for services.***

Finding:

Partial Compliance

Suggestion:

The triage policy in place calls for inmates to be seen within two hours for an emergent referral, within twenty-four hours for an urgent referral and within seven days for a routine referral. While these identified times demonstrate that inmates are prioritized for service, the IMPLEMENTATION of this policy continues to face challenges. Urgent and routine referrals were seen on time 90% of the time, which is an improvement for urgent referrals and meets the compliance benchmark. Only 50% of emergent referrals were addressed on time. While fluctuations are expected, they should be the exception and not the norm. The compliance rate for this provision is 90% in order to be rated and sustained at substantial compliance.

***B.1.e. Develop and implement protocols, commensurate with the level of risk of suicide or self-harm, to ensure that prisoners are protected from identified risks for suicide or self-injurious behavior. The protocols shall also require that a Qualified Mental Health Professional perform a mental health assessment, based on prisoner's risk.***



<u>Finding:</u>

Partial Compliance

For this provision, it is imperative that protocols are implemented with the level of risk of suicide or self-harm for the inmate's protection. It is not sufficient to have developed the protocols without the intentional IMPLEMENTATION of them in everyday practice. There has been improvement as suicide watches are now conducted, for the most part, at TMH. The Monitor was unable to access the video for TMH and therefore was unable to determine whether watches are performed as outlined in policy and protocols.

It remains unclear what occurs between the time when mental health is called for an evaluation for someone who has behavioral instability due to suicidal thoughts and when mental health actually arrives. While mental health usually arrives within minutes of the call, there are times when there is a significant lag, over 30 minutes, with no indication or documentation as to what happens with observation during that time.

Searching and securing inmates placed on watch has declined as compared to the prior 9-month reporting period. The average number of inmates secured in the prior reporting period was 75%, this period it is 66%. The average number of inmates secured in the prior reporting period was 48%, this period it is 37.5%. Based on data submitted by Wexford:

July 2025: 12 individuals were placed on suicide watch; 8 inmates were secured (67%); 3 inmates were searched (25%)

August 2025: 16 individuals were placed on suicide watch; 10 inmates were secured (63%); 4 inmates were searched (25%)

September 2025: 17 individuals were placed on suicide watch; 8 inmates were secured (47%); 6 inmates were searched (35%)

October 2025: 20 individuals were placed on suicide watch; 15 inmates were secured (75%); 10 inmates were searched (50%)

November 2025: 12 individuals were placed on suicide watch; 9 inmates were secured (75%); 6 inmates were searched (50%)

December 2025: 20 individuals were placed on suicide watch; 14 inmates were secured (70%); 8 inmates were searched (40%)



<u>Suggestion:</u>

Suicide watches in TMH was a good decision and continues to provide increased oversight for these vulnerable individuals. Watches done in OJC need continued attention to ensure the safety of the patient. Continue to secure and search inmates on watch and document barriers to performing this process. Document de-escalation procedures by Wexford and deputies and challenges with implementation. Adequate cell searches and body searches and properly securing inmates are necessary to protect inmates from the risk of self-injurious behavior. The Monitor recommends continued spot checks of QMHPs who are conducting watches and enforcing corrective actions as deemed necessary. The Monitor recommends video observations of suicide watches to ensure MHT compliance and help minimize any fraudulent activity.

***B.1.f. For prisoners with emergent or urgent mental health needs, search the prisoner and monitor with constant supervision until the prisoner is transferred to a Qualified Mental Health Professional for assessment.***

Finding:

Partial Compliance

Based on documentation provided by Wexford:

July 2025: 12 individuals were placed on suicide watch; 3 inmates were searched (25%)

August 2025: 16 individuals were placed on suicide watch; 4 inmates were searched (25%)

September 2025: 17 individuals were placed on suicide watch; 6 inmates were searched (35%)

October 2025: 20 individuals were placed on suicide watch; 10 inmates were searched (50%)

November 2025: 12 individuals were placed on suicide watch; 6 inmates were searched (50%)

December 2025: 20 individuals were placed on suicide watch; 8 inmates were searched (40%).

As stated above, it remains unclear, due to lack of documentation, what type of observation is being rendered while an inmate is awaiting transfer to a QMHP for assessment.

<u>Suggestion:</u>



COMPLIANCE REPORT # 23                                                              103

Continue to keep accurate records of searches conducted at Code Whites. The Monitor recommended OPSO document constant direct observation is being conducted while awaiting a QMHP assessment. There must be documented support that an inmate awaiting mental health to arrive to being observed and kept safe. The Monitor recommends there be accurate documentation provided which accounts for contributing factors regarding why searches are not performed on 100% of inmates at risk of harm and appropriate steps (corrective active plan) to ensure future compliance. The documentation should also reflect what was done in leu of the immediate search to minimize harm, i.e. an inmate was watched directly until a search could be conducted. While the Monitor understands that security searches fall strictly under the purview of security operations and Wexford is unable to perform the functions required to bring this provision into substantial compliance, this provision requires this function be completed and constant observation by security be performed until assessment by mental health. Communication and documentation will be imperative to show this function is happening on a consistent, collaborative and thorough basis and that each party is functioning within the confines of their responsibility. OPSO must inform Wexford regarding whether searches and securing has occurred and Wexford must document visible evidence confirming this practice.

***B.1.g. Ensure that a Qualified Mental Health Professional conducts appropriate mental health assessments within the following periods from the initial screen or other identification of need:***
> ***1) 14 days, or sooner, if medically necessary, for prisoners with routine mental health needs;***
> ***2) 48 hours, or sooner, if medically necessary, for prisoners with urgent mental health needs; and***
> ***3) immediately, but no later than two hours, for prisoners with emergent mental health needs.***

Finding:

Partial Compliance

Suggestion:

Based on data submitted by Wexford for the period in review, on average, 50% of emergent referrals were addressed on time, while 90% of urgent referrals were addressed on time. Routine referrals were addressed 90% on time for the period in question. The Monitor recommends Wexford separate referrals from intake versus referrals while admitted to OPSO to determine whether the issues are related to intake or after the inmates is already residing in jail. This may help Wexford focus limited resources on the problem area.



***B.1.h. Ensure a Qualified Mental Health Professional preforms a mental health assessment no later than the next working day following any adverse triggering event (i.e., any suicide attempt, any suicide ideation, or any aggression to self, resulting in serious injury).***

Finding:

Partial Compliance

While mental health is doing a better job of following up within 24 hours of a code white related to a suicide and some behavioral disturbances, there continues to be gaps in communication to mental health regarding use of force activity thereby rendering it impossible for mental health to respond as mandated by this provision.  There were at least 136 UOF during the reporting period. Wexford documented 69 UOF incidents from July 2025-December 2025 with mental health follow-up. This amounts to about 51% of UOF incidents at OJC being addressed by mental health. Of the 69 incidents addressed, mental health had timely followed up in 67% of the cases.

There needs to be additional work done to implement a formal and more transparent way to contact mental health for UOF at OJC along with when there are triggering community events like family death, life sentence, or return from a funeral. Inmate x420 reported a sexual assault on October 1, 2025 and there was no documented mental health follow up. Inmate x578 was stabbed on August 17, 2025 with no documented mental health follow up. Inmate x655 and x924 were involved in the same stabbing event with no mental health follow up. Inmate x141 was involved in a UOF on October 15, 2025 and although she was seen by medical and mental health, the UOF incident was not documented as discussed. Inmate x316 was a victim of a PREA investigation with an incident occurring on October 24, 2025 yet mental health follow up did not address the incident in a timely manner. It does not appear the incident was addressed until possibly in therapy on November 14, 2025. Inmate x340 had an incident on August 2, 2025 with no mental health follow up.

Suggestion:

Submit RANDOM mental health assessments which have been completed after a triggering event. Three per month (total of at least 18 assessments along with the corresponding incident reports in the SharePoint folder) for the period in review would be helpful to support improvement in this provision. **Conduct a CQI to keep track of these assessments and timeliness.** Reeducate deputies regarding the importance of alerting



COMPLIANCE REPORT # 23                    105

mental health staff regarding all triggering events, in advance as much as feasible, so proper assessments and assistance can be provided. Ensure medical and mental health staff within Wexford are communicating and informing each other regarding triggering events as they become aware. Ensure there is mental health timely follow up for triggering events and documentation to support the incident was addressed.

**B.1.i. Ensure that a Qualified Mental Health Professional, as part of the prisoner's interdisciplinary treatment team, maintains a risk profile for each prisoner on the mental health case load based on the Assessment Factors identified in Appendix B, and develops and implements a treatment plan to minimize the risk of harm to each of these prisoners.**

Finding:

Partial Compliance

Wexford continues to report improvement in completing treatment plans at OJC. A number was not given for the number of plans which were completed or how many were outstanding. Wexford has created a multidisciplinary treatment planning team who are currently focusing on creating treatment plans for patients on the specialty mental health units (2A and 2B). This team has a psychiatrist, a psychiatric nurse, a social worker, a discharge planner and a deputy. While this is a step in the right direction, the concern with this model is that the psychiatrist who chairs the MDT is not the provider who prescribes medication for the patients. The psychiatrist can make recommendations, but the assigned provider must agree and make changes, if they are even aware of the recommendations. The assigned provider for 2A and 2B should be the chair of the MDT so real-time changes and decisions can be made to improve the care and treatment of the patients.  The Monitor was unable to attend the MDT meeting during this site visit so unsure if the recommendations from the prior report (having medical attend, scheduled follow up meetings with the MDT, and whether goals and interventions are being created from these meetings) are being realized.  As stated in the prior report, the document generated from this meeting should be a comprehensive treatment plan with goals, objectives and interventions.  Treatment plans direct treatment and keep the clinicians involved and supporting staff abreast of interventions and objectives for each patient. The aim is to provide person-centered, coordinated, high-quality care to patients. All inmates on the mental health caseload require a risk profile based on the Assessment Factors in Appendix B, to include an acknowledgement that the factors were considered



COMPLIANCE REPORT # 23                                                         106

and may not apply to that individual AND an interdisciplinary treatment plan. While every inmate on the case load may not require a monthly treatment plan, an adequate treatment planning schedule needs to be created and implemented to ensure all inmates on the case load have a treatment plan and an updated plan when clinically indicated or scheduled. The mental health provider, in consultation with OPSO, should determine what is needed, in terms of additional psychiatrists' hours, in order to conduct multidisciplinary treatment plans throughout the entire facility. At this juncture, triggering events are not yet captured nor result in any updates to the treatment plan, which it should.

Suggestion:

A clinical analysis of treatment needs will be needed to inform an adequate and appropriate treatment planning schedule for OJC. Ensuring interdisciplinary treatment plans are created and followed for the general population, and the inmates housed in the specialty mental health housing units is critical to include a risk profile for each inmate on the mental health case load will be necessary for substantial compliance. Treatment plans should be scheduled for every 60 days in general population and at least every 30 days on mental health specialty units, more frequently when a triggering event occurs. As stated before, these treatment plans must include interventions to minimize risk of harm for inmates throughout the system, including stepdown and outpatient level of care along with the acknowledgement that risks were assessed and may not be relevant for the patient. This risk profile should also include deficits in planned services and content, like lack of a licensed substance abuse counselor, and remedies to correct the deficits. Triggering events should result in an update to the treatment plan which will address interventions and objectives to target recovery from the event.

***B.1.j. Ensure adequate and timely treatment for prisoners, whose assessments reveal mental illness and/or suicidal ideation, including timely and appropriate referrals for specialty care and visits with Qualified Mental Health Professionals, as clinically appropriate.***

Finding:

Partial Compliance

At the time of the site visit, there were 674 inmates on the behavioral health caseload and 504 on the provider caseload. OPSO/Wexford experienced delays in ensuring suicide visits occurred timely. In the CQI study conducted to monitor this, July



2025 findings indicated 67% of patients on suicide watch had daily MHP visits, 0% had a written treatment plan within 72 hours and 73% were treated as per policy. In the November 8, 2025 study, 57% of patients had a daily visit with a MHP, 64% had a written treatment plan within 72 hours, and 57% received treatment based on policy. In the November 10, 2025 study, 53% had timely policy driven visits. There was no data submitted to support whether the daily visits which are to be conducted by   a QMHP for individuals awaiting transfer to TMH has improved.. While the provision does not direct the need for special areas to conduct mental health work, the provision calls for adequate treatment for inmates with mental illness. Adequate mental health treatment is not conducted on the tier, from the module, cell side nor in a dayroom where an inmate may be reluctant to discuss private, intimate issues with a clinician. The lack of confidentiality and a space that promotes confidentiality leads to a lack of validity that the information received is adequate to provide the necessary treatment. Many group sessions are held sporadically or not at all for a number of reasons, including staffing challenges.. There continue to be disruptions to service to include group and individual therapy sessions. Patient x520 was prescribed individual weekly therapy in his treatment plan which did not occur. Patient x916 was flagged in the prior report for numerous disruptions in service interfering in his ability to receive prescribed mental health treatment.  This pattern continued into this reporting period and there is no documentation he received any group therapy. Patient x944 had "lack of time" and room unavailable as reasons for not receiving prescribed mental health treatment. Patient x615 only attended 4 out of 13 scheduled groups during this reporting period due to various reasons including groups being canceled until the unit is under more control. One of the advantages of the Phase III design is that it provides confidential spaces for conducting interviews of inmates and facilitating group sessions in a manner which is safe for both the QMHP and inmate.

<u>Suggestion:</u>

There continues to be a need for a full range of mental health and consistent individual and group counseling services at OJC and TMH/TDC. Adequate treatment includes providing an environment where confidentiality is secured so the inmate can share valid information to inform necessary treatment. While the Monitor is aware of and appreciates the structural limitations to providing constitutionally adequate mental



health services at OJC, this does not supersede the needs of the patient and is one of the reasons for this consent decree. This need should be addressed once Phase III is operational. The mental health provider and OPSO must collaborate and plan TOGETHER in order to provide an adequate and therapeutic system of mental health services, especially with the anticipated opening and operation of Phase III. Currently, the inmates are unable to attend therapeutic sessions without adequate clinical staff to conduct sessions and correctional staff to transport and provide security for both staff and inmates. The Monitor reiterates that cell side visits do not constitute therapeutically appropriate or clinically adequate mental health services and will not result in substantial compliance. The Monitor recommends continued documentation of barriers to providing timely and adequate mental health treatment for all individuals captured on the mental health caseload. Issues cannot be rectified without knowledge of the problem. Consistent and reliable access to care is necessary for substantial compliance. OPSO may want to consider having community-based volunteer services come in and facilitate groups which would help provide services for inmates. Nurse practitioners, nurses and psychiatrists can all assist in facilitating programming for the mentally ill at OJC/TMH/TDC

***B.1.k. Ensure crisis services are available to manage psychiatric emergencies. Such services include licensed in-patient psychiatric care, when clinically appropriate.***

Finding:

Partial Compliance

There are no designated in-patient licensed facilities identified to provide treatment for the OPSO population.

Suggestion: OPSO continues to lack access to licensed in-patient psychiatric services for male and female inmates, beyond simple emergency room treatment. OPSO/Wellpath is encouraged to continue to provide documentation that all psychiatric emergencies are sent to an emergency department, and any crisis is adequately resolved, which will keep this provision in partial compliance. Currently, the utilization of TMH and external emergency departments are the resources which must be used.

***B.1.l. On an annual basis, assess the process for screening prisoners for mental health needs to determine whether prisoners are being appropriately identified for care. Based on this assessment, OPSO shall recommend changes to the screening system. The assessment and recommendations will be documented and provided to the monitor.***



Finding:

Partial Compliance

Suggestion:

The 2025 Annual Report is in the folder. While it adequately describes the screening process and includes data collected, there is no indication the OPSO has assessed the screening process and made recommendations for change. This provision SPECIFICALLY requires OPSO to provide recommendations/input into the screening process. This can be as simple and indicating the current system in place is adequate. An OPSO generated document or a paragraph/additional sheet attached to the Annual Report which demonstrates their attention to the screening process would suffice.  Screenings require an adequate clinical response and if there are inmates who are not being adequately screened and identified for care, from the perspective of OPSO, this needs to be addressed. Provide the recommended documentation to return this provision to substantial compliance.

Findings:

B.2.a.   Partial Compliance

B.2.b.   Partial Compliance

B.2.c.   Partial Compliance

B.2.d.   Substantial Compliance

B.2.e.   Partial Compliance

B.2.f.   Partial Compliance

B.2.g.   Partial Compliance

B.2.h.   Substantial Compliance

***B.2.a. Review, revise, and supplement existing policies in order to implement a policy for the delivery of mental health services that includes a continuum of services, provides necessary and appropriate mental health staff, includes a treatment plan for prisoners with serious mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with the Constitution.***
Finding:

Partial Compliance

There was no data included to determine whether daily visits by a QMHP with inmates on the waitlist for TMH is improving. There is a continued need for policies in place to provide a continuum of treatment for all individuals on the behavioral health



caseload at the jail. These policies should outline the purpose of the Multidisciplinary Team (MDT) along with expectations for follow-up work and timing expectations for treatment plans. These policies should outline expectations for treatment and care throughout OJC along with what an inmate can expect based on where they are housed. This provision not only covers having policies in place but IMPLEMENTING those polices in order to have a continuum of services for all patients receiving mental health care. There is a dire need for consistent therapeutic groups to be available for all patients on the caseload. There is also a need for consistent individual and substance abuse counseling at OJC The numbers remain low as to how many individuals are receiving these services quarterly. While offering group therapy is not a constitutional standard of care, if it is a clinical, therapeutic recommendation, it should occur. Serious mental illness is defined as mental, behavioral, or emotion disorder of mood, thought, or anxiety that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life. Those disorders include, but are not limited to, Schizophrenia Spectrum Disorders, other psychotics disorders, bipolar related disorder, major depressive disorders, and post-traumatic stress disorders. Implementation of policy to ensure the delivery of mental health services across the entire facility continues to be hampered by staffing deficits, from both Wexford and OPSO. Until a baseline number of services needed is generated and updated, there is no indication of the number of staff actually needed from Wexford or OPSO to provide a continuum of treatment services at OPSO. The number of treatment plans completed for OJC was not readily available. Without adequate staff, there will be no consistent treatment, including scheduled mental health and activity groups for the inmates.

Suggestion:

Both Wexford and OPSO must commit to consistent and appropriate implementation of policies in order to ensure an adequate delivery of mental health services, including de-escalation interventions. This will include documenting wait lists and service needs along with barriers to the provision of treatment, including missing group sessions. This also includes holding staff accountable for employment requirements. This will include documenting how long an inmate awaits transfer to TMH and what therapeutic and clinically adequate services are provided during that time. The creation of the MDT is a



positive addition to the services provided at OJC and will help create treatment plans in OJC but should be directed by the provider assigned to provide treatment for the individual rather than an assigned psychiatrist who is not involved in the treatment and care of said individual. As stated above, Wexford needs to identify the appropriate staffing levels needed to move into substantial compliance with this provision and satisfy the requirements of the Consent Judgment. A comprehensive plan as to how the staff will be secure is also recommended, especially with the opening of Phase III. While the Monitor can appreciate the physical plant constraints in providing an adequate continuum of care, the needs of the patient and ensuring constitutionally adequate treatment cannot be put on hold. The Monitor encourages Wexford and OPSO to collaborate and try and find solutions to the physical plant issues to ensure patients are receiving the care they need.

***B.2.b. Ensure that treatment plans adequately address prisoners' serious mental health needs and that the treatment plans contain interventions specifically tailored to the prisoner's diagnoses and problems.***

Finding:

Partial Compliance

The mental health caseload was 674 and provider caseload was 504 at the time of the site visit. The multidisciplinary treatment team has been operational since May to see patients on 2A and 2B. No MDT treatment plans were produced or entered into SharePoint to determine functionality and relevance to the treatment process. The MDT is facilitated by a psychiatrist who is not intimately involved in the care and treatment of the patient, as the current MDT psychiatrist is assigned to a different floor. The expectation is that the MDT will develop treatment plans designed to coordinate goals, objectives, and interventions that guide comprehensive care for each inmate. The treating provider should facilitate this process to ensure continuity of care and support timely decisions regarding patient management. While the MDT psychiatrist may offer recommendations at this stage, it remains possible that the treating provider either opts not to implement them or is not informed of such recommendations. The follow-up treatment plans still remain scarce, but the hope is this will improve once the initial round of treatment plans is completed.

Suggestion:

Continue to work towards providing interdisciplinary treatment plans to all individuals



on the mental health case load throughout the facility. Treatment plans are needed for all male, female, and youthful inmates at all levels of care, including acute care, suicide watches, TDC and outpatient level of care. These treatment plans need to be developed by a multidisciplinary team, when clinically indicated, including the inmate, as much as possible. It is recommended that staffing levels be assessed, and staff retained to provide the level of expected care and timely treatment for this population. ***All patients who are receiving mental health services need a treatment plan to direct care.*** Treatment plans can be done on a schedule based on clinical needs and the schedule should be discussed and agreed on by Wexford and the Monitor. If an individual is in general population and receiving medication and follow up from a QMHP, that person should have a treatment plan created by the provider and QMHP to address ongoing needs. While every individual may not need a multidisciplinary plan where security, nursing, a provider and QMHP (for example) will need to be a part of the creation, for substantial compliance, there must be a treatment plan on record for every individual on the caseload, based on clinical interactions and needs.

***B.2.c. Provide group or individual therapy services by an appropriately licensed provider where necessary for prisoners with mental health needs.***

Finding:

Partial Compliance

There remain challenges with consistently providing group and individual therapy services at OJC. Until there are sufficient security staff to provide supervision for groups to take place, and Wexford knows the number of staff they will need to meet expected treatment goals, it will be difficult to move this provision into substantial compliance. Until there are confidential locations to conduct interventions, the validity of inmate responses is in question which in turn questions whether appropriate, clinically therapeutic programming is being offered. Please see summary regarding disruption of programming services in provision B.1.j.

For the last six months of 2025: July 2025, 85 individuals participated in general mental health counseling. August 2025, 75 individuals participated in general mental health counseling. September 2025, 51 individuals participated in general mental health counseling. October 2025, 83 individuals participated in general mental health



counseling. November 2025, 88 individuals participated in general mental health counseling. December 2025, 156 individuals participated in general mental health counseling. There is no documentation to account for the drastic change in individuals who participated in general mental health counseling between November and December.

July 2025, 157 individuals participated in substance abuse counseling. August 2025, 148 individuals participated in substance abuse counseling. September 2025, 149 individuals participated in substance abuse counseling. October 2025, 149 individuals participated in substance abuse counseling. November 2025, 63 individuals participated in substance abuse counseling. December 2025, 272 individuals participated in substance abuse counseling. There was no substance abuse counselor on staff at the site visit so unsure who was facilitating substance abuse counseling during the period of review.

July 2025, 1 individual participated in sexual abuse counseling. August 2025, 2 individuals participated in sexual abuse counseling. September 2025, 1 individual participated in sexual abuse counseling. October 2025 and November 2025, 0 individuals participated in sexual abuse counseling. December 2025, 2 individuals participated in sexual abuse counseling.

These overall numbers continue to seem low when there are over 650 individuals receiving mental health services at OJC.

Suggestion:

This provision will remain a challenge to move into substantial compliance without determining a baseline level of need for service at OJC. It is surprising that only 76.5 individuals on average between July and November (December was not counted as it seems to be a significant outlier without documentation to support this change) out of over 650 individuals are in need and participated in general mental health counselling. If individual and group sessions cannot be held consistently, this provision will not move to substantial compliance. Please note how many individuals are unable to access the service provided due to barriers like adequate space, staffing challenges (including Disruption of Service forms) and are on a waitlist. Document the corrective action plans which will be implemented to address these issues. Continue to provide data on the number of inmates who received counseling for sexual abuse, alcohol, and drug abuse. The Monitor would encourage placement of random therapy notes in SharePoint to help



determine how the services are being delivered, what the sessions entail, and who is providing the services. The Monitor would also encourage transparency in the process of how these services are introduced to patients and the clinical decision as to why services are not offered to the majority of patients at OJC and what has been determined as the baseline need for these services. There continues to be a need for intentional invitations to be delivered to inmates for treatment services. Keep a running list of how many groups are not being held rather than just the attendance of inmates. Group sessions continue to have disruptions due to various reasons including "lack of time" or lockdowns due to disruptive behaviors. Wexford needs to work on a reporting system to capture not just the needs of the population but the vast number of groups not being held and the groups which will be needed to address the entire mental health population. OPSO and Wexford both bear responsibility in bringing this provision into substantial compliance and are encouraged to collaborate on solutions for the physical plant limitations to provide needed treatment to patients until Phase III is operational. As stated before, nurse practitioners, nurses and psychiatrists can all facilitate programming so groups and individual sessions can occur throughout the entire facility.

***B.2.d. Ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the prisoner's mental health status.***

Finding:

Substantial Compliance

At this juncture, based solely on the documentation, which is completed, The Mental Health Caseload Disciplinary Hearing Form has a line to check "Due to mental illness, pt. exempt from disciplinary sanctions. MHP will consult with psych." Most forms completed indicate there was no mental illness as a contributing factor to patient's behavior. While the process may still have flaws, this provision is being graded on whether the evaluation includes recommendations. While the line is present, the expectation is for there to be recommendations made and information provided regarding the mental health status of the inmate. This provision risks being downgraded to partial compliance without adequate documentation for the next site visit that shows there is consistent consultation with mental health prior to the disciplinary board or placement on a disciplinary unit of any individual on the behavioral health caseload and



there is adequate information provided on the inmate's mental health status in the evaluation.

Suggestion: It is imperative that mental health staff are contacted PRIOR to any inmate, especially those on the mental health caseload, being moved into disciplinary housing. Wexford should be using incident reports to ensure they are aware of all mental health inmates who may find themselves in disciplinary housing. It is imperative that OPSO puts into place a consistent process to alert mental health prior to movement of an individual, especially one on the caseload, to disciplinary housing. **This also means that OPSO needs to insist on having a current list of all patients on the mental health caseload to ensure OPSO can contact mental health as soon as safely possible, if not prior to movement.** There needs to be an analysis done to assess the impact of mental health evaluations on disciplinary sanctions. This needs to be started and discussed at the next site visit.

***B.2.e. Ensure that prisoners receive psychotropic medications in a timely manner and that prisoners have proper diagnoses and/or indications for each psychotropic medication they receive.***

Finding:

Partial Compliance

Suggestion:

During the period of review, there were mismanagements of patients at OJC. On September 5, 2025, a provider wrote that patient x230 was gravely ill yet did not provide any interventions. This same patient, 25 days later, was sent out emergently from court due to being gravely disabled. Patient x867 had his medications discontinued in January 2025 (prior to the period in question) at the request of the patient without any mental health follow-up through July 2025. He was seen on August 1, 2025 in court where he was ordered to go to the hospital for treatment of his mental illness with catatonia. He was not hospitalized until August 5 There was no documentation in the folder to support Wexford capturing medication variances which is crucial to proper medication administration.  This Monitor watched a number of medication passes during the site visit. There were medications missing from the cart as they had expired and there had been no documentation that there was notification to have them renewed or discontinued. There were refusals without obtaining informed consent from the patient.



COMPLIANCE REPORT # 23                                116

Individuals going to court or absent from the tier did not receive medication and there was no formal mechanism to ensure they would receive the missed dose. There are lags in provider follow up for refusals. Patient x288 was noncompliant with medication for 18 days in July 2025 prior to seeing a provider. Patient x466 was noncompliant with medication for 7 days in August and did not see a provider. This Monitor reviewed over 30 charts and there were no required nurse's notes or documented contact made to a provider regarding refusals or patients being absent from medication administration for a follow up plan. One nurse told this Monitor that she uses her discretion to decide whether to give a patient medication after the time it was prescribed. There appears to be a supervisory system in place for Dr. Robinson to review the charts of the nurse practitioners, yet this information is being withheld from the Monitor which would help determine whether diagnoses and indications for psychotropic medication is proper. With reports of polypharmacy without justification and use of medication for off label use without proper documentation, it would be helpful to see the chart reviews conducted by Dr. Robinson.  The Monitor has some concerns regarding the prescribing of medications without the proper diagnosis/indication being explicitly documented in the medical record.

Suggestion:

Collect MEDICATION VARIANCES! Provide documentation and analysis of data to ensure inmates are receiving psychotropic medications in a timely manner, especially upon admission to the facility. Educate nurses as to the importance of contacting providers when medication doses are missed due to court or absence from the housing pod to determine whether the missed medication dose can be given at a later time. Ensure there is a formal process in place to address court and other reasons for an inmate to be absent during medication administration to receive their medication. Enforce nurses laying eyes on patients who refuse medication to try and encourage compliance or collect informed refusal. Ensure medications are being used to treat the diagnosis on record or there is clear justification in the record for the off-label use of a psychotropic medication. Consider having the overnight nurses help prep the cart for the day shift to cut down on the delay to begin medication administration. Ensure nurses are aware that collecting variances does not necessarily mean something is wrong or was done incorrectly but is a



way to improve the system. It is STRONGLY recommended that psychiatric nurse practitioners have consistent, objective, and transparent oversight and supervision from psychiatrists in this setting. This should entail review of at least 10-20% of charts each month with formal feedback. The chart reviews are to assess quality, safety, and appropriateness of care. There should be emphasis on whether the documentation is complete and adherence to evidence-based clinical guidelines. It should include investigation of polypharmacy, ensuring medications are being used for diagnoses on record, laboratory findings are being properly followed up and appropriately ordered, and progress notes are addressing issues and in line with treatment plan interventions. Discussion of clinical cases will be beneficial to ensure clinical acumen. It may be useful to have a monthly meeting with the Wexford psychiatrist, psychiatric nurse practitioners, and the LSU psychiatrists to ensure understanding of the patient population, collaboration on patients and ensure all the work is assigned and completed. This supervision should entail chart reviews, one on one periodic meetings (twice a month would be beneficial) to review cases, access to the supervisor for questions and collaboration on difficult cases and ensuring adequate and timely follow-up is occurring.

***B.2.f. Ensure that psychotropic medications are administered in a clinically appropriate manner as to prevent misuse, overdose, theft, or violence related to medication.***

<u>Finding:</u>

Partial Compliance

There is no documentation in SharePoint to support Wexford capturing medication variances at OJC. While there was some improvement in mouth checks being performed, there were still times where patients walked away from the nurse without having their mouth checked. The deputy was present and engaged in the medication administration process.  As stated in prior reports, variances include late administration of medication (nurses have one hour before and one hour after the set time for the medication to be given for administration to be timely), missed dose of medication, if a medication is ordered and not received by the patient within 24 hours of the order, the use of numerous smaller dose(s) of pills to equal the prescribed amount when the prescribed amount is available in one pill (olanzapine 20mg is prescribed and rather than give olanzapine 20mg tablet, which is available, two 10mg tablets are given). There



COMPLIANCE REPORT # 23                                        118

continued to be no information or encouragement given to individuals who refused medication. At one medication pass this Monitor witness, there were 3 medication refusals documented. The LPN did not go on the housing unit to try and speak with the refusers until the other Monitor convinced her to go. Speaking with the inmates resulted in compliance of all 3 inmates taking their medication that morning.

Suggestion:

Monitoring medication variances at OJC and TMH and accurately report findings. Wexford and OPSO need to work cooperatively to ensure medication passes are aligned with policy and procedures in order to prevent misuse, overdose, theft, and violence related to medication, which includes consistent mouth checks, observant deputies, and encouragement for compliance. Proper and thorough searches of cells and persons must be conducted by OPSO to help curb the presence of contraband, including excess prescribed and unprescribed medications. Found medications must be sent to the proper personnel for identification to help curb misuse, overdose, theft and violence in the facility. Nurses need to be directed to educate and inform refusing inmates about the risks rather than just accept a signature for the chart.

***B.2.g. Ensure that prescriptions for psychotropic medication are reviewed by a Qualified Mental Health Professional on a regular, timely basis and prisoners are properly monitored.***

Finding:

Partial Compliance

Suggestion:

Based on the CQI studies submitted for this provision, there are continuing to be compliance challenges with proper monitoring of patients on psychotropic medications. CQI pulls 10-15 random charts and looks for key components in the medical record to determine compliance with medication monitoring. In October 2025, 100% of reviewed charts had the diagnosis on the master problem list. In January 2026, 80% of the random sample of patients had their diagnosis listed on the master problem list. BMI monitoring remains a challenge. In October 2025, 64% of patients had their BMI monitored properly and in January 2026, 67% had their BMI monitored properly. In January 2026, only 47% of sampled patients had their baseline hemoglobin A1c charted which fell from 80% having it documented in October 2025. Thirty-three percent (33%) of patients had other



drug levels monitored as indicated in the study conducted in January 2026 while in July 2025, 50% of patients had other drug levels monitored. In July 2025, 87% of the random sample had baseline workup completed and in January 2026, this number fell to 73%, which is an overall improvement from January 2025 when only 53% had baseline workup complete. Regarding AIMS monitoring, in November 2025, 13% of patients had a diagnosis on their treatment plan which fell to 0% in December 2025. 40% of patients had treatment plans which included AIM testing every six month which fell to 27% in December 2025. In December 2025, only 40% of patients had AIMS assessed at baseline as compared to 87% in the November 2025 study. Refusals of medications needs attention and require proper clinical assessment and documentation which is part of adequate monitoring of inmates. Patients are expected to be counseled when a pattern of refusals occur, which is not happening consistently. The Monitor wants to reiterate the importance of the nurse practitioners at OJC/TMH/TDC receiving consistent and appropriate supervision for their work from a licensed, seasoned psychiatrist. The numbers fluctuate more and fall below compliance in medication monitoring as compared to prior tours. Case conferences and discussions are important to ensure clinical acumen and impart knowledge which may be lacking in individuals new to the correctional medicine system Ordered labs and missed labs require follow up from the ordering provider. This Monitor was informed there are assigned psychiatric nurses who alert providers to missed labs, refused labs, and rescheduled labs. There was no technician on site for a few months during this reporting period, which may contribute to the lower compliance numbers therefore we will see if this improves for the next reporting period. If a completed lab returns abnormal, the provider should be documenting what is being done to address the lab. If a patient on a second-generation antipsychotic has metabolic issues, there should be collaboration with the somatic doctor regarding treatment rather than expecting the somatic doctor to handle the case. The medications psychiatrists and nurse practitioners order are the responsibility of the prescriber. Seeking assistance shows good judgment yet the ultimate liability lies with the prescriber.

***B.2.h. Ensure that standards are established for the frequency of review and associated charting of psychotropic medication monitoring, including monitoring for metabolic effects of second-generation psychotropic medications.***



<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u>

There are standards established for the frequency of review and associated charting of psychotropic medication monitoring. This grade is based on the standards being established not the implementation or follow-through which is expected which is captured in Provision B.2.g.

<u>Findings:</u>

B.3.a.    Partial Compliance

B.3.b.    Substantial Compliance

***B.3.a. OPSO shall develop and implement policies and procedures for prisoner counseling in the areas of general mental health/therapy, sexual-abuse counseling, and alcohol and drug counseling. This should, at a minimum, include some provision for individual services.***
<u>Finding:</u>

Partial Compliance

While the overall numbers have improved in counseling services, the utilization rates for counseling services appear disproportionately low relative to the population at OJC receiving mental health treatment. Given a caseload of 674, an average of only 76.5 inmates participating in general mental health counseling indicates that this service may be underutilized. It is even more disproportionate that only 6 individuals participated in sexual abuse counseling over the past six months and it is not clear whether this is 6 distinct individuals. During the most recent site visit, staff were not consistently promoting or offering counseling services, and no substantial changes were observed by the Monitor.

For the six-month period prior to this site visit: July 2025, 85 individuals participated in general mental health counseling. August 2025, 75 individuals participated in general mental health counseling. September 2025, 51 individuals participated in general mental health counseling. October 2025, 83 individuals participated in general mental health counseling. November 2025, 88 individuals participated in general mental health counseling. December 2025, 156 individuals participated in general mental health counseling. There is no documentation to account for the drastic change in individuals who participated in general mental health counseling between November and December.

July 2025, 157 individuals participated in substance abuse counseling. August



2025, 148 individuals participated in substance abuse counseling. September 2025, 149 individuals participated in substance abuse counseling. October 2025, 149 individuals participated in substance abuse counseling. November 2025, 63 individuals participated in substance abuse counseling. December 2025, 272 individuals participated in substance abuse counseling. There was no substance abuse counselor on staff at the site visit so unsure who was facilitating substance abuse counseling during the period of review.

July 2025, 1 individual participated in sexual abuse counseling. August 2025, 2 individuals participated in sexual abuse counseling. September 2025, 1 individual participated in sexual abuse counseling. October 2025 and November 2025, 0 individuals participated in sexual abuse counseling. December 2025, 2 individuals participated in sexual abuse counseling.

Groups and individual sessions continue to be conducted inconsistently throughout the reporting period.  While the provision does not require a confidential space provided for treatment, adequate treatment requires confidentiality in order for there to be valid responses from inmates to inform necessary treatment. Cell side or on the tier interventions are not adequate mental health treatment. Development of the policies and procedures is not sufficient for substantial compliance without implementation, which would include consistent availability of therapeutic services.

Suggestion:

Tracking of the following is necessary to ensure services are available and implemented: 1) the overall baseline need for counseling services; 2) whether each counseling session identified is actually provided; and 3) the reason service was not provided and corrective actions, if implemented. The need for counseling service and group therapy should also be reflected in the treatment plan along with a clinically appropriate schedule and interventions.  The creation of dedicated space where confidential therapeutic engagement can occur would be ideal in moving this provision towards substantial compliance. The Monitor looks forward to this being the case once Phase III is operational. As stated previously, nurse practitioners and psychiatrists can also provide counseling and groups, especially on the mental health specialty units where medication compliance and understanding is crucial. To the CQI study on groups/individual therapy, please add how many patients have been offered group and individual therapy to support



that Wexford is encouraging comprehensive quality care. There should be documentation to support that services are being offered (progress note, treatment plan note, etc…).

***B.3.b. Within 180 days of the Effective Date, and quarterly thereafter, report all prisoner counseling services to the Monitor, which should include:***

***1)       the number of prisoners who report having participated in general mental health/therapy counseling at OPP;***

***2)       the number of prisoners who report having participated in alcohol and drug counseling services at OPP;***

***3)       the number of prisoners who report having participated in sexual-abuse counseling at OPP; and***

***4)       the number of cases with an appropriately licensed practitioner and related one-on-one counseling at OPP.***

Finding:

Substantial Compliance

Suggestion:

The provision is solely being graded on whether the report was submitted with the requested information. See numbers above in B.3.a. The quarterly review is submitted with the numbers of individuals who report participating in general mental health counseling, substance abuse counseling, and sexual abuse counseling. The questions as to the sufficiency of the service are addressed in Provision B.3.a.

Suggestion: Continue to collect and analyze data concerning inmates in need of these services and create corrective action plans to address the deficits which may be present at OJC and TMH. To the CQI study on groups/individual therapy, please add how many patients have been offered group and individual therapy to support that Wexford is encouraging comprehensive quality care. There should be documentation to support that services are being offered (progress note, treatment plan note, etc…). Submit the quarterly report with numbers of individuals participating in the services listed above. Wexford needs to spend more time determining the true needs of the population, which they have begun doing with surveys of the population and determining what needs to be implemented to address those needs.

Findings:

B.4.a.   Partial Compliance

B.4.b.   Substantial Compliance

B.4.c.   Substantial Compliance

B.4.d.   Partial Compliance



B.4.e.   Substantial Compliance

B.4.f.   Substantial Compliance

B.4.g.   Substantial Compliance

***B.4.a. OPSO shall ensure that all staff who supervise prisoners have the adequate knowledge, skill, and ability to address the needs of prisoners at risk for suicide. Within 180 days of the Effective Date, OPSO shall review and revise its current suicide prevention training curriculum to include the following topics:***
***1) suicide prevention policies and procedures (as revised consistent with this Agreement);***
***2) analysis of facility environments and why they may contribute to suicidal behavior;***
***3) potential predisposing factors to suicide;***
***4) high-risk suicide periods;***
***5) warning signs and symptoms of suicidal behavior;***
***6) case studies of recent suicides and serious suicide attempts;***
***7) differentiating suicidal and self-injurious behavior; and***
***8) the proper use of emergency equipment.***

Finding:

Partial Compliance

While all staff are required to participate in suicide prevention training, the knowledge that is shared is not completely translated into demonstrating the skill and ability to address the needs of the inmates at risk of suicide. The lack of compliance with searches when someone is placed on watch remains a concern. The lack of searches results in at-risk inmates having access to contraband. There needs to be continued attention to all self-injurious and suicidal behaviors.   Training should also include mock demonstrations regarding the proper response to a suicide attempt. While this provision focuses on training curriculum, the curriculum is only as good as the manifestation of what has been learned which shows the ability to address the needs of the inmates.

***B.4.b. Ensure that all correctional, medical, and mental health staff are trained on the suicide screening instrument and the medical intake tool.***

Finding:

Substantial Compliance

Suggestion:

This provision is graded solely on all staff being trained on the suicide screening instrument and medical intake tool rather than the application and implementation of the tool. Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff to include training on updated policies, procedures, and techniques. All incoming staff



COMPLIANCE REPORT # 23                                                    124

should be trained on the suicide screening instrument and medical intake tool during onboarding orientation. This monitor recommends Wexford keep a running list of ALL employees of OPSO, including Wexford employees, and document when training is due, when it has been done and the reason for pending status. Simply submitting a list of employees who have completed training is not sufficient to determine whether employees are up to date on this training.

***B.4.c. Ensure that multi-disciplinary in-service training is completed annually by correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. The training will be reviewed and approved by the Monitor.***

<u>Finding:</u>

Substantial Compliance

<u>Suggestion:</u> This provision is being graded solely on annual training being completed and documented rather than whether staff are properly adhering to and implementing the training. Continue to provide documentation that multi-disciplinary in-service training has been completed annually for all current correctional, medical, and mental health staff, to include training on updated policies, procedures, and techniques. Training will need to address deficiencies in communication, especially between OPSO and Wexford clinicians, and documentation regarding de-escalation procedures, disciplinary process, and searches. Training should clearly delineate the responsibilities of various staff member involvement, including during medication pass. Supervisory spot checks may be needed to ensure training is adequate and adhered to during various processes around OJC and TMH. This monitor recommends Wexford keep a running list of ALL employees of OPSO and document when training is due, when it has been done and reason for pending status. Simply submitting a list of employees who have completed training for a month is not sufficient to determine whether employees are up to date on this training. Part of the training needs to include emphasis on communication between Wexford and OSPO, especially with de-escalation efforts and notification of mental health after an incident, along with identifying approved documentation which is to be used throughout the facility.

***B.4.d. Ensure that all staff are trained in observing prisoners on suicide watch and step-down units status.***



Finding:

Partial Compliance

While training is done, there are still gaps in the process which places inmates at risk. It remains unclear how observation is conducted between when a person is suspected of needing to be on suicide watch and when mental health arrives for the evaluation. Mental health was called at 9:27am on October 11, 2025 for Patient x405 to be evaluated for suicide watch. Mental health arrived at 10:53am and there is no documentation to support the observation which was conducted for the hour+ the inmate waited for an evaluation. Mental health was called at 1907 on November 18, 2025 for Patient x362 to be evaluated. Mental health arrived at 1940 and there was no documentation to support the observation done to ensure the safety of the patient while he waited. Mental health was called at 1207 and arrived at 1230 for Patient x287 on October 17, 2025 without documentation to account for the 23 minutes the inmate waited for his evaluation. Patient x568 waited from 10:58am to 12:03pm on December 15, 2025 for mental health to arrive without documentation in the record to support his safety being prioritized for the hour+ he waited for his evaluation. All staff conducting watch should be completing the approved Observation/Restraint Checklist document.

Suggestion:

There will be expected waiting times for mental health to arrive when called to evaluate someone for suicide or behavioral challenges. What occurs during those waiting times to ensure the safety of the inmate is needed to support training is being properly implemented.  Continued training and supervisory observation, in person and via video will be necessary to ensure performance of suicide watches and accurate completion of these documents. Patients who are awaiting mental health evaluation should be under direct observation, which can only be done by the person(s) calling in the referral, which is usually an officer or staff member on site.

***B.4.e. Ensure that all staff that have contact with prisoners are certified in cardiopulmonary resuscitation ("CPR").***

Finding:

Substantial Compliance



Suggestion:

Continuing to provide documentation that all current staff, including OPSO and Wexford, are certified in CPR. The goal is to have at least 90% of all staff at OPSO certified in CPR. As stated earlier, a list of ALL employees who come in contact with inmates should be created and a spreadsheet could help with organization to ensure everyone is up to date in all required trainings. This information should be housed in one location (SharePoint Folder) and be ready prior to the next site visit. Ensure each provider, security officer and staff member have accurate dates on record so there is no question as to who is in need of CPR certification.

***B.4.f. Ensure that an emergency response bag, which includes a first aid kit and emergency rescue tool, is in close proximity to all housing units. All staff that has contact with prisoners shall know the location of this emergency response bag and be trained to use its contents.***

Finding:

Substantial Compliance

The cut down tools were sharp and the bags were sealed and easily located by the deputies.

Suggestion:

Ensure the cut down tools are maintained and adequately sharpened, and new staff are trained in the proper use of the tool throughout the facility. Training should also include proper technique in breaking the seal on the bag that holds the cutdown tool. Ensure that staff are available in the control room in order to access the cut down tool, if necessary. Ensure every bag has all necessary requirements.

***B.4.g. Randomly test five percent of relevant staff on an annual basis to determine their knowledge of suicide prevention policies. The testing instrument and policies shall be approved by the Monitor. The results of these assessments shall be evaluated to determine the need for changes in training practices. The review and conclusions will be documented and provided to the Monitor.***

Finding:

Substantial Compliance

Suggestion:

SECOND REQUEST: The Monitor, for the next site visit, expects the total number of along with definition of relevant staff for both Wexford and OPSO to be written down and placed in the Sharepoint folder. There is also an expectation for proof of how employees are



randomly selected. Based on the submitted documentation, there were 14 deputies (5% of 280) and 17 medical staff members (8% of 212.5) which were tested on their knowledge of suicide prevention policies. The average score for the deputies was 81% while the average score for the medical staff was 83%. Four deputies and two medical staff scored below 80% and were promptly remediated to ensure competency. With no date on the document in the SharePoint folder, unsure what period of time this report covers. Based on data from OPSO there were 345 officers (71 in IPC, 203 in OJC, 58 in TMH/TDC, and 13 in transportation) as of August 15, 2025 who may have contact with prisoners. The expectation is for the numbers to be verified, and the correct number of staff tested for the next site visit. FINAL OPPORTUNITY - This provision risks being downgraded if 1) the proper number of individuals (5%) is not completed and 2) random selection of staff is not verified.

Findings:

B.5.a.   Partial Compliance

B.5.b.   Partial Compliance

B.5.c.   Partial Compliance

B.5.d.   Partial Compliance

B.5.e.   Partial Compliance

B.5.f.   Partial Compliance

B.5.g.   Substantial Compliance

B.5.h.   Partial Compliance

B.5.i.   Partial Compliance

B.5.j.   Substantial Compliance

B.5.k.   Partial Compliance

***B.5.a. OPSO shall implement a policy to ensure that prisoners at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution.***

Finding:

Partial Compliance

While various policies are in place to ensure inmates at risk of self-harm are identified, protected, and treated in a manner consistent with the Constitution, there remains the challenge of consistent IMPLEMENTATION. Searches and securing inmate



COMPLIANCE REPORT # 23                                                      128

who are at-risk remains a top priority for compliance. Consistent and documented direct observation of prisoners prior to mental health assessment and during the time before transfer to a secure location are paramount. Without mental health being consulted prior to a use of force, inmates are at risk for harm. See examples in B.4.d. regarding the importance of documentation of safety for individuals awaiting mental health evaluation.

Suggestion:

Continue to offer a confidential space for the clinician designated to monitor inmates on suicide watch to conduct assessments. Continue to document any barriers to having access to confidential space. Ensure inmates are searched to prevent self-harm when placed on suicide watch and contraband is removed when reported. Implement medication administration policies, to include adequate mouth checks, to help prevent access of the inmate to medication for self-harm. Document consistent out of cell time for inmates on suicide watch. Individuals on suicide watch need intensive treatment interventions including out of cell time, counseling, and therapy, as medically indicated. Merely documenting an inmate has been viewed every 15 minutes is insufficient. Document treatment interventions of inmates on suicide watch and any barriers present in not providing appropriate treatment. Document any inmate on suicide watch or in detox protocols who is found with contraband or misuse of supplies. The key will be implementing standing policies to ensure the safety of inmates and staff. It is also imperative there is timely supervisory review of suicide watches to ensure employees are following existing policies and be held accountable, up to disciplinary procedures, if policies are not adhered to. Document the process between the call for mental health to come evaluate an inmate and when mental health arrives.

***B.5.b. Ensure that suicide prevention procedures include provisions for constant direct supervision of current suicidal prisoners and close supervision of special needs prisoners with lower levels of risk, at a minimum, 15 minutes check. Correctional officers shall document their checks in a format that does not have pre-printed times.***

Finding:

Partial Compliance

The Observation/Restraint Checklist and Worksheet does not have pre-printed times. With suicide watches now being conducted at TMH, there appears to be some improvement in this area. This Monitor was unable to access the videos from TMH to



determine whether watches were being conducted appropriately. There was no documentation submitted to support improvement in direct observations which must be conducted after a watch is issued prior to mental health arrival and then until transfer to a safe environment.

Suggestion: Submit documentation for suicide watches in IPC and direct observations in OJC. There needs to be consistent supervisory review to ensure employees are adhering to existing policies and disciplinary actions taken if policies are not followed. Preparations need to be made to ensure video access to TMH for suicide watches is available at the next site visit.

***B.5.c. Ensure that prisoners on suicide watch are immediately searched and monitored with consistent direct supervision until a Qualified Mental Health Care Professional conducts a suicide risk assessment, determines the degree of risk, and specifies the appropriate degree of supervision.***

Finding:

Partial Compliance

There is no documentation submitted to demonstrate that prisoners are monitored until a QMHP arrives to conduct a suicide risk assessment. Inmates are not consistently and immediately searched when placed on suicide watch.

July 2025: 12 individuals were placed on suicide watch; 3 inmates were searched (25%)

August 2025: 16 individuals were placed on suicide watch; 4 inmates were searched (25%)

September 2025: 17 individuals were placed on suicide watch; 6 inmates were searched (35%)

October 2025: 20 individuals were placed on suicide watch; 10 inmates were searched (50%)

November 2025: 12 individuals were placed on suicide watch; 6 inmates were searched (50%)

December 2025: 20 individuals were placed on suicide watch; 8 inmates were searched (40%)

Suggestion:

Inmates need to be immediately searched or as soon as safely possible 100% of the time.



The threshold for compliance being used is 90%. Written procedures for searches should be a part of training, so each staff member is clear of their responsibilities. Cells should be searched prior to placement of an inmate on suicide watch and documented. Collaboration and proactive communication are necessary between OPSO deputies and mental health staff to meet the requirements of this provision.

***B.5.d. Ensure that prisoners discharged from suicide precautions receive a follow-up assessment within three to eight working days after discharge, as clinically appropriate, in accordance with a treatment plan developed by a Qualified Mental Health Care Professional. Upon discharge, the Qualified Mental Health Care Professional shall conduct a documented in-person assessment regarding the clinically appropriate follow-up intervals.***

Finding:

Partial Compliance

Overall, the frequency of follow-up visits by a QMHP once a prisoner is discharged from suicide precautions continues to improve. Based on the submitted documentation, it appears only August and September 2025 fell below the 90% compliance expectations. Around 37% of follow-up visits were missed in August and 33% in September. There remains a dearth in the development of written treatment plans within 72 hours of placement on suicide watch. This limits the continuity of care and comprehensive method needed to help these at-risk individuals. Treatment plan and treatment plan updates are needed to ensure prescribed treatments are being performed along with progress being made by the inmate. Treatment plan goals should be discussed in progress notes.

Suggestion:

Suicide ideation/attempt can be emotional and the need for follow-up is necessary. Just as suicide assessments are conducted in a confidential space, suicide follow-up assessments require the same degree of care. A cell side visit for suicide follow up is not adequate or clinically appropriate treatment. Continue to document if there are access issues to inmates. Document any barrier to having a confidential space to complete these post-suicide watch assessments. Continue to monitor and document follow-up appointments and ensure they are conducted as policy dictates. Continue to prioritize and move in the right direction in terms of frequency of completing timely follow-up for these patients. Create treatment plans to assist with adequate care and oversight for these at-risk individuals.

***B.5.e. Implement a step-down program providing clinically appropriate transitions for prisoners***



*discharged from suicide precautions.*

Finding:

Partial Compliance

Simply having a document which outlines a step-down program is insufficient for substantial compliance without implementing a clinically appropriate, consistently run program for both males and females. At a prior site visit, the proposed programming for step-down units was reviewed. It included individual and group counseling services, recreational and music therapy, medication education and addressed discharge resources. While this programming is a good start, there are hours each day where the prisoners are unoccupied. There should be more mental health programming available than free time for this special housing population. This program has not been consistently operational during the period in review for a myriad of reasons, including staffing deficits. Consistent implementation is just as important as having the program. The program is described as providing an individualized care approach to meet the needs of the patients who may require assistance transitioning from intensive acute treatment to the general population. Having an MDT meeting for the male step down and acute units facilitated by a provider who is not responsible for the treatment and care for the patient appears to be checking off a box rather than providing quality care for the patient. The treatment plan should help generate and instruct the treatment and care which is needed for each individual. The treating provider should be facilitating this meeting as the responsible party for medications, which is a key component to treatment for this population. Knowing which programming is needed for which individual should come from the treatment plan.

Suggestion:

Consistent implementation of the step-down program is necessary. The introduction of medication education (which is number 6 on the list of offerings for this program), even in a group setting, is imperative for this population. Ensure the multi-disciplinary treatment plans include individualized treatment for inmates which is reflected in the programming being offered in the step-down program. The progress notes should reflect the treatment being given in the program in line with the prescribed interventions in the treatment plan. Continue to document interruptions in service for this unit and any



barriers in consistent programming. Nurse practitioners, nurses and psychiatrists can provide resources in terms of facilitating programming on this unit to address medication issues, hygiene issues and medication education.

***B.5.f. Develop and implement policies and procedures for suicide precautions that set forth the conditions of the watch, incorporating a requirement of an individualized clinical determination of allowable clothing, property, and utensils. These conditions shall be altered only on the written instruction of a Qualified Mental Health Care Professional, except under emergency circumstances or when security considerations require.***

Finding:

Partial Compliance

One hundred percent (100%) of inmates are not searched properly prior to being placed on suicide watch. The ones who are not searched immediately have no documentation in the record to provide an explanation as to why. The compliance threshold this monitor uses for substantial compliance is 90%. This provision calls for individualized determination of allowable property. It appears the system is an all or none mentality as to what an individual can have on suicide watch. The restrictions need to be clinically driven and properly documented to address the presented risk. Searching individuals is a key component to enforce the clinical determination of allowable property.

Suggestion:

Document all searches, including whether it occurs prior to or after the prisoner is placed on suicide watch. Provide documentation of INDIVIDUALIZED determinations of the conditions for watch for male and female inmates at OJC and at TMH. This should include all inmates who may be in non-suicide resistant cells or are awaiting a mental health assessment and are therefore on direct observation. Provide policy, procedure, and documentation about suicide watches in IPC. Once the documents are provided, implementation must also be monitored closely and employees held accountable for failing to adhere to existing policy. Once restricted property is identified, it should be removed immediately so as to prevent self-harm.

***B.5.g. Ensure that cells designated by OPSO for housing suicidal prisoners are retrofitted to render them suicide-resistant (e.g., eliminating bed frames/holes, sprinkler heads, water faucet lips, and unshielded lighting or electrical sockets).***

Finding:



Substantial Compliance

All the designated cells by OPSO have been retrofitted to render them suicide-resistant (9 cells on 2A, 2 cells on 3C, 2 cells on 2C, 2 cells on 3E). The toilets have been installed, and the cells have been updated. There are still inmates at risk for self-harm being housed in non-suicide resistant cells. Suicide watch has been moved to TMH, with the exception being housed in OJC.  The installation of wire mesh screen on 2A was an improvement in preventing jumping from inmates. Ensure the cells being used for suicide watch in IPC are suicide resistant.

Suggestion:

Continue direct observation of individuals who are housed in non-suicide resistant cells while on suicide watch to best provide for their safety. Continue suicide watch at TMH.

**B.5.h. Ensure that every suicide or serious suicide attempt is investigated by appropriate mental health and correctional staff, and that the results of the investigation are provided to the Sheriff, and the Monitor.**

Finding:

Partial Compliance

Wexford is working on establishing what constitutes a true morbidity and mortality (M&M) case. The plan remains to present M&M cases quarterly and the Monitors will provide feedback to the team regarding the presentation and whether appropriate cases have been captured. It is recommended that all completed suicides have a psychological autopsy completed by a psychologist which would help enhance the understanding and factors in the suicide.

Suggestion:

There needs to be intentional collaboration and systemic changes produced from investigations by OPSO and the mental health provider concerning suicides and serious suicide attempts at the facility. Wexford and OPSO may need to come up with criteria which will be used to classify an event as a suicide or suicide attempt. If either Wexford or OPSO identify an event as a self-harm episode, it needs to be investigated, and the COLLABORATIVE results of the investigation given to the Sheriff and the Monitor. To reiterate, there is no expectation that there will never be a suicide or suicide attempt in the correctional facility, but when they occur, they require more intentional and self-critical analysis of the event by both OPSO and the mental health provider (Wexford).



Psychological autopsies should help in identifying systemic deficits which will help inform systemic changes. Merely addressing these events in a meeting is inadequate without meaningful analysis and tangible improvements, such as enforcing existing policies that include notifying mental health professionals to assist with de-escalation. Submit a collaborative, self-reflective analysis to the Sheriff and Monitor that demonstrates comprehensive understanding and thorough investigation of these critical incidents.

***B.5.i. Direct observation orders for inmates placed on suicide watch shall be individualized by the ordering clinician based upon the clinical needs of each inmate and shall not be more restrictive than is deemed necessary by the ordering clinician to ensure the safety and well-being of the inmate.***

Finding:

Partial Compliance

The lack of staff at OJC continues to limit the ability of staff to provide direct observation for inmates. There continue to be observations from adjacent modules.

Suggestion:

The Monitor continues to recommend that inmates in IPC or anywhere in OJC, now that watches have moved to TMH, who are placed on suicide watch and have yet to be assessed by an QMHP, should be on direct observation. If the QMHP determines that direct observation is necessary, there needs to be documentation to support this. Continue to submit suicide watch audits with the location of the watch embedded in the report. Include random direct observation documentation in the folder along with orders for restriction which includes clinical rationale. Include direct observation watchlist sheets in the Sharepoint folder. It remains Wexford's responsibility to demonstrate substantial compliance and should provide documentation in the correct folder to support compliance.

***B.5.j. Provide the Monitor with periodic report on suicide and self-harm at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. The report will include the following:***
***1) all suicides;***
***2)all serious suicide or self-harm attempts; and***
***3) all uses of restraints to respond to or prevent a suicide attempt.***

Finding:

Substantial Compliance

Suggestion:

The report for the last six months of 2025 was provided to the Monitor. The Monitor



suggests OPSO and Wexford discuss all cases to ensure both parties are in agreement as to what is a suicide, what is a serious suicide or self-harm attempt, and the use of restraints to prevent a suicide attempt. If OPSO classifies an event as a suicide attempt or self-harm event and Wexford disagrees, it should be included in this report and the rationale as to why the differing of opinion should be present.

***B.5.k. Assess the periodic report to determine whether prisoners are being appropriately identified for risk of self-harm, protected, and treated. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.***

<u>Finding:</u>

Partial Compliance

The report for July 2025-December 2025 was available for the Monitor to review at the site visit in January 2026.  While the report was completed in a timely manner, there remain challenges in OPSO documenting changes to policies and procedures based on analysis of risk at the facility. There remain issues with adequate searches of inmates having access to contraband with no changes being offered to rectify the problem. The report needs to address the CAPs which may need to be put in place to better identify and rectify the gaps in the current procedures.

<u>Suggestion:</u>

Provide updated procedures to the Monitor to address outstanding issues with implementation of ensuring risk challenges are adequately addressed. This provision will also require adequate treatment plan creation, as this would address risk of self-harm and the protective measures in place, to ensure all individuals who engage with the inmate are adequately knowledgeable about the needs of the patient. Simply having training on these issues is not adequate if implementation is not routinely occurring.

<u>Findings:</u> This section involves use of restraints at OPSO. For the next site visit, the restraint policy needs to be shared along with transparency regarding prior restraint use documented in Report #21.

B.6.a.   Partial Compliance

B.6.b.   Substantial Compliance

B.6.c.   Substantial Compliance

B.6.d.   Substantial Compliance

B.6.e.   Substantial Compliance



B.6.f.    Substantial Compliance

B.6.g.    Partial Compliance

***B.6.a. OPSO shall prevent the unnecessary or excessive use of physical or chemical restraints on prisoners with mental illness.***

Finding:

Partial Compliance

Between July 2025 and December 2025, at least 136 use of force (UOF) incidents occurred at OJC. Mental health staff documented responses to 69 of these incidents (51%), with many interventions taking place post-event. Consequently, over 67 incidents (49%) involved inmates experiencing UOF without prior de-escalation efforts, as mental health support was provided after the event. There remains an ongoing need for consistent and proactive engagement with mental health services before any use of force or the implementation of de-escalation protocols within the facility.

Increased emphasis should be placed on contacting mental health professionals prior to a UOF event in order to develop strategies that prevent unnecessary application of physical or chemical restraints. Both tasers and chemical sprays, even when used briefly to subdue an inmate, are forms of restraint; likewise, using physical contact to gain compliance constitutes restraint. While ensuring safety is essential, it is equally important to prioritize de-escalation methods and utilize all available resources to minimize the need for UOF. Access to incident reports does not eliminate the necessity for improved communication and timely consultation with mental health staff before employing restraints on inmates by OPSO.

Suggestion:

Provide documentation of policies in use for planned de-escalation and use of force. Provide documentation to support consistent implementation of the policy and procedures in place to ensure mental health is contacted prior to the use of force, when reasonably safe. OPSO needs to generate a report for the Monitor documenting ALL uses of physical and chemical restraints throughout the Facility along with attempts to contact mental health and whether the restraint was planned. Create and submit to the Monitor documentation to determine how many instances of use-of-force incidents occurred over the year prior to the next site visit where mental health was not contacted prior to exercising the use-of-force. Substantial compliance will be met when at least 90% of UOF



episodes are reported and responded to by mental health, whether in an attempt at de-escalation and/or in the 24-hour aftermath with appropriate treatment planning processes put in place.

***B.6.b. Maintain comprehensive policies and procedures for the use of restraints for prisoners with mental illness consistent with the Constitution.***

Finding:

Substantial Compliance

There were no documented incidents, during the current reporting period, of restraint use  for inmates with mental illness. While the policy and procedure for restraint use was agreed upon by the Lead Monitor, DOJ, and counsel for the Plaintiff, since the last monitoring period, it was not uploaded into the SharePoint folder. Ensure there are policies and procedures in place to ensure their use is consistent with the Constitution

***B.6.c. Ensure that approval by a Qualified Medical or Mental Health Professional is received and documented prior to the use of restraints on prisoners living with mental illness or requiring suicide precautions.***

Finding:

Substantial Compliance

There were no documented incidents, during the current reporting period, of restraint use for inmates with mental illness or requiring suicide precautions.

***B.6.d. Ensure that restrained prisoners with mental illness are monitored at least every 15 minutes by Custody Staff to assess their physical condition.***

Finding:

Substantial Compliance

***B.6.e. Ensure that Qualified Medical or Mental Health Staff document the use of restraints, including the basis for and duration of the use of restraints and the performance and results of welfare checks on restrained prisoners.***

Finding:

Substantial Compliance

There were no documented incidents, during the current reporting period, of restraint use for inmates with mental illness.



*B.6.f. Provide the Monitor a periodic report of restraint use at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report shall include:*

*1)        A list of prisoners whom were restrained;*

*2)        A list of any self-injurious behavior observed or discovered while restrained; and*

*3)        A list of any prisoners whom were placed in restraints on three or more occasions in a thirty (30) day period or whom were kept in restraints for a period exceeding twenty-four (24) hours.*

Finding:

Substantial Compliance

The report was present in the SharePoint folder. There were no documented incidents, during the current reporting period, of therapeutic restraint use for prisoners with mental illness. This report is reviewed for therapeutic use of restraints rather than system wide use of restraints.

Suggestion: Continue to provide the periodic report on time and include any restraint chair use.

*B.6.g. Assess the periodic report to determine whether restraints are being used appropriately on prisoners with mental illness. Based on this assessment, OPSO shall document recommended changes to policies and procedures and provide these to the Monitor.*

Finding:

Partial Compliance

Place policy on restraints from OPSO into the SharePoint folder to provide documentation that restraint use on prisoners with mental illness has been taken into account.

Findings:

B.7.a.   Partial Compliance

B.7.b.   Partial Compliance

B.7.c.   Partial Compliance

B.7.d.   Partial Compliance

*B.7.a. OPSO shall ensure that all staff who supervise prisoners have the knowledge, skills, and abilities to identify and respond to detoxifying prisoners. Within 180 days of the Effective Date, OPSO shall institute an annual in-service detoxification training program for Qualified Medical and Mental Health Staff and for correctional staff. The detoxification training program shall include:*

*1) annual staff training on alcohol and drug abuse withdrawal.*

*2) training of Qualified Medical and Mental Health Staff on treatment of alcohol and drug abuse conducted by the Chief Medical Officer or his or her delegate.*

*3) oversight of the training of correctional staff, including booking and housing unit officers, on the policies and procedures of the detoxification unit, by the Chief Medical Officer or his or her delegate.*

*4) training on drug and alcohol withdrawal by Qualified Medical and Mental Health Staff.*



*5) training of Qualified Medical and Mental Health Staff in providing prisoners with timely access to a Qualified Mental Health Professional, including psychiatrists, as clinically appropriate; and*
*6) training of Qualified Medical and Mental Health Staff on the use and treatment of withdrawals, where medically appropriate.*

Finding:

B. 7. a. Partial Compliance

Finding:

Partial Compliance

Training on detoxification is provided. What is missing is proof as to what percentage of the staff that are required to be trained are trained. According to Wexford policy, and NCCHC policies, intake screening should take place within eight hours of the arrival of the inmate at the jail. For individuals screened with a delay of many hours, for example 1000-13,712 hours, an explanation for the delay should be provided.

*B.7.b. Provide medical screenings to determine the degree of risk for potentially life-threatening withdrawal from alcohol, benzodiazepines, and other substances, in accordance with Appendix B.*

Finding:

Partial Compliance

To obtain an accurate medical history to determine the risk of withdrawal, intake screening should be performed with auditory privacy. At this time, intake medical screening takes place with other inmates able to overhear private medical and mental health information. According to Wexford policy, intake screening should take place within eight hours of the arrival of the inmate at the jail. The Wexford Annual Report addresses reasons for not meeting the 8-hour timeframe. Staff shortages are listed first. Intoxicated patients are listed second.  Intoxication should not be the basis for delaying screening.  Intoxication must be diagnosed and not assumed. Many serious medical illnesses mimic intoxication. Combative patients are listed as another reason for a delay in intake screening.  The Wexford Standard Operating Procedure states that patients not fit for confinement, such as those with altered mental status, are not to be allowed into the facility and should be sent to the hospital for medical clearance. The deterioration of inmates without timely intake screening can be catastrophic. The intake screening tracking continuing quality study of May 2025 reviewed the intake screening for twenty-two patients. Intake screening for these patients did not occur within eight hours. In nine



COMPLIANCE REPORT # 23                                        140

of the twenty patients, intake medical screening was postponed due to delays with booking.

***B.7.c. Ensure that the nursing staff complete assessments of prisoners in detoxification on an individualized schedule, ordered by a Qualified Medical or Mental Health Professional, as clinically appropriate, to include observations and vital signs, including blood pressure.***
<u>Finding:</u>

Partial Compliance

Management of detoxification, section B.7.a-c.

Suicide is the leading single cause of death in jails, and the risk is increased among individuals in substance withdrawal and those with substance use disorder. Long term pharmacotherapy minimizes the risk of opioid overdose and death. In patients with opioid use disorder, treatment with buprenorphine reduces post release recidivism and death from overdose. During the first two weeks after release, the relative risk of death from overdose is 12 times greater, highlighting the importance of treatment in saving lives.

There are delays in assessments of patients who may qualify for the medication assisted treatment (MAT) program. There are insufficient numbers of providers starting patients on buprenorphine. Patients are started and or discontinued from buprenorphine in a subjective manner. The presence of other substances in the urine toxicology screen is not a reason to withhold buprenorphine, but it is cited as a reason to withhold buprenorphine or to discontinue buprenorphine treatment. The dosing of the buprenorphine is sometimes improperly low and contradicts Wexford's addiction specialist's recommendation, The prescribers start at a low dose due to being "uncomfortable". This will improve with education. Patients with other substances in the urine, such as THC, amphetamine or fentanyl are discontinued from the MAT program. Patients with substances in the urine are not timely started on the buprenorphine and are improperly removed from the MAT. Program. Patients are not consistently provided with substance abuse counseling while awaiting placement on the MAT program, or when discontinued from the program.

As an example in the medical records, one patient was accused of attempted diversion and the buprenorphine was discontinued. Abrupt discontinuation of buprenorphine will cause withdrawal with the attendant risk of overdose on illicit fentanyl.

In August 2025, there were multiple overdoses in the jail.  Some of these patients



had been discontinued from the MAT program and were not receiving buprenorphine. There is no standard policy for discontinuation of a patient from the MAT program. Another patient overdosed and the provider declined to start the patient on buprenorphine. due to suspected misuse of other unknown substances. Two months later the patient overdosed again. On December 1st, 2025, a referral for the medication assisted treatment program was sent to director of the MAT program. Ten days later the patient's assessment for the MAT program was completed. On December 17th, the patient was started on buprenorphine again. A two-week delay in restarting therapy

Another patient overdosed on August 26th, 2025.  He was on the MAT program and received buprenorphine at lower than the Wexford recommended dosing for buprenorphine. Buprenorphine was discontinued due to the presence of fentanyl in the urine. Then he overdosed on opioids After the overdose on opioids he was not timely restarted on buprenorphine. He did not receive any substance abuse counseling when he was discontinued from buprenorphine.

Mr. S. overdosed on August 26th, 2025. He had never been on buprenorphine. According to the intake medical screening, this patient had used fentanyl since the age 15 until an overdose in 2023.  Despite this long history of fentanyl use, the patient was not started on buprenorphine.  There is no policy to ascertain why a person with a long history of opiate use was not started on the MAT program

Another patient was not started on buprenorphine as the provider was "unable to substantiate" drug use. The patient 's urine drug screen on arrival to the jail was positive for amphetamines, buprenorphine, benzodiazepine and THC (marijuana)on August 16, 2025. By December 23, 2025, the patient   had not been restarted on buprenorphine. The medical decision making is not in the health record.

From October 28,2025 to November 13, 2025, there was a suspension of the MAT program on tier 1C.  Detoxification protocols were not implemented, and substance abuse counseling not provided.

The opioid detoxification program suffers from too few providers who initiate buprenorphine; from subjective decision making and lack of knowledge and training. The current status is leaving the patients at risk of serious harm from untreated opioid dependence and death from overdose of opioids.



***B.7.d. Annually, conduct a review of whether the detoxification training program has been effective in identifying concerns regarding policy, training, or the proper identification of and response to detoxifying prisoners. OPSO will document this review and provide its conclusions to the Monitor.***

Finding:

Partial Compliance

Patients with a history of alcohol use disorder are to be started on Ativan within four hours of acceptance into the jail. In a review of ten random patients in October 2025, this time frame was met in 60% of the patients. According to the CQI study the following are reasons that the four-hour target is not met. Sometimes the medication is administered but not entered on the medication administration record,; sometimes the patient does not verbalize a complaint, and the withdrawal policy is not followed; sometimes it is nursing error. In one case the patient was lethargic, and the medication was properly withheld. Not following the policy because the patient does not verbalize a complaint demonstrates misunderstanding of the policy. The policy is there so that the patient does not develop symptoms.

B. 8. a.  Partial Compliance

B. 8. b. Partial Compliance

***B. 8. a. OPSO shall ensure that medical and mental health staffing is sufficient to provide adequate care for prisoners' serious medical and mental health needs, fulfill constitutional mandates and the terms of this Agreement, and allow for the adequate operation of the Facility, consistent with constitutional mandates.***

Findings:

Partial Compliance

Ongoing difficulties remain in recruiting and retaining sufficient staff, including medical and mental health professionals, to effectively address the complex medical and mental health needs of inmates. Instances of missed group sessions are documented through disruption of service forms. Searches and security measures for individuals at risk are currently inadequate. Additionally, there is a persistent lack of comprehensive documented observation for at-risk prisoners, particularly prior to evaluation by a Qualified Mental Health Professional (QMHP).

Suggestion:

It is imperative that sufficient funding is allocated to recruit qualified staff and ensure constitutionally required treatment is consistently delivered throughout the entire facility. This includes supporting regular group sessions and developing effective treatment plans. The mental health provider must request an appropriate number of personnel to fulfill all mandated services across OJC, TMH, and TDC. Additionally, the MAT (Medication-Assisted



Treatment) program should be appropriately staffed based on patient volume, with adequate resources dedicated to group programming.

With the forthcoming implementation of Phase III, it is recommended that adequate staffing levels be achieved and maintained to provide care for individuals with mental health needs in accordance with constitutional standards. Facility constraints must not override the constitutional rights of those receiving treatment.

***B.8.b. Within 90 days of the Effective Date, OPSO shall conduct a comprehensive staffing plan and/or analysis to determine the medical and mental health staffing levels necessary to provide adequate care for prisoners' mental health needs and carry out the requirements of this Agreement. Upon completion of the staffing plan and/or analysis, OPSO shall provide its findings to the Monitor, SPLC, and DOJ for review. The Monitor, SPLC, and DOJ will have 60 days to raise any objections and recommend revisions to the staffing plan.***
Finding:

Partial Compliance

To achieve substantial compliance with this provision, the Monitor requests submission of a current, comprehensive staffing plan that reflects present-day expectations and the current census. The Monitor requires clarification from OPSO and Wexford regarding their assessment of the necessary staffing levels for OJC, TMH, TDC, based on the latest criteria for substantial compliance. Given changes in population and the introduction of Phase III, documentation of a thorough staffing plan is essential.

Findings:

B.9.a.   Partial Compliance

B.9.b.   Partial Compliance

B.9.c.   Partial Compliance

B.9.d.   Partial Compliance

B.9.e.   Partial Compliance

B.9.f.   Non-Compliance

***B.9.a. OPSO shall develop, implement, and maintain a system to ensure that trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Within 90 days of the Effective Date, OPSO shall develop and implement a risk management system that identifies levels of risk for suicide and self-injurious behavior and requires intervention at the individual and system levels to prevent or minimize harm to prisoners, based on the triggers and thresholds set forth in Appendix B.***
Finding:

Partial Compliance

There continues to be use of non-suicide resistant cells at OJC for inmates at high risk of self-harm without proper direct observation in place. There has been no



COMPLIANCE REPORT # 23                                                    144

documented collaboration to implement and maintain a system to ensure trends and incidents involving avoidable suicides and self-injurious behavior are identified and corrected in a timely manner. Identification of contraband is not immediately addressed which increases the risk of self-harm in the facility. Inadequate searches of inmates present risk factors which increases the risk of self-harm. Documentation of a prisoner being watched between a call for mental health evaluation and when mental health arrives is non-existent.

Suggestion:

Analyze the trends and incidents involving avoidable suicides and self-injurious behaviors to determine required interventions, like CAPs for adequate searches and removal of contraband, at the individual and system levels to prevent or minimize harm to inmates, especially inmates with repeated suicidal or self-harming behaviors. Ensure that any inmate who is not in a suicide resistant cell, especially in IPC, is under Direct Observation and that Observation Worksheets are accurately completed. Document and demonstrate the collaborative efforts between OPSO and Wexford to maintain a safe system.

***B.9.b. The risk management system shall include the following processes to supplement the mental health screening and assessment processes: incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk prisoners in need of clinical treatment or assessment by the Interdisciplinary Team or the Mental Health Committee; and development and implementation of interventions that minimize and prevent harm in response to identified patterns and trends.***

Finding:

Partial Compliance

Effective risk management within the facility necessitates collaboration between OPSO and Wexford. Both entities play essential roles in submitting and capturing data that will be analyzed to develop comprehensive risk assessments aimed at minimizing harm. Regular meetings should be established, allowing both parties to share data and information for the joint development of a robust risk management system. The MDT serves as a solid foundation for addressing complex risk concerns and would be optimally utilized with a treating provider leading and formulating the resulting plans. Ideally, this approach can be expanded to the broader population, enabling the implementation of targeted treatment and follow-up plans designed to guide services and identify risks requiring attention. Ongoing analysis remains



crucial to confirm that processes adequately manage both individual and systemic risk levels, with particular attention to risks associated with segregation.

Suggestion:

Conduct a comprehensive and collaborative analysis of risk management system processes, incorporating specified criteria to effectively minimize and prevent harm based on identified patterns and trends. This review should emphasize the importance of multidisciplinary treatment teams operating across the Facility, prioritizing evidence-based strategies such as adequate out-of-cell time and early involvement in disciplinary procedures, including the completion and utilization of written recommendations to inform appropriate actions. All stakeholders share responsibility for mitigating risks, necessitating deliberate collaboration beyond routine information sharing at monthly meetings.

***B.9.c. OPSO shall develop and implement an Interdisciplinary Team, which utilizes intake screening, health assessment, and triggering event information for formulating treatment plans. The Interdisciplinary Team shall:***

***1. include the Medical and Nursing directors, one or more members of the psychiatry staff, counseling staff, social services staff, and security staff, and other members as clinical circumstances dictate;***

***2. conduct interdisciplinary treatment rounds, on a weekly basis, during which targeted patients are reviewed based upon screening and assessment factors, as well as triggering events; and***

***3. provide individualized treatment plans based, in part, on screening and assessment factors, to all mental health patients seen by various providers.***

Finding:

Partial Compliance

The establishment of the MDT, which currently operates on 2A and 2B, marks a positive step toward implementing multidisciplinary teams in person at OJC. However, this Monitor notes that since only attendance sheets are uploaded to the SharePoint folder, it remains challenging to evaluate the effectiveness of this process. In the absence of the treating provider facilitating the MDT, recommendations may not be realized, and there is no assurance that the developed plan will be implemented for the patient. It remains expected that all inmates included on the behavioral health caseload possess a multidisciplinary treatment plan accompanied by a clinically appropriate follow-up schedule. However, most treatment plans continue to lack timely updates, and in many instances, are not completed at all.

Suggestion:

Continue to generate and complete treatment plans in TMH. Create a plan/template for



how treatment plans will be conducted and completed, including time frame, with a multidisciplinary team in all areas outside of TMH. Continue to work on the staffing plans and staffing needs in order to have multidisciplinary treatment team meetings throughout the facility. Follow the prescribed policy and include all that is necessary for a completed treatment plan.

*B.9.d. OPSO shall develop and implement a Mental Health Review Committee that will, on a monthly basis, review mental health statistics including, but not limited to, risk management triggers and trends at both the individual and system levels. The Mental Health Review Committee shall:*
*1. include Medical and Nursing Director, one or more members of the psychiatry staff and social services staff, the Health Services Administrator, the Warden of the Facility housing the Acute Psychiatric Unit, and the Risk Manage;*
*2. identify at-risk patients in need of mental health case management who may require intervention from and referral to the Interdisciplinary Team, the OPSO administration, or other providers;*
*3. conduct department-wide analyses and validation of both the mental health and self-harm screening and assessment processes and tools, review the quality of screenings and assessments and the timeliness and appropriateness of care provided, and make recommendations on changes and corrective actions;*
*4. analyze individual and aggregate mental health data and identify trends and triggers that indicate risk of harm;*
*5. review data on mental health appointments, including the number of appointments and wait times before care is received;*
*6. review policies, training, and staffing and recommend changes, supplemental training, or corrective actions.*

Finding:

Partial Compliance

While there is a committee which meets monthly, in the absence of a functioning Interdisciplinary Treatment Team assigned to OJC, there remain limitations in effectively addressing the needs of at-risk patients requiring mental health case management and potential referrals from the Mental Health Review Committee. Delays in timely follow-up for treatment plans, as dictated by a needed clinical schedule, further impede the ability to adequately meet treatment requirements. Efforts are ongoing to establish interdisciplinary teams capable of conducting thorough and reliable risk assessments. Additionally, OPSO and Wexford have increased the frequency of their meetings to enhance collaboration and work toward achieving substantial compliance in this area.

Suggestion:

Continue to expand and utilize the Interdisciplinary Treatment Team for all of OJC. Ensure treatment plans are done as per policy throughout the entire facility including 2A/2B/3E. TDC also has individuals in need of mental health treatment and should have treatment plans directing their care. Provide documentation of Mental Health Review



COMPLIANCE REPORT # 23                                147

Committee meetings, where COLLABORATION is taking place in both organizing and documenting findings, addressing all listed elements, including analysis of all data collected. This data should address and track systemic concerns as well.

*B.9.e. OPSO shall develop and implement a Quality Improvement and Morbidity and Mortality Review Committee that will review, on at least a quarterly basis, risk management triggers and trends and quality improvement reports in order to improve care on a Jail-wide basis.*
*1.The Quality Improvement Committee shall include the Medical Director, the Director of Psychiatry, the Chief Deputy, the Risk Manager, and the Director of Training.*
*2.The Quality Improvement Committee shall review and analyze activities and conclusions of the Mental Health Review Committee and pursue Jail-wide corrective actions. The Quality Improvement Committee shall:*
*a. monitor all risk management activities of the facilities through the review of risk data, identification of investigation or corrective action; and*
*b. generate reports of risk data analyzed and corrective actions taken.*

Finding:

Partial Compliance

This provision mandates ongoing collaboration between OPSO and Wexford to achieve substantial compliance. A comprehensive quality improvement process should be implemented, wherein risk management triggers and trends are systematically reviewed across the facility, and both parties jointly pursue enhancements in care delivery. The Monitor seeks evidence of OPSO participation in joint meetings as well as tangible outputs that demonstrate cooperative efforts to establish a safer environment. Wexford, OPSO, and the Monitor are continuing their work to define the parameters of M&M reviews, with relevant cases being addressed on a quarterly schedule.

Suggestion:

Jail-wide Corrective Action Plans (CAPs) have been developed, aiming to promote collaborative engagement between OPSO and Wexford for thorough monitoring of all risk management activities. Collaboration is emphasized as a critical element of this provision, particularly regarding jail-wide CAPs. It is recommended to provide documentation supporting the implementation of joint corrective action plans in areas identified for improvement, such as notifying mental health services prior to planned use of force, addressing access to care barriers, managing medication refusals and administration of medication when a patient is absent from housing unit, ensuring timely laboratory services post-inmate refusal, refining the grievance process, and facilitating access to chronic medical care. Additionally, documentation of attendance and discussion topics from quarterly meetings, along with collaboratively proposed action items, should be provided. Finally, it is essential to demonstrate how analyzed



data informs positive systemic changes throughout the facility.

*B.9.f. OPSO shall review mortality and morbidity reports quarterly to determine whether the risk management system is ensuring compliance with the terms of this Agreement. OSPO shall make recommendations regarding the risk management system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

Non-Compliance

OPSO has not submitted any recommendations regarding the risk management system or necessary changes in policy based on a review of the mortality and morbidity quarterly reports. There has been no documentation from OPSO ensuring the risk management system is in compliance with the terms of this agreement.

Suggestion:

In accordance with this provision, OPSO is obligated to review quarterly mortality and morbidity reports to assess whether the risk management system complies with the terms of this agreement. OPSO must also provide recommendations concerning the risk management system and advise on any necessary policy modifications governing this process. These recommendations and the related review are to be submitted to the Monitor; however, this submission has not yet taken place.

Reminder: A proper M&M should include the following:

1) It should be comprehensive and involve providers, nurses, social workers, pharmacists and administrators who all contribute to the care of the patient

2) It should be presented in a structured format utilizing a standardized template
    a. The template should include a CLEAR timeline, psychiatric history, medical history, and diagnostic and treatment history

3) Consider presenting deaths, injuries, unexpected complications, near-misses, and ethical/legal issues which the team is trying to address

4) There should be a Root Cause Analysis (RCA) which includes all underlying reasons for the outcome

5) Most mental health patients have co-morbid medical conditions so this needs to be explored in an M&M

6) Actionable recommendations with assignment of which individual is



COMPLIANCE REPORT # 23                    149

responsible for which tasks

7) The written summary with recommendations should be shared with all stakeholders who are involved in the care and treatment of the individual

## C.    Medical Care

### Overview:

There are improvements in the completion and reporting of medical operations. The CQI studies are completed and computerized. Corrective actions plans are being implemented to improve patient care. There are training initiatives focusing on the impact of variances on patient safety. The responsibilities of the Health Services Administrator and the Director of Nursing are currently shared as there is no individual hired for each of those positions.

There is overreliance on Licensed Practical Nurses for health care in the jail. Phone calls do not substitute for face-to-face assessments in person or by telemedicine. This resulted in a critical error, that narrowly avoided the patient's death. The patient reported black stools on August 8, 2025. The sick call complaint included feeling lightheaded and dizzy. A LPN responded but did not recognize the gravity of the complaint. On August 12th another LPN wrote a note and no action was taken. On August 23rd he patient again complained of dizziness and had to sit down. An LPN did not recognize the seriousness of the symptom. On September 2nd an LPN wrote a note and nothing happened. On September 14th, during medication administration, the patient reported feeling weak and lightheaded. The LPN did not administer the blood pressure medicine because of the low blood pressure. On September 28 at 12:40am the patient fainted in his dormitory. A. registered nurse assessed the patient for the first time in the six weeks. She recognized that the patient was pale and obtained the history of black tarry stools. She called the provider and the patient was sent to the hospital by ambulance. The patient had almost no blood in his body (hemoglobin 2, normal 14). The patient was given blood at the hospital, and a bleeding tumor of the intestines was surgically removed. The reliance on LPN is indefensible, and this patient almost died as a result. On October 3, 2025, upon return from the hospital, the provider documented unwisely and threw the LPN under the bus.

Another patient, with multiple serious medical problems, including asthma, had an attack of respiratory distress with low amounts of oxygen in the blood. Starting at 4:26 p.m., the



COMPLIANCE REPORT # 23                                                      150

LPN managed the patient without a registered nurse helping and with the provider on the telephone from home.  At 7:24pm, the patient had had three hours of low oxygen, and the at home provider ordered the patient sent to the emergency department. At 8:02 p.m., the LPN spoke again with the nurse practitioner on the phone to find out "the best way to send the patient to the hospital."

*C. OPSO shall ensure constitutionally adequate treatment of prisoners' medical needs. OPSO shall prevent unnecessary risks to prisoners and ensure proper medication administration practices. OPSO shall assess on an annual or more frequent basis whether the medical services at OPP comply with the Constitution. At a minimum, OPSO shall:*
*1. Quality Managing of Medication Administration:*
 *a. Within 120 days of the Effective Date, ensure that medical and mental health staff are trained on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.*
 *b. Ensure that physicians provide a systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for his or her condition.*
 *c. Maintain medication administration protocols that provide adequate direction on how to take medications, describe the names of the medications, how frequently to take medications, and identify how prisoners taking such medications are monitored; and*
 *d. Maintain medication administration protocols that prevent misuse, overdose, theft, or violence related to medication.*

C. 1. a. Partial Compliance

C. 1. b. Partial Compliance

C. 1. c. Partial Compliance

C. 1. d. Partial Compliance

C. 1. a.

Finding:

Partial Compliance

The high rate of medication variances continues to be a challenge.  A medication variance is said to be present if the medication is not administered according to the five rights: right patient, right drug, right time, right dose, and the right route. Medications are not renewed timely.

Medication variances are common. Until OPSO enforces mouth checks, hoarding, diversion, and overdoses continue. The responsibility of the deputy to conduct mouth



checks to make sure the inmate swallowed the medication is not universally accepted by custody staff. This has been a repeated observation of the monitors.

C. 1. b.

Finding:

Partial Compliance

There is no documentation in the medical records of systematic review of the use of medication to ensure that each prisoner's prescribed regimen continues to be appropriate and effective for their condition. A report with demographic information and a brief description of the result of the review and any changes that resulted would satisfy this provision.

C. 1. c.

Finding:

Partial compliance

The medical providers are working hard on improving this provision. The medication protocols are present but the adherence to the protocols is inconsistent, resulting in medication variances. Documentation in the medical records describe medications as not administered for the following reasons: due to expiration, awaiting delivery, in transit, unavailable and pharmacy holds. Adherence to protocols should prevent lapses in the delivery of prescribed medications to patients.  Patients who are at the hospital have documented refusals in the medical record. When a patient is at the hospital, the medication administration record should not be documented as a refusal.

C. 1. d.

Finding:

Partial Compliance

Hoarding of medication, and diversion of medication are common. Observing medication administration on the tiers, custody staff did not consistently perform   mouth checks. The Monitor believes that an effective mouth check policy has one person responsible for the mouth check and that is the deputy.

*C.2.a. Provide the Monitor a periodic report on health care at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date; and every six months thereafter until termination of this Agreement. Each report will include:*



*(1) number of prisoners transferred to the emergency room for medical treatment related to medication errors.*
*(2) number of prisoners taken to the infirmary for non-emergency treatment related to medication errors.*
*(3) number of prisoners prescribed psychotropic medications.*
*(4) number of prisoners prescribed "keep on person" medications; and*
*(5) occurrences of medication variances.*

*C.2.b. Review the periodic health care delivery reports to determine whether the medication administration protocols and requirements of this Agreement are followed. OPSO shall make recommendations regarding the medication administration process, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

C. 2. a. Partial Compliance

C. 2. b. Partial Compliance

Finding:

C. 2. a. Partial Compliance

It is primarily the detection and reporting of medication variances that causes this section to be partial instead of substantial compliance.  Errors involving the "five rights" of medication administration; the right patient, the right drug, the right dose, the right route, and the right time. During lockdowns, medication distribution should continue once the patients are locked into their cells. Patients going to court are not receiving their medications before going to court. The monitors observed this during the site visit. The medication administration record documents "at court". These patients should receive their medications before being "at court". The monitor observed that contrary to policy and training, the medication nurse did not go to the tier to ask patients about their refusal. For example, during med pass, when encouraged by the monitor, the nurse went to the individuals to ask for refusal and to ask why the patient did not come to pill pass. All three patients came to pill call when the nurse asked them if they wanted their medicine.

Finding:

C. 2. b. Partial Compliance

There are efforts to improve the medication administration including the procedures and practices to identify the most efficient and safest physical placement of the nurse and the medication cart. There are examples of medication variances in the electronic health records. Medications are described in the electronic health record as not



COMPLIANCE REPORT # 23                                                            153

given due to being in transit, unavailable, expired or hoarded. Documentation of medications may be "not given", without an explanation of "not given".

*3.a. OPSO shall notify Qualified Medical or Mental Health staff regarding the release of prisoners with serious medical and/or mental health needs from OPSO custody, as soon as such information is available.*

*3.b. When Qualified Medical or Mental Health staff are notified of the release of prisoners with serious medical and/or mental health needs from OPSO custody, OPSO shall provide these prisoners with at least a seven-day supply of appropriate prescription medication, unless a different amount is necessary and medically appropriate to serve as a bridge until prisoners can reasonably arrange for continuity of care in the community.*

*3.c. For all other prisoners with serious medical and/or mental health needs who are released from OPSO custody without advance notice, OPSO shall provide the prisoner a prescription for his or her medications, printed instructions regarding prescription medications, and resources indicating where prescriptions may be filled in the community.*

*3.d. For prisoners who are being transferred to another facility, OPSO shall prepare and send with a transferring prisoner, a transition summary detailing major health problems and listing current medications and dosages, as well as medication history while at the Facility. OPSO shall also supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution, in the amount required by the receiving agency.*

Findings:

C. 3. a. Substantial Compliance

C. 3. b. Partial Compliance

C. 3. c. Substantial Compliance

C. 3. d. Substantial Compliance

Finding:

C. 3. a. Substantial compliance

The medical provider is aware of pending releases and consistently provides medication or a prescription.

C. 3. b. Substantial compliance

Upon release, the patients are provided with at least a seven-day supply of their prescription medications.

C. 3. c. Substantial compliance

There is good coordination of custody and the medical provider resulting in good compliance with providing medication prescriptions on release.

C. 3. d. Substantial compliance

The facility does provide the necessary information to the receiving correctional facility. Please add an updated quality improvement study addressing this provision.

**D. 1. Sanitation and Environmental Conditions**



Findings:

D.1. a.   Partial Compliance

D. 1. b.  Non-Compliance

D. 1. c.  Partial Compliance

D. 1. d.  Partial Compliance

D. 1. e.  Partial Compliance

D. 1. f.  Partial Compliance

D. 1. g.  Substantial Compliance

D. 1. h.  Substantial Compliance

***D. 1. a. OPSO shall provide oversight and supervision of routine cleaning of housing units, showers, and medical areas. Such oversight and supervision will include meaningful inspection processes and documentation, as well as establish routine cleaning requirements for toilets, showers, and housing units to be documented at least once a week but to occur more frequently.***

The Monitor inspected all occupied housing units in the OJC and TDC/TMH facilities and interviewed OPSO staff and inmates during the tour. Section D.1.a. remains in partial compliance based on the following observations.

The TDC and TMH facility dayrooms and living areas were found to be reasonably clean, similar to that noted during Tour #22. The cleanliness of the TDC and TMH showers and bathroom areas was also observed to be generally clean with the exception of the hard water and soap scum deposits on the shower walls in TMH 1A and TDC 4W. The mop closet in TMH 2B was cluttered with improperly stored supplies including numerous cleaning chemical bottles scattered on the floor. Cluttered mop closets create potential harborage for insects and rodents and improperly stored chemical containers may spill or leak and cause a health hazard.

During the inspection of the OJC facility, the circulation areas as well as the medical and dental offices were again found to be maintained in a generally clean and orderly manner. However, the significant improvements in overall OJC cleanliness that were noted in Report #22 were not maintained during this compliance period. The dormitory showers continue to be problematic with chronic humidity issues, including heavily rusted doors and window frames which impedes adequate cleaning. Observations of accumulated trash and debris, hoarded items, excessive clutter, dirty floors, and dirty and soaped windows showed regression since the previous inspection. For example, clear



plastic bags overflowing with trash were observed in numerous cells and excessive quantities of meal service items were found including 17 milk cartons on a cell windowsill in 2E. Whereas, other areas were observed to be reasonably clean including the showers in pods 2A, 2B, and 3A.

The regular provision of clean inmate clothing and bedding and an appropriate inventory of these supplies are essential to sanitation, infection control, and disease prevention. The Sanitarian reported that the exchange of inmate uniforms (weekly), sheets (weekly) and blankets (monthly) has continued to adhere to the regular schedule and the inventory for these items was sufficient for scheduled exchanges, though the inmates continue to report extended periods without laundry exchanges. The Monitor asked several inmates whether they used the provided laundry bags for their personal items to be washed and the most common response was that they did not use them as it took too long to get their items returned or that they did not trust that their items would be adequately cleaned, which is what leads to inmates hand-washing their personal items in a shower, mop bucket, toilet, or utility sink and then draping them in the cells and on rails to dry. On a positive note, the current OPSO laundry contractor is returning the laundry in a timelier manner. However, OPSO must provide consistent and reliable laundry services to the inmates to overcome the skepticism that surrounds the laundry process.

Although the facility maintains an adequate stock of cleaning supplies, the inmates at OJC continue to report a lack of access to them. No documentation was provided to document compliance with the previous recommendation that OPSO routinely document the provision of cleaning materials and housing unit cleaning activities in the pod control logbooks or develop a consolidated form, by shift, requiring staff sign-off for all days in a given month for ease of tracking and monitoring. OPSO provided logbook audit forms; however, they do not address or audit areas related to sanitation. Various weekly Pod Inspection Reports were provided for OJC for the month of October 2025; however, they do not appear to accurately reflect the sanitary conditions as the check boxes related to sanitary issues are consistently affirmatively marked as clean, which does not correspond with the embedded soils and ongoing lack of cleanliness observed during the Monitor's inspections. Although several of the forms appear to document problems, the completed form did not appear to reflect them. For example, the inspection report for 1A dated



October 13, 2025 denotes that the floors are clean, despite a handwritten note stating, "Bottom floor shower drain is stopped up/flooded. Toilet in 18M stopped up/slightly flooded. Mezzanine shower stopped up/flooded." Floors that are flooded due to stopped up shower drains and toilets are not clean. Therefore, not reflecting meaningful inspection processes and documentation as required by the provision.

No change or improvement was found related to the OPSO targeted cleaning program that was implemented in April 2024, primarily focused on the deep cleaning of pod showers and other common areas in the pod either not accessible by the pod inmates or generally not addressed by the pod inmates/security staff. The stated goal was weekly cleanings in all pods. There is still only a single staff-member assigned to this program and when this person is not present for duty (days off, training, vacation, etc.), or assigned to other tasks, such as contractor escort, the cleaning tasks are not accomplished and there continues to be entire weeks that showed no showers were cleaned and therefore, this process is not resulting in routine, documented cleaning as required by the provision.

As noted in prior reports, the OPSO practice of consolidating all cleaning supplies outside of the housing units has continued and inmate access to the unit janitor closets remains restricted according to staff. The Monitor again observed a few spray bottles and other cleaning equipment in individual cells and in the dormitory housing units. This indicates that Security staff continues to have issues maintaining accountability for the supplies.

In specific regard to Item 7 of the June 17, 2024 Stipulation and Order by the Court stating,

> *Sanitation and Environmental Conditions (§ IV.D.1). Within 60 days, OPSO shall develop and implement a cleaning program to ensure that all housing units, including common areas, day rooms, restrooms, and shower areas, are cleaned at least once per week. The date of the weekly cleanings shall be documented by OPSO staff, and all housing units shall be inspected at least once a week by a security or cleaning supervisor to ensure compliance. A description of the cleaning program, and documentation of its implementation, shall be sent to the Monitor and Plaintiffs. Updates to the cleaning program must be submitted to the Plaintiffs and Monitor*



*each monitoring cycle.*

The Monitor found:

- OPSO has developed and implemented a cleaning program as required by the Order but, again, documentation did not reflect that the cleanings were being performed weekly according to the Order.
- Weekly pod inspection reports were provided for only the month of October 2025 and as stated above, the reliability of these reports is questionable.
- A description of the cleaning program was provided to the Monitor as required.

Finding:

Based on the observed conditions and documentation this section remains in Partial Compliance. However, continued regression in the next compliance period may result in a rating reduction.

**D. 1. b. Continue the preventive maintenance plan to respond to routine and emergency maintenance needs, including ensuring that showers, toilets, and sink units are adequately installed and maintained. Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs.**

Finding:

Non-Compliance

Observations:

As with previous inspections, the Monitor reviewed the OPSO Preventive Maintenance Plan, the Preventive Maintenance Schedule Summary report, routine work order submissions, instances of cell closures, and Preventive Maintenance work order reports as well as inmate grievances related to maintenance issues. It is the Monitor's opinion that the preventive maintenance system is underutilized and relatively unmonitored in terms of quality assurance/quality control as OPSO has not filled the Maintenance Director position since it was vacated in April 2025.

The Monitor also interviewed and/or toured portions of the facility with the Life-Safety Officer, a plumbing contractor representative, and the Chief Financial Officer (who also serves as the Acting Maintenance Director.  The documentation reflected that a preventive maintenance program for major building systems and components consistent



with OPSO policy and the Consent Judgment exists. Preventive maintenance continues to be a challenge due to delayed or deferred preventive maintenance, staffing and budget constraints. The documentation reflected that the completion rate for PM work orders has not substantially increased since the last inspection (less than 30% for the 1st and 2nd quarters of 2025). The Monitor inspected pipe chases in OJC TDC/TMH buildings 1, 2, 3, and 4. Clutter and trash from previous repairs appeared to be reduced substantially since the last inspection. In report #22, the Monitor noted an example of deliberate failure to complete repairs with regard to the IKON plumbing monitoring systems installed in every pipe chase. The majority of waste flow monitoring devices located behind every inmate toilet were either non-functional and/or removed entirely from the waste pipe with many leaving the pipe open to the air and allowing backups to overflow onto the floor of the pipe chases. These conditions remained and were observed again by the Monitor. The CFO advised that the previously advised that the contractor had been notified and was working on a quote to restore the system. As of the date of the inspection, the work to restore the system has not progressed beyond the information gathering stage. It is the Monitor's opinion that the monitoring system can be a valuable tool for the Maintenance staff if utilized properly. Alternatively, if the waste-line monitors and debris hooks are abandoned, removed, and capped off, Maintenance staff will still have to perform the same repair tasks for the inevitable clogged drains, but will have to wait for notification by security staff when there is an issue in a given cell (or cells).

Through the Monitor's personal observations and individual inmate interviews conducted during the walk-thru in each housing unit, the Monitor again observed a significant number of issues regarding water, electric or HVAC services in individual cells and dormitories in OJC/TDC/TMH that were not addressed in a timely fashion, possibly due to a lapse in reporting by security staff and/or Maintenance staffing issues. The issues primarily involved water pressure issues at the restroom sinks in open dormitory pods and in individual cells and inoperable shower heads, toilets and urinals throughout OJC and TDC/TMH. The Monitor did not find excessively hot inmate domestic water supplies in TDC/TMH, but several were again found to be insufficient (105 to 120 degrees is recommended for safety, sanitation, and personal hygiene.) Given the number of additional inmates being housed in these areas, the reliable operation of these systems



becomes even more important.

The current work order system is limited in its reporting capabilities, however, OPSO has upgraded the building automation system (Siemans BAS), however, it appears that OPSO Maintenance staff have yet to receive any substantial training on the BAS since the upgrade. The Monitor strongly recommends OPSO invest in "superuser" training with one or two select staff members who would then be able to train the rest of the staff in turn. This would improve Maintenance's ability to monitor major systems and respond to failures/potential failures in a timely manner ONCE staff are trained to utilize the system to its potential.

Both PM and routine maintenance work order documentation was submitted in the form of a spreadsheet under this section for review. A review of the data reflected several issues with routine maintenance as well. While the Monitor understands OPSO's staffing predicament given the loss of the Maintenance Director and some key tradespeople (i.e. the resident plumbing SME), resorting to piecemeal contracting of routine maintenance issues like plumbing presents its own issues. For example, a review of several plumbing work orders completed by the contractor demonstrated a 6-day turn-around from work order submission to completion, largely due to the paperwork and authorizations necessary. This compares unfavorably with OPSO's previous performance with only a 1-to-2-day turnaround for in-house repairs. The 4 to 5 days becomes critical when bedspace is at a premium as it causes cells to be closed for maintenance and unusable for housing purposes. The Monitor recommends OPSO give considerable attention to this issue and either fill the Maintenance Director position as well as plumbing and other trade specialists to either get back to full staffing for the section or consider contracting out the entire maintenance operation. While the Monitor believes in-house management and employees are often the best option, contracting out the entire operation would allow for better management, accountability, and a faster response to routine and preventive maintenance tasks. While a comprehensive contract can and should contain specific performance measures, OPSO would need to develop a comprehensive contract monitoring program where an in-house SME would perform the necessary QA/QC activities to ensure contract compliance and utilize the work order data to periodically audit the various maintenance/trade categories.



A review of the Maintenance-related grievances noted the upward trend from the previous report has continued through the end of this rating period.  The Monitor recommends Maintenance staff review the grievances to identify any significant grouping of issues by type and/or location in order to mitigate the upward trend in since the last inspection.

Work orders appear to be submitted in a timely manner is required by the Consent Judgment ("Work orders will be submitted within 48 hours of identified deficiencies, or within 24 hours in the case of emergency maintenance needs") as the Monitor was able to observe Maintenance personnel working on plumbing, lighting, and electrical issues. The Monitor continues to recommend OPSO randomly sample the inspection reports vis-à-vis actual work orders to provide documentation as to the timely submission of work orders as the timely follow-on repair actions are essential.

The Monitor again observed an increasing number of broken cell door windows, primarily in lockdown OJC units that were present during the last inspection and need immediate replacement.  "Hot" receptacles accessible to inmates in the housing units were far less prevalent than during previous inspections. The Monitor also noted several cell doors in OJC 3B and 3D that had been purposefully vandalized to prevent staff from securing the doors (bent hinges/broken locks) are still pending repair or are in progress. It is the Monitor's opinion that the damage is directly related to a lack of direct supervision and inmate management on the part of security staff. However, the retrofit design of the repairs appeared to be substantially more robust than the previous locks/hinges and should support the mitigation of the vandalism prevalent with specific groups of inmates. The maintenance of the cells with slider doors is still a challenge as well.

Given the minimal completion rates for preventive maintenance work orders, extended repair times for routine work orders, the ongoing issues with incomplete/faulty repairs (IKON system), and the status of the damaged doors and windows, the Monitor is maintaining this section in non-compliance but looks forward to the initiatives being brought forward by the CFO and the hiring of a permanent maintenance supervisor.

***D. 1. c. Maintain adequate ventilation throughout OPSO facilities to ensure that prisoners receive adequate air flow and reasonable levels of heating and cooling. Maintenance staff shall review and assess compliance with this requirement, as necessary, but no less than twice annually.***



<u>Finding:</u>

Partial Compliance

<u>Observations:</u>

On a positive note, the Monitor observed the majority of cell supply registers in the OJC housing units to be unblocked on the day of the inspection, which was a significant improvement over past inspections. Adequate air flow is maintained in the facilities but can be impeded in inmate cells when inmates block the air vents.  The Monitor encourages OPSO security staff to remain diligent in checking blocked registers as well as covered lighting. Compliance in this area remains an inmate supervision issue and must continue to be addressed by security staff consistently. The Monitor noted that the majority of housing dayrooms and cells to be at relatively reasonable levels of heating and cooling with some exceptions in individual cells where the monitor detected no moving air coming from the supply register. Few inmates reported cell clusters with low or no airflow and higher temperatures in various units in OJC. The HVAC issues noted in the previous report for several TDC Units appeared to be largely remedied. The recommended temperature range for the majority of housing units is 65 to 85 degrees. The OPSO staff present were advised to routinely monitor the ambient air temperatures.

The following, regarding test and balance reports, is restated from previous reports. As noted in the previous reports, test, and balance reports for the Kitchen/Warehouse (2014), OJC (2017) and TDC (2012) were the latest available to the Monitor.

Prior to the September 2019 report, this section had been interpreted as requiring comprehensive "test and balance" assessments on a semi-annual basis. Such assessments are very expensive and typically performed only during the commissioning of new or replacement HVAC systems. The Monitor has consistently requested OPSO provide reports from the Building Automation System (BAS) covering the inspection period which would reflect the actual air temperatures in the units and cells on a continuous basis. The BAS controls the heating and cooling throughout all occupied areas in OJC, and the reports would be used to verify the system's performance as well as the maintenance response to routine and emergency situations requiring service or replacement of the HVAC components.



With the upgrade of the BAS, OPSO was able to provide most of the requested data captures in the form of charts reflecting the temperature readings of the multiple VAV boxes (mechanical boxes that regulate the cool/warm air flow based on temperature settings) in each unit that control the ambient air temperature according to system presets. The Monitor acknowledges the absence of the September and October data captures due to the effects of the cyber-attack, however, several weeks were also missing from August, so the data was somewhat incomplete. Upon reviewing the reports for the OJC housing units, the monitor noted issues with several VAV boxes in units on all four floors of the facility. Several VAV boxes registered 58 degrees or 90+ degrees across the 7-day snapshots on the reports with several of them appearing to be in a chronic non-operating state. There were several others noted that dipped below 65 degrees or above 85 degrees for anywhere from 1 to 3 days indicating some action had been taken by maintenance staff to repair the issue or it self-corrected. Ideally, all of the VAV temperatures in a given housing unit should be within 5 to 7 degrees of each other to ensure consistency throughout the unit. Several unit reports showed this range to be 10 to 12 degrees or more in the same unit. The Monitor strongly recommends OPSO utilize these periodic reports to identify chronically inoperative or malfunctioning VAV equipment for repair. The Monitor looks forward to seeing fewer issues during the next review period or this section will be considered for a down-grade in the overall rating. If OPSO staff cannot remedy the issues, the Monitor recommends engaging a qualified contractor to effect the repairs and/or conduct a test and balance of the facility. The Monitor looks forward to the full implementation of the upgrade and commends OPSO on the initiative.

As during previous tours, the Monitor reviewed live data of the system's warning and alarm functions which reflected no major equipment or systems issues that had not been addressed at that moment. The Monitor inspected the BAS system and noted several alarms or alerts present on the system. The Monitor recommends OPSO staff continue to seek training from Siemens on the BAS upgrades and functionality of the system. The Monitor continues to recommend that the Maintenance Director implement a routine audit/inspection of the housing areas for such occurrences and compare the findings with the BAS and work order reports to ensure the systems are working as expected.



Additionally, the Monitor continues to recommend the Maintenance Director establish a "system status review" protocol requiring the responsible on-duty staff member to review the live HVAC equipment monitor status throughout the facility at least once per day to facilitate the identification and repair of any issues noted and document/log these reviews for routine recordkeeping as well as staff accountability.

It is the Monitor's opinion that the OJC Building Automation System and the new BAS system supporting the TMH units, as currently operated, meets the intent of the Consent Judgment regarding this section, needed repairs and service notwithstanding.

In light of the above, this section remains in Partial Compliance.

***D. 1. d. Ensure adequate lighting in all prisoner housing units and prompt replacement and repair of malfunctioning lighting fixtures in living areas within five days unless the item must be specially ordered.***

Finding:

Partial Compliance

Observations:

The Monitor observed sufficient lighting being provided in housing units and the majority of individual cells of both OJC and TDC. The Monitor found several cells with dim or no lighting. While some required a lamp replacement, the majority of the light fixtures noted were covered with paper stuck to the fixture and two that had a partial sheet held against the light fixture with homemade rope (this is a security staff issue). The Monitor strongly recommends that security and maintenance staff work together to remove all of the paper and material covering the light fixtures.

No original outlet boxes inside housing pods were found to have exposed wiring or energized outlets accessible to the inmates which the Monitor notes as a definite achievement though several newly installed junction boxes for the inmate tablet charging stations showed some evidence of tampering and even removal of the covers—an issue noted in every report since 2018 and significant shock hazard for the inmates and staff so this section remains in partial compliance.

 Maintenance staff continue to maintain a supply of replacement lamps, transformers, or ballasts to repair malfunctioning lighting.

***D. 1. e. Ensure adequate pest control throughout the housing units, including routine pest control spraying on at least a quarterly basis and additional spraying as needed.***

Finding:



Partial Compliance

Observations:

A review of the documentation submitted found sufficient evidence of a pest control program that meets the intent of the Consent Judgment. OPSO continues to maintain a pest control contract with a state-licensed company for monthly service of all housing areas and bi-weekly service for the kitchen/warehouse as well as on-demand services. The Monitor reviewed the vendor's pest activity reports, and no major vermin infestation was reported. The Sanitarian reported that there were no inmate grievances related to pest control for the rating period. Pests including drain flies and ants were not observed by the Monitor in TDC/TMH; however, inmates housed in TDC 3W report seeing ants and one inmate had used toothpaste to "caulk" around the floor-wall junction in an effort to keep them out. The presence of drain fly infestation continues to be a problem in the OJC open dormitory pods 4A, 4D, 4E, and 4F, and their presence was also documented in the internal environmental inspection reports. Drain flies resemble gnats or fruit flies and breed in the organic film that coats shower drains, stagnant water, and wet or damp mops and cleaning tools.  Drain flies are a nuisance and can carry potentially harmful microorganisms from floor drains and sewage on their bodies and contaminate clean surfaces. Drain flies are controlled by frequent drain cleanings to prevent blockage by accumulations of organic matter, eliminating sources of standing or stagnant water, and properly storing mops and cleaning tools. Based on the chronic drain fly infestation, this section remains in partial compliance.

**D. 1.f. *Ensure that any prisoner or staff assigned to clean a biohazardous area is properly trained in universal precautions, outfitted with protective materials, and properly supervised.***

Finding:

Partial Compliance

Observations:

As noted in prior reports, Policy 1101.07, "Bio-hazardous Spill Cleaning Procedures" [Revised 1/18/2018] Section VIII. A. 1 has been revised to allow properly trained and equipped inmates and deputies to clean up bio-hazardous spills. Training materials were devised by the Sanitarian. Documentation was provided to indicate that the sanitation program has not hired a new employee since 2023, and no new inmate workers have been assigned to the sanitation program since March 2025 and therefore



no training was needed.

The Monitor also reviewed training curricula and documentation indicating that during 2025, all pre-service staff received training in bio-hazardous cleanup procedures as part of their initial training and the in-service training for this requirement was conducted at a completion rate of 96%.

As of November 2018, OPSO policy requires the Sanitation and/or Environmental Officer to be notified of such incidents each business day to enable them to replace any bio-hazardous clean up protective materials used and inspect the area to ensure it was properly cleaned and sanitized. Given the number of incidents in the facility, the lack of bio-hazard reports is somewhat concerning to the Monitor. The Sanitarian has previously advised that her practice is to routinely review all reports mentioning such incidents to ensure proper follow-up is conducted and that required cleanup/inspection procedures have been followed, but without timely notification, it is doubtful that a meaningful follow-up inspection by the Sanitarian can occur.

***D. 1. g. Ensure the use of cleaning chemicals that sufficiently destroy the pathogens and organisms in biohazard spills.***

Findings:

Substantial Compliance

Observations:

The chemicals used at OPSO are sufficient to destroy pathogens and organisms in biohazard spills. Log sheets were provided documenting the routine provision of cleaning supplies to each floor for security staff/inmate use. A discrepancy was found with the Safety Data Sheets (formerly Material Safety Data Sheets) for the chemicals stored in the TDC/TMH supply storage room; however, it was immediately corrected and therefore does not pose a hazard. The Monitor is continuing to rate this section in substantial compliance.

***D. 1. h. Maintain an infection control plan that addresses contact, blood borne, and airborne hazards and infections. The plan shall include provisions for the identification, treatment, and control of Methicillin-Resistant Staphylococcus Aureus ("MRSA") at the Facility.***

Findings:

Substantial Compliance

Observations:



The Monitor reviewed the OPSO infection control policy 1201.11 and the Wexford Infectious Diseases and Infection Control Guidelines (effective April 2024) submitted by OPSO and found the policy and Wexford document sufficient to meet the requirement for substantial compliance. The OPSO infection control policy was last reviewed in June 2021 with a review date of March 2022. A memo dated January 7, 2026, states that it is being reviewed and will either be forwarded to the Sheriff for approval or any major changes will be forwarded to the Monitors. This Provision will remain in substantial compliance.

**D. 2. Environmental Control**

Findings:

D. 2. a.  Partial Compliance

D. 2. b.  Partial Compliance

***D. 2. a. OPSO shall ensure that broken or missing electrical panels are repaired within 30 days of identified deficiencies, unless the item needs to be specially ordered.***

Findings:

Partial Compliance

Observations:

OPSO Policies 601.02 "Reporting and Addressing Maintenance Needs" and Policy 601.03 "Preventive Maintenance" [August 15, 2016] are implemented. Major electrical panels at OJC and TMH are located in secure maintenance spaces inaccessible to inmates.

During the inspection, the Monitor noted no significant issues in electrical rooms accessible by security staff (maintenance equipment/materials improperly stored in front of electrical panels) that had been observed previously. Of significant concern are the junction boxes connecting the tablet charging stations to power in the inmate accessible areas. Several of these boxes had been tampered with or had the covers completely removed.

***D. 2. b. Develop and implement a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires.***

Findings:

Partial Compliance

Observations:

During the tour, the Monitor noted no energized outlets in the inmate areas on original construction circuits. The junction boxes noted above require immediate repair with secure fasteners. The covers for these boxes had apparently been missing for some



COMPLIANCE REPORT # 23                                              167

time. The Monitor did not observe any intercoms to be non-functioning in OJC during these random checks and in conversation with the occupants of the cells. The Monitor observed however, that if the inmate is locked in a cell, the inmate must either call out to the pod deputy (if present) or request another inmate who may be out of their cell to alert the pod control staff member if an issue or emergency arises as it seems intercom calls sometimes go unanswered..

The Monitor was encouraged by the presence of staff in the majority of the pod control rooms throughout OJC as these are the only workstations in OJC currently capable of receiving emergency intercom calls. However, there is still no backup system whereby intercom calls from OJC inmate cells can be answered if the control pod is not manned, however OPSO has had an assessment of the security electronics system performed by the original contractor.

The intercom system in the TDC/TMH sallyport that provides backup response to TMH inmate intercom calls is still inoperative in that staff cannot speak to the inmate. The following is repeated from Report #21 and #22 to provide continuity in the Monitor's reporting. This has been noted repeatedly. Intercom issues were noted in previous reports under Section IV.D.1.b. (with no apparent action from OPSO Maintenance), however the Monitor has determined that this issue is more appropriately covered in this section that requires the implementation of "a system for maintenance and timely repair of electrical panels, devices, and exposed electrical wires".

The inmate intercoms in the Temporary Mental Health (TMH) facility are non-working at the officer control stations, and while the Sallyport Control officer is able to observe and hear inmate intercom calls on the intercom system, and a microphone has been installed, there continues to be technical as well as staff training issues preventing two-way communication with the inmate in individual TMH cells. Subsequently, the Sallyport Control officer is not required to monitor inmate intercom calls. The Monitor continues to recommend TMH supervisory staff review the procedure and require the Sallyport Control officer to notify the respective TMH pod deputy any time a call is observed on the control screen once the equipment is in working order.

While the Monitor recognizes that the TMH population is anticipated to move to the new Phase 3 housing when it is open, this is still several months away so the issue



remains. The Monitor continues to recommend that IT staff responsible for the intercom systems make a comprehensive survey of working/non-working intercom equipment in every housing unit to facilitate repair of the system throughout the facility and add random intercom testing in every unit to the routine inspection process. Additionally, security staff supervisors should continue to emphasize the importance of the prompt response to emergency intercom calls by pod deputies and pod control staff.

**D. 3. Food Service**

This report summarizes the findings for the Food Service provisions of the Consent Judgment based on the Monitor's document reviews and tour conducted January 12-15, 2026. The Monitor inspected the Orleans Justice Center (OJC) Kitchen/Warehouse; observed meal preparation and service activities; and spoke with OPSO supervisors and deputies, Summit contracted food service employees, and inmates.

Sections IV. D. 3. a., IV. D. 3. b., and IV. D. 3. c of the Consent Judgment remained in Substantial Compliance.

Findings:

D. 3. a. Substantial Compliance

D. 3. b. Substantial Compliance

D. 3. c. Substantial Compliance

***D. 3. a. OPSO shall ensure that food service staff, including prisoner staff, continues to receive in-service annual training in the areas of food safety, safe food handling procedures, and proper hygiene, to reduce the risk of food contamination and food-borne illnesses.***

Findings:

Substantial Compliance

Observations:

D. 3. a. remains in Substantial Compliance for the period of July 2025 through December 2025 based on the documentation provided by Summit. The in-service employee training included instruction on personal hygiene and foodborne illness. Documentation was provided substantiating food safety training, and a kitchen orientation quiz was provided for new inmate kitchen workers, with the exception of October 2025, November 2025, and December 2025, because there were no new inmate kitchen workers employed during those months.

***D. 3. b. Ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized on a daily basis.***



COMPLIANCE REPORT # 23                    169

Findings:

Substantial Compliance

Observations:

The Monitor reviewed the documents submitted for the compliance period of July 2025 through December 2025, including the cleaning logs, daily chemical usage logs, chemical sanitizer concentration logs, and the kitchen vehicle inspection forms and no problems were found. The Monitor inspected the kitchen including areas where food is stored and prepared including the bakery, tray preparation area, dishwashing room, dry goods storage, coolers, freezers, and the loading dock, and found all the areas to be appropriately clean. Therefore, D. 3. B. remains in Substantial Compliance.

***D. 3. c. Check and record on a daily basis the temperatures in the refrigerators, coolers, walk-in refrigerators, the dishwasher water, and all other kitchen equipment with a temperature monitor, to ensure proper maintenance of food service equipment.***

Findings:

Substantial Compliance

Observations:

For the compliance period of July 2025 through December 2025, Section IV. D. 3. C. of the Consent Judgment remains in substantial compliance. The documentation related to cooler, freezer, and dishwasher water temperatures for the current compliance period was reviewed and indicated that the temperatures were checked and recorded daily and comply with the food code. The Monitor observed dishwashing operations and the dishwasher was operating within the proper temperature range. The Monitor measured the temperatures in the coolers and freezers during the tour, and they were within the proper range. OPSO and Summit continue to monitor refrigeration temperatures and no significant problems or concerns were noted during this compliance period. However, due to the age of the kitchen it is still recommended that OPSO develop and implement a formal preventive maintenance plan for the refrigeration system.

**D. 4. Sanitation and Environmental Conditions Reporting**

Findings:

D.4. a. Substantial Compliance

D.4. b. Substantial Compliance

***D. 4. a. Provide the Monitor a periodic report on sanitation and environmental conditions in the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective***



*Date; and every six months thereafter until termination of this Agreement. The report will include*
  *(1) number and type of violations reported by health and sanitation inspectors;*
  *(2) number and type of violations of state standards;*
  *(3) number of prisoner grievances filed regarding the environmental conditions at the Facility;*
  *(4) number of inoperative plumbing fixtures, light fixtures, HVAC systems, fire protection systems, and security systems that have not been repaired within 30 days of discovery;*
  *(5) number of prisoner-occupied areas with significant vandalism, broken furnishings, or excessive clutter;*
  *(6) occurrences of insects and rodents in the housing units and dining halls; and*
  *(7) occurrences of poor air circulation in housing units.*

Findings:

Substantial Compliance

Observations:

OPSO provided the two Semi-annual reports covering the rating period under this section. This documentation, as well as the Sanitation and Environmental reports, contained the requisite information spelled out by the Consent Judgment for this section.

*D. 4. b. Review the periodic sanitation and environmental conditions reports to determine whether the prisoner grievances and violations reported by health, sanitation, or state inspectors are addressed, ensuring that the requirements of this Agreement are met. OPSO shall make recommendations regarding the sanitation and environmental conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Findings:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic sanitation, and environmental conditions reports to ensure issues are addressed along with making recommendations regarding sanitation and environmental conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor. The Monitor reviewed the Semi-annual reports (7/24-12/24 and 1/25-6/25) provided by OPSO as required and found documentation supporting the review conducted by OPSO command staff. The documentation was sufficient to satisfy the requirements of the Consent Judgment for this rating period. This section remains in Substantial Compliance.

## E. 1. Fire and Life Safety

Findings:

E.1. a.   Substantial Compliance

E. 1. b.  Substantial Compliance

E. 1. c.   Partial Compliance



COMPLIANCE REPORT # 23                                                                 171

E. 1. d.  Substantial Compliance

E. 1. e.  Substantial Compliance

 *E. 1. a. Ensure that necessary fire and life safety equipment is properly maintained and inspected at least quarterly. These inspections must be documented.*

Finding:

Substantial Compliance

Observations:

The Monitor was able to conduct a tour of the OJC, TDC/TMH, and the Kitchen/Warehouse facilities during the January 2026 inspection with the Facility Life Safety Officer. The Monitor observed no major issues with the fire and life safety equipment other than noted below. The Monitor did note evidence of previously burned material in the form of black burn marks on the floor of the pipe chase vestibules just outside the housing unit door(s). The burn marks are made when inmates past ignited "wicks" made of paper towels under the doors to keep them lit and hidden from staff. While the odor persisted, the Monitor could not objectively determine whether the marks were recent or had been present for an extended period of time. The Monitor also noted the smell of burning materials in several housing units. The response procedure for broken sprinkler heads implemented prior to Tour #20 continues to reduce the downtime for the suppression systems whenever an inmate vandalizes a sprinkler head. The procedure includes a 15-minute "Fire Watch" security rounds in affected areas which further supports the mitigation of risk. All fire extinguishers observed were found to be current on required inspections.

The Fire Alarm Control Panels in the areas inspected were found to be properly inspected as of December 2025 and free of significant trouble However, issues with batteries, detection devices, etc. were noted for OJC, the Kitchen/Warehouse, and TMH Building 1/TDC Building 4. The issues were either corrected on the spot by the inspection service with device replacements or programming corrections or were scheduled for repair by the Life-Safety Officer. The Monitor is of the opinion that current operations meet local fire marshal requirements and is consistent with applicable code(s).

The Monitor also reviewed all monthly and quarterly inspection documentation as well as outside inspection documentation.



There were no significant issues with the documentation with the exception of some original internal inspection documents that were unavailable due to the cyber-attack. However, requisite work orders had been generated when warranted, and that all major systems were operational/ "green tagged". The vent hood fire suppression system over the main cooking line in the Kitchen noted during the previous inspection was serviced and made operational during the rating period. Of note, and previously reported, the inspection documentation continues to reflect draping, clutter and trash issues throughout the OJC inmate housing areas, however the Monitor noted fewer observed instances in most individual cells. The monitor noted fewer significant issues with excess inmate property being improperly stored in several of the housing units. As previously noted, Staff should continue the unit shakedowns and consider potential solutions to reduce the amount of clutter and potential fire-load the material presents.

As noted in the previous inspection, the Life Safety Officer continues to use the "Facility Dude" work order system to maintain the schedule of required inspections. The system notifies the Fire Safety Officer when an inspection is due. OPSO continues to maintain contracts with licensed vendors to complete annual inspections of all fire and life safety equipment. OPSO provided copies of quarterly inspections conducted by the Fire Safety Officer for Kitchen/Warehouse, OJC, and TDC/TMH for the rating period. This documentation, supported by observations during the compliance tour, indicates that OPSO ensures that necessary fire and life safety equipment is properly maintained and inspected at required intervals.

***E. 1. b. Ensure that a qualified fire safety officer conducts a monthly inspection of the facilities for compliance with fire and life safety standards (e.g., fire escapes, sprinkler heads, smoke detectors, etc.).***

Finding:

Substantial Compliance

Observations:

The Monitor was provided with the monthly inspection documents (some original documents were unavailable due to the cyber-attack) for the Kitchen /Warehouse, OJC, and TDC/TMH facilities performed during the current compliance period. The monthly and quarterly inspections were thorough and complete with all noted discrepancies listed with the associated work order number where appropriate. Non-functioning exit signs,



primarily in service spaces, were already noted by the Life-Safety Officer with repair/replacement parts being put on order. Clutter in cells and the draping of inmate clothing items were observed by the Monitor with draping being a particular problem in the dormitory units. Contraband sheets/blankets continue to be the greatest contributors to the fire load in the pod housing units that can be effectively mitigated by security staff. These inspections are conducted by a qualified fire safety officer or a qualified contractor, as required by the Consent Judgment.

***E. 1. c. Ensure that comprehensive fire drills are conducted every six months. OPSO shall document these drills, including start and stop times and the number and location of prisoners who were moved as part of the drills.***

Finding:

Partial Compliance

Observations:

The Consent Judgment requires comprehensive fire drills every six months. OPSO provided documentation for 8 total fire drills conducted in January through March 2025 for the four squads at OJC and TDC/TMH as well as the Kitchen/Warehouse facility. However, the Life-Safety Officer advised that while drills were conducted during the first two months of this rating period, the documentation was lost and irretrievable due to the effects of the cyber-attack. Absent this documentation, the Monitor has placed this section in Partial Compliance until the next inspection. OPSO has continued its practice of conducting only "Level 1" drills (no inmate evacuation) but the Monitor was assured that Level 2 drills would be conducted during the next rating period. Pre-service training was provided to all participants in classes held during the rating period.

***E. 1. d. Provide competency-based training to staff on proper fire and emergency practices and procedures at least annually.***

Finding:

Substantial Compliance

Observations:

OPSO has developed the requisite policy, training course syllabus/outline and written directives necessary for this section. OPSO training staff provided documentation noting life safety training was provided for the pre-service classes during the compliance period. Documentation for the In-Service classes were provided only for rating period, and the summary for the 2025 training year indicated just over 96% of the required staff



received the training. Sign-in sheets submitted reflect that the life-safety material was being presented at every scheduled in-service class during the rating period. This section remains in Substantial Compliance.

***E. 1. e. Within 120 days of the Effective Date, ensure that emergency keys are appropriately marked and identifiable by touch and consistently stored in a quickly accessible location, and that staff are adequately trained in use of the emergency keys.***

Finding:

Substantial Compliance

Observations:

Inspection reports note the routine verification of the keys and the Fire Safety Officer documents the periodic testing of the keys to verify they are operational. The Fire Safety Officer trains staff on the location and use of the keys during the fire and life safety training curriculum provided to all staff at the training academy.

## E. 2. Fire and Life Safety Reporting

Findings:

E. 2. a.  Substantial Compliance

E. 2. b.  Substantial Compliance

***E. 2. a. (1) – (3) Provide the Monitor a periodic report on fire and life safety conditions at the Facility. These periodic reports shall be provided to the Monitor within four months of the Effective Date and every six months thereafter until termination of this Agreement. Each report shall include:***
***(1) number and type of violations reported by fire and life safety inspectors;***
***(2) fire code violations during annual fire compliance tours; and***
***(3) occurrences of hazardous clutter in housing units that could lead to a fire.***

 Finding:

 Substantial Compliance

Observations:

The semiannual reports, referenced in E. 2. a., are conducted by OPSO on a semi-annual basis (January through June and July through December). The Monitor was provided with the report subsequent to the inspection. The report covered the rating period and noted the requisite information. The 2025 Fire and Life Safety Conditions and inspection reports generated during the rating period were made available to the Monitor prior to the January 2026 inspection. The reports contained the supporting information for the semiannual reports spelled out by the Consent Judgment. In light of the supporting documentation, the Monitor finds this section to be in substantial compliance.

***E. 2. b. Review the periodic fire and life safety reports to determine whether the violations reported by***



*fire and life safety inspectors are addressed, ensuring the requirements of this Agreement are being met. OPSO shall make recommendations regarding the fire and life safety conditions, or other necessary changes in policy, based on this review. The review and recommendations will be documented and provided to the Monitor.*

Finding:

Substantial Compliance

Observations:

The Consent Judgment requires a review of the periodic fire and life safety reports to ensure issues are addressed along with making recommendations regarding the fire and life safety conditions and policy changes based upon the review. Such reviews are to be documented and provided to the Monitor.

The Monitor reviewed the supporting documentation provided by OPSO (630/25 and 12/31/25 semi-annual reports) and determined that it was sufficient to satisfy the requirements of this section, to include the provision of documentation of the senior staff review of the semi-annual report as required. Accordingly, the rating for this section remains as Substantial Compliance.

## F. Language Assistance

*F.1.a. OPP shall ensure effective communication with and provide timely and meaningful access to services at OPP to all prisoners at OPP, regardless of their national origin or limited ability to speak, read, write, or understand English. To achieve this outcome, OPP shall:*

*(1) Develop and implement a comprehensive language assistance plan and policy that complies, at a minimum, with Title VI of the Civil Rights Act of 1964, as amended, (42 U.S.C. § 2000d et seq.) and other applicable law;*

*(2) Ensure that all OPP personnel take reasonable steps to provide timely, meaningful language assistance services to Limited English Proficient ("LEP") prisoners;*

*(3) At intake and classification, identify and assess demographic data, specifically including the number of LEP individuals at OPP on a monthly basis, and the language(s) they speak;*

*(4) Use collected demographic information to develop and implement hiring goals for bilingual staff that meet the needs of the current monthly average population of LEP prisoners;*

*(5) Regularly assess the proficiency and qualifications of bilingual staff to become an OPP Authorized Interpreter ("OPPAI");*

*(6) Create and maintain an OPPAI list and provide that list to the classification and intake staff; and*

*(7) Ensure that while at OPP, LEP prisoners are not asked to sign or initial documents in English without the benefit of a written translation from an OPPAI.*

*F.2.a. OPP shall develop and implement written policies, procedures and protocols for documenting, processing, and tracking of individuals held for up to 48 hours for the U.S. Department of Homeland Security ("DHS");*

*F.2.b Policies, procedures, and protocols for processing 48-hour holds for DHS will:*

*(1) Clearly delineate when a 48-hour hold is deemed to begin and end;*

*(2) Ensure that, if necessary, an OPPAI communicates verbally with the OPP prisoner about when the 48-hour period begins and is expected to end;*

*(3) Provide a mechanism for the prisoner's family member and attorney to be informed of the 48-hour hold time period, using, as needed, an OPPAI or telephonic interpretation service;*

*(4) Create an automated tracking method, not reliant on human memory or paper*



*documentation, to trigger notification to DHS and to ensure that the 48-hour time period is not exceeded.*

*(5)    Ensure that telephone services have recorded instructions in English and Spanish;*

*(6)    Ensure that signs providing instructions to OPP prisoners or their families are translated into Spanish and posted;*

*(7)    Provide Spanish translations of vital documents that are subject to dissemination to OPP prisoners or their family members. Such vital documents include, but are not limited to:*

*i.      grievance forms;*

*ii.     sick call forms;*

*iii.    OPP inmate handbooks;*

*iv.    Prisoner Notifications (e.g., rule violations, transfers, and grievance responses) and*

*v.     "Request for Services" forms.*

*(8)    Ensure that Spanish-speaking LEP prisoners obtain the Spanish language translations of forms provided by DHS; and*

*(9)    Provide its language assistance plan and related policies to all staff within 180 days of the Effective Date of this Agreement.*

*F.3.a. Within 180 days of the Effective Date, OPP shall provide at least eight hours of LEP training to all corrections and medical and mental health staff who may regularly interact with LEP prisoners.*

*(1)    LEP training to OPP staff shall include:*

*i.      OPP's LEP plan and policies, and the requirements of Title VI and this Agreement;*

*ii.     how to access OPP-authorized, telephonic and in-person OPPAIs; and*

*iii.    basic commands and statements in Spanish for OPP staff.*

*(2)    OPP shall translate the language assistance plan and policy into Spanish, and other languages as appropriate, and post the English and translated versions in a public area of the OPP facilities, as well as online.*

*(3)    OPP shall make its language assistance plan available to the public.*

*F.4.*

*(1)    OPP shall ensure that adequate bilingual staff are posted in housing units where DHS detainees and other LEP prisoners may be housed.*

*(2)    OPP shall ensure that an appropriate number of bilingual staff are available to translate or interpret for prisoners and other OPP staff. The appropriate number of bilingual staff will be determined based on a staffing assessment by OPP.*

<u>Findings</u>:

F.1. a.  Substantial Compliance

F. 2. a. Substantial Compliance

F. 2. b. Substantial Compliance

F. 3. a. Partial Compliance

F. 4.    Substantial Compliance

<u>Observations</u>:

The Language Assistance Plan required by this paragraph has been prepared and finalized. F. 1. a. remains in substantial compliance.

OPSO asserts that DHS and ICE inmates are not detained. OPSO developed a policy which was submitted to the Monitors. Provisions F. 2. a. and b. continue to be in substantial compliance.

OPSO provided documentation regarding the use of the language line. OPSO has



provided documentation regarding the number of bilingual staff and the manner in which the needs of language assistance are provided resulting in the continuance of substantial compliance for provisions of F. 4. The Consent Judgment specifically requires at least eight hours of LEP training for all deputies and mental health staff who may regularly interact with LEP inmates. Provision IV. F. 3. a. is determined in partial compliance as no proof of the eight hours of training was provided. Without proof, a claim of substantial compliance by OPSO is insufficient.

## G.  Youthful Prisoners

*G. Consistent with the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementation of regulations, a youthful prisoner shall not be placed in a housing unit in which the youthful prisoner will have sight, sound, or physical contact with any adult prisoner through use of a shared dayroom or other common space, shower area, or sleeping quarters. In areas outside of housing units, OPSO shall either: maintain sight and sound separation between youthful prisoners and adult prisoners, or provide direct staff supervision when youthful prisoners and adult prisoners have sight, sound, or physical contact. OPP shall ensure that youthful prisoners in protective custody status shall have no contact with, or access to or from, non- protective custody prisoners. OPP will develop policies for the provision of developmentally appropriate mental health and programming services.*

Finding:

Substantial Compliance

Observations:

OPSO housed youthful offenders during the entire monitoring period. Youthful male inmates housed by OPSO are housed separately from adult inmates. Youthful female have sometimes been housed in a single cell within TMH, but it is rare that OPSO houses youthful female inmates. When youthful inmates are in contact with adult inmates outside of the housing units, such as attending programs or going to court, they are directly supervised. During the monitoring period, developmentally appropriate mental health services were provided to youthful inmates. Travis School continues to provide educational and programming services. The requirement for developmentally appropriate mental health and programming services is separate and apart from PREA.

Housing youthful offenders places an additional strain on the overcrowded conditions. As of the writing of this report, eighteen (18) male youthful offenders were occupying a housing unit designed for sixty (60) inmates and no female youthful offenders were being housed. In the past, OPSO utilized one off the mental health units to house female youthful offenders, resulting in a backlog of male mental health inmates in



the OJC.

## A – D. The New Jail Facility and Related Issues

### A.  New Jail

*The Parties anticipate that Defendant will build a new jail facility or facilities that will replace or supplement the current facility located at 2800 Gravier Street, New Orleans, Louisiana. This Agreement shall apply to any new jail facility.*

Finding:

A. Substantial Compliance.

### B.  Design and Design Document

*Defendant shall obtain the services of a qualified professional to evaluate, design, plan, oversee, and implement the construction of any new facility. At each major stage of the facility construction, Defendant shall provide the Monitor with copies of design documents.*

Finding:

B. Substantial Compliance

Observations:

These provisions apply to the construction of any new facility. Phase III is such a facility. As the City is the entity overseeing the construction of Phase III, OPSO must coordinate with the City to provide copies of design document at each major stage. The City has been providing access to design documents and information regarding Phase III, but assistance from the Court has often been necessary to facilitate access.

### C.  Staffing

*Defendant shall consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. OPSO shall complete a staffing study to ensure that any new facility is adequately staffed to provide prisoners with reasonable safety.*

Finding:

C. Partial Compliance

Observations:

The Consent Judgment requires that the Defendant consult with a qualified corrections expert as to the required services and staffing levels needed for any replacement facility. A new staffing study was conducted for OJC. In addition, the Monitor agrees that Chief Mallett has the qualifications to complete a staffing study. However, OPSO still lacks the staff for its implementation or a plan as to how to go about the attainment of the required staff. The paragraph remains in partial compliance.

### D.  Compliance with Code and Standards

*Defendant will ensure that the new jail facility will be built in accordance with: (1) the American*



*Correctional Association's standards in effect at the time of construction; (2) the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, including changes made by the ADA Amendments of 2008 (P.L. 110-325) and 47 U.S.C. §§ 225-661, and the regulations there under; and (3) all applicable fire codes and regulations.*

Finding:

Monitors not qualified to evaluate.

Observations:

The Monitors do not have the knowledge or expertise to evaluate compliance with this paragraph. OPSO asserts that it is in compliance with this provision, without offering documentation. Documentation from the architect would be sufficient.

## VII. Compliance and Quality Improvement

### A. Policies, Procedures, Protocols, Training Curriculum and Practices

*Within 120 days of the Effective Date, OPSO shall revise and/or develop its policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement. OPSO shall revise and/or develop, as necessary, other written documents, such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Agreement. OPSO shall send pertinent newly drafted and revised policies and procedures to the Monitor as they are promulgated. The Monitor will provide comments on the policies to OPSO, SPLC, and DOJ within 30 days.*

*OPSO, SPLC, and DOJ may provide comments on the Monitor's comments within 15 days. At that point, the Monitor will consider the Parties' comments, mediate any disputes, and approve the policies with any changes within 30 days. If either party disagrees with the Monitor, they may bring the dispute to the Court. OPSO shall provide initial and in-service training to all Facility staff with respect to newly implemented or revised policies and procedures. OPSO shall document employee review and training in new or revised policies and procedures.*

Finding:

VII. A. Partial Compliance

Observations:

OPSO has now completed the development of the required policies. OPSO's efforts in the development of procedures and lesson plans resulted in this paragraph continuing to be in partial compliance. OPSO should continue to seek the input of the Monitors and Parties on any revisions of the policies required by the Consent Judgment. OPSO is reminded that it may not unilaterally change those policies.

### (H). B. Written Quality Improvement Policies and Procedures

*Within 180 days of the Effective Date, Defendant shall develop and implement written quality improvement policies and procedures adequate to identify serious deficiencies in protection from harm, prisoner suicide prevention, detoxification, mental health care, environmental health, and fire and life safety in order to assess and ensure compliance with the terms of this Agreement on an ongoing basis. Within 90 days after identifying serious deficiencies, OPSO shall develop and implement policies and procedures to address problems that are uncovered during the course of*



*quality improvement activities. These policies and procedures shall include the development and implementation of corrective action plans, as necessary, within 30 days of each biannual review.*

Finding:

VII. B. Partial compliance

Observations:

OPSO has developed corrective action plans to identify serious deficiencies, and to address problems that are uncovered during the course of quality improvement activities to warrant a finding of partial compliance. These corrective action plans have been agreed to by the parties and Monitors and have been filed with the Court. The plans contain specific performance measures, timelines, and the persons responsible. The issue now is implementation which will require the auditing of adherence to the action plan and appropriate accountability measures.

### (I). C. Full-Time Compliance Coordinator

*The Parties agree that OPSO will hire and retain, or reassign a current OPSO employee for the duration of this Agreement, to serve as a full-time OPSO Compliance Coordinator. The Compliance Coordinator will serve as a liaison between the Parties and the Monitor and will assist with OPSO's compliance with this Agreement. At a minimum, the Compliance Coordinator will: coordinate OPSO's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to OPSO's personnel to the Monitor, SPLC, DOJ, and the public, as needed; ensure that all documents and records are maintained as provided in this Agreement; and assist in assigning compliance tasks to OPSO personnel, as directed by the Sheriff or his or her designee. The Compliance Coordinator will take primary responsibility for collecting information the Monitor requires to carry out the duties assigned to the Monitor.*

Finding:

Substantial Compliance

Observations:

Colonel Nicole Harris continues to serve as the full-time Compliance Coordinator.

### (J.) D. Self-Assessment

*On a bi-annual basis, OPSO will provide the public with a self-assessment in which areas of significant improvement or areas still undergoing improvement are presented either through use of the OPSO website or through issuance of a public statement or report.*

Finding:

Substantial Compliance

Observations:

OPSO provides the assessment through its website. This provision is in substantial compliance.



## J. Reporting Requirements and Right of Access

## A. Periodic Compliance Reporting

*OPSO shall submit periodic compliance reports to the Monitor. These periodic reports shall be provided to the Monitor within four months from the date of a definitive judgment on funding; and every six months thereafter until termination of this Agreement. Each compliance report shall describe the actions Defendant has taken during the reporting period to implement this Agreement and shall make specific reference to the Agreement provisions being implemented. The report shall also summarize audits and continuous improvement and quality assurance activities, and contain findings and recommendations that would be used to track and trend data compiled at the Facility. The report shall also capture data that is tracked and monitored under the reporting provisions of the following provisions: Use of Force; Suicide Prevention; Health Care Delivered; Sanitation and Environmental Conditions; and Fire and Life Safety.*

Finding:

Substantial Compliance

Observations:

The required compliance reports were submitted during the monitoring period.

This provision is now in Substantial Compliance.

## B.  (Notification of) Death of Any Prisoner

*OPSO shall, within 24 hours, notify the Monitor upon the death of any prisoner. The Monitor shall forward any such notifications to SPLC and DOJ upon receipt. OPSO shall forward to the Monitor incident reports and medical and/or mental health reports related to deaths, autopsies, and/or death summaries of prisoners, as well as all final SOD and IAD reports that involve prisoners. The Monitor shall forward any such reports to SPLC and DOJ upon receipt.*

Finding:

Substantial Compliance

## C. Records

*Defendant shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Monitor within seven days of request for inspection and copying. In addition, Defendant shall maintain and provide, upon request, all records or other documents to verify that they have taken the actions described in their compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, incident reports, tier logs, or use of force reports).*

Finding:

Substantial Compliance

Observations:

During this compliance period, OPSO provided the Monitors with any records requested within seven (7) days of request with the exception of some requests made by the Medical Monitor and Mental Health Monitor. This provision is in substantial compliance, but improvement to responses from Wexford is still warranted.



## IV. Stipulated Orders

OPSO and the Plaintiffs/DOJ negotiated two agreements after Compliance Report #3. OPSO and the Plaintiffs/DOJ agreed to a third Stipulation and Order after Compliance Report #20 which was signed on June 17, 2024. The language of the Stipulated Orders is linked directly to the Consent Judgment and represent priority areas for inmate safety. Some of them require a one-time action such as the posting of a memorandum or providing training by a specific date. Some of the provisions of the Stipulated Order of February 11, 2015, contain on-going obligations that are in addition to the Consent Judgment or clarify the obligations under the Consent Judgment. All of the provisions of the Stipulation and Order of June 17, 2024, contain on-going obligations that are in addition to the Consent Judgment or expand the obligations under the Consent Judgment.

The three provisions of the April 22, 2015, Stipulated Order are in substantial compliance and contained provisions that were to be accomplished by specific dates during April 2015. As those dates have passed, the Monitors no longer monitor those provisions. The Stipulated Order of February 11, 2015 has provisions which require ongoing compliance. As of Report #21, OPSO's compliance with the June 17, 2024 Stipulation and Order is included.

Stipulated Order of February 11, 2015:

*1. a. At each of the scheduled Court status conferences, the Sheriff or his designee shall report to the Court regarding OPSO's compliance status with each section (e.g. Section IV.A, IV.B.) of the Consent Judgment. This report shall include a summary of OPSO's progress since the immediate previously scheduled status conference and will include in the reporting OPSO's planned actions in the next 60 days to come into compliance.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Court. Those are now being filed with the Court as to the items found in non-compliance in Report #20, but not as to those in partial compliance.

*1. b. OPSO shall comply with the Consent Judgment's requirement for periodic a compliance report as set forth in Consent Judgment Section VIII.A.2. The report shall describe the steps OPSO has taken in furtherance of compliance, and the activities planned during the next reporting period. The first report is due by April 1, 2015, and periodic reports shall be due in accordance with Section VIII.A, and/or on*



*dates mutually agreed to by the parties and the Monitors, and approved by the Court, as necessary.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining planned actions in the form of a report to the Monitors every six months.

*1. c. Within 24 hours of the occurrence of any of the following incident, OPSO shall notify the Monitor via email:*

- *Death of an inmate/arrestee while held in custody (or housed in a hospital to which the inmate has been committed for care and retain in the custody of OPSO; or whose injury occurred while in custody and was subsequently released from custody);*
- *An inmate's/arrestee's suicide, suicide attempt, aborted suicide attempt, suicidal intent, and/or deliberate suicide self-harm gesture as defined by the American Psychiatric Association;*
- *An inmate's allegation of sexual abuse, sexual assault, sexual harassment, or voyeurism whether the incident is between or among inmates, or between or among inmates and a staff/contractor or volunteer;*
- *An inmate's report, or a report by a staff/contractor or volunteer, of any inmate/inmate allegation of assault; or other inmate allegation of felonies occurring to them while in custody;*
- *An inmate's report of a report by a staff/contractor or volunteer, of any allegation of excessive force by an employee, volunteer or contractor;*
- *Suspension or arrest of any OPSO employee, volunteer, or contractor for alleged criminal activities while on-duty and/or in a facility under the control of OPSO; and*
- *Any recovery of significant contraband, specifically weapons.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision.  At best, the Monitor learns of some of the items through incident reports, review of investigations and newspaper reports. Seldom is the notification within 24 hours. OPSO should put in place a system to comply with this provision. It is suggested that the notification come from the Chief of Corrections or the Administrative Colonel as they are more likely to be aware of the occurrence of the triggering events.

*5. b. Commencing March 1, 2015, OPSO will make available to the Monitors, at the Monitors' request, the quarterly reviews conducted by ISB and the command staff regarding the operation of the EIS system, including supporting documentation reviews, as delineated by Section IV A. 4. b., c., d., and e. of the Consent Judgment.*

Finding:



Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. As noted in the rating and comments in Section IV. A. above, simply providing a list of names with no indication that the command staff has reviewed the list and determined what action, if any, should be taken is insufficient.

*7. a. OPSO shall provide a monthly report to the Monitors, identifying the number of deputies hired the previous month; the number of deputies who resigned, if known, the reason for resignation, and the date the deputy entered service; and the number of deputies who were terminated, the reason for termination, and the date the deputy entered service. The same report shall be provided for non-sworn (civilian staff). A cumulative annual total will also be included as part of this report.*

Finding:

Substantial Compliance

Observations:

OPSO provides a monthly report that complies with the requirements of this provision.

*7. c. At the scheduled status conferences with the Court, OPSO shall report regarding progress to achieving hiring based on the plan, as well as any modifications and update to the plan.*

Finding:

Partial Compliance

Observations:

OPSO has not sufficiently complied with the requirements of this provision. This provision envisions outlining progress on adherence to the recruitment plan in the form of a report to the Court.

Stipulation and Order of June 17, 2024:

*1. __Non-Compliance Corrective Action Planning__*
*a. OPSO shall implement the steps identified in the Non-Compliance Corrective Action Plan by the deadlines reported therein.*
*b. OPSO shall provide Plaintiffs and the Monitor with a monthly report regarding progress until those provisions are in substantial compliance. The Non-Compliance Monthly Report shall be sent to Plaintiffs and the Monitor three days before the regularly scheduled monthly meeting between OPSO, Plaintiffs, and the Monitor.*
*c. OPSO shall file the Non-Compliance Monthly Report with the Court once every quarter for the next calendar year. Specifically, OPSO shall file the Non-Compliance Monthly Report within 7 days of the monthly meeting held in August 2024, November 2024, February 2025, and May 2025.*

Finding:

Partial Compliance



Observations:

While OPSO has timely provided monthly reports on the Non-Compliance Action Plan and timely filed the reports within the quarterly meetings held during the monitoring period, OPSO has consistently failed to implement the steps identified by the deadlines contained therein as indicated in OPSO's own reports.

**2.   *OPSO Communications to Plaintiffs and the Monitor***
*a.  Right of Access (VIII.D.-E.) Within 30 days, OPSO shall designate a new or current OPSO employee to serve under the title of "Compliance Information Officer" (CIO). The CIO will be responsible for responding to written requests for information from one or both of the Plaintiffs, including by orchestrating the production of requested documents in the possession or control of OPSO, within 14 days of receipt of such requests, consistent with paragraph 12a. of the 06/21/16 Stipulated Order. R. Doc. No. 1082. The CIO will work with OPSO staff and contractors to ensure timely production of document to the CIO within 10 days of the CIO's request to staff. If documents do not exist or are not responsive to the Plaintiffs' request for document, the OPSO employee or contractor must describe those particularized reasons for non-production of documents in a memorandum to the CIO with 10 days of the CIO's request for document. The CIO shall provide a memorandum each monitoring period to the Monitor and Plaintiffs about OPSO's compliance with this section.*

Finding:

Partial Compliance

Observations:

OPSO has failed to provide documents requested within 14 days of receipt of the request on numerous occasions. Also, OPSO failed to provide a memorandum for this monitoring period regarding compliance with this section. This provision is in danger of being downgraded to Non-Compliance.

**3.   *Staffing, Staffing Plans, and Recruitment (IV.A.6.a.-b.)***
*a.  Within 65 days, OPSO shall implement an Emergency Security Staffing Plan (ESSP). Under the ESSP, at least one deputy must be assigned to and must be physically present (and not in the pod module) on 2A (or any unit that has been designated by the Housing Unit Assignment Plan ("HUAP") as the MH (mental health) or SW (suicide watch) or DO (direct observation) or MH seg (mental health segregation) unit in the Orleans Justice Center ("OJC") , 2C (or any unit that has been designated by the HUAP to hold youthful offenders), 2D (or the units that has been designated by the HUAP to hold youthful offenders), and 3C (or the unit that has been designated by the HUAP as the male disciplinary unit) 24 hours a day, 7 days a week. This deputy may not be assigned to other units and must be physically on the unit (and not in the pod module) at all times during their shift, but shall be periodically relieved by another deputy and/or supervisor during meals or breaks. The ESSP must describe how other deputies and/or supervisors will relieve the deputy assigned to 2A, 2C, 2D, and 3C during meals and breaks to ensure 24/7 physical staffing on these units. OPSO shall provide a memorandum each monitoring period to the Monitor and Plaintiffs about OPSO's compliance with this section.*

Finding:

Partial Compliance

Observations:



OPSO implemented the Emergency Security Staffing Plan (ESSP), but at least one deputy was not consistently assigned to the required housing units. OPSO provides the required memorandum during the monitoring period.

**4. *Custodial Placement Within OPSO (IV.A.10.)***
 **a. *Classification System Validation (IV.A.10.f.)***
    ***i. Within 90 days, OPSO shall secure a contract with a qualified organization or individual for the validation of the classification system. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.***
    ***ii. The validation of the classification system shall be completed within 180 days. OPSO shall provide documentation of the validation to the Monitor and Plaintiffs upon its completion.***

Finding:

Substantial Compliance

Observations:

OPSO secured a contract for validation of the classification system within 90 days and provided it to the Monitors and Plaintiffs. The validation was completed within 180 days. OPSO provided documentation of the validation to the Monitors and Plaintiffs upon its completion.

**5. *Grievances (IV.A.11.a.(1), (3))***
    ***Within 90 days, OPSO shall secure a contract for the supply of electronic kiosks that can be used to file confidential grievances electronically in each housing unit. The electronic kiosks, that will replace the currently non-functioning kiosks, shall be installed in each of the housing units, and shall be in workable order and fully operational, within 180 days. OPSO shall provide a copy of the contract to the Monitor and Plaintiffs upon its execution.***

Finding:

Substantial Compliance

Observations:

OPSO secured the contract for the supply of electronic kiosks for the confidential filing of grievances. It became operational in April 2025.

**6. *Medical and Mental Health Care (IV.B.-C.)***
**a. *Within 90 days, OPSO shall create and implement a system of notifying the Provider's mental health staff of every use of force incident by radio. For planned use of force incidents and use of force incidents where OPSO staff does not need to use immediate for to preserve the safety of staff or the safety of OPSO residents, a supervisor will radio for mental health staff prior to the use of force. This does not replace the need for identification and response to other triggering events, such as mental health involvement in de-escalation in advance of the use of force. Within 90 days, OPSO shall train deputies on the system and need to alert the Provider's mental health staff of all use of force incidents so the Provider can conduct a mental health assessment. OPSO shall provide the Monitor and Plaintiffs with documentation showing the change, the materials used during the training, and a record of who received the training.***

Finding:

Partial Compliance



Observations:

OPSO implemented a system of notifying the mental health staff of every use of force incident by radio but did not effectively implement it. While roll call training was provided, the necessary documentation was not provided.

**7. *Sanitation and Environment Conditions (IV.D.1.)***
***Within 60 days, OPSO shall develop and implement a cleaning program to ensure that all housing units, including common areas, day rooms, restrooms, and shower areas are cleaned at least once per week. The date of the weekly cleanings shall be documented by OPSO staff, and all housing units shall be inspected at least once a week by a security or cleaning supervisor to ensure compliance. A description of the cleaning program and documentation of its implementation shall be sent to the Monitor and Plaintiffs. Updates to the cleaning program must be submitted to the Plaintiffs and Monitor each monitoring cycle.***

Finding:

Partial Compliance

Observations:

OPSO developed and implemented a cleaning program, but the cleaning program, with the exception of the showers, was not effectively implemented so as to result in cleaning at least once per week.



| | Report #10 3/18/19 | Report #11 9/19/19 | Report #12 3/6/20 | Report#13 11/16/20 | Report #14 5/17/21 | Report #15 11/15/21 | Report #16 06/26/22 | Report #17 12/08/22 | Report #18 07/13/23 | Report #19 12/07/23 | Report #20 06/24/24 | Report #21 12/19/24 | Report#22 07/28/25 | Report #23 01/12/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IV.A. 1. Use of Force Policies and Procedures/Margo Frasier** | | | | | | | | | | | | | | |
| IV. A. 1.a. | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A. 1.b. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV. A. 1.c. | SC | SC | PC | PC | PC | PC | NC | NC | NC | PC | PC | SC | SC | SC |
| **IV.A.2. Use of Force Training/Margo Frasier and Shane Poole** | | | | | | | | | | | | | | |
| IV. A. 2. a. | PC | SC | SC | SC | PC | PC | SC | SC | PC | PC | PC | PC | SC | SC |
| IV. A. 2. b. | PC | SC | SC | SC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV. A. 2. c. | PC | SC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC | PC | SC |
| **IV.A.3. Use of Force Reporting/Margo Frasier** | | | | | | | | | | | | | | |
| IV. A.3 a. | PC | SC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 b. | PC | PC | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 c. | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 d. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 e. | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 f. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 g. | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV. A.3 h. | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.4. Early Intervention System ("EIS") /Margo Frasier and Shane Poole** | | | | | | | | | | | | | | |
| IV.A.4.a. | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.4.b. | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.4.c. | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.4.d. | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.4.e. | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.A.5. Safety and Supervision/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.5.a. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.5.b. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.5.c. | PC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.d. | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC | NC | NC | NC |
| IV.A.5.e. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.5.f. | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.5.g. | PC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV.A.5.h. | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.5.i. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC |
| IV.A.5.j. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | NC | PC | NC | NC |
| IV.A.5.k. | PC | SC | SC | PC | PC | PC | PC | NC | NC | NC | PC | PC | PC | PC |
| IV.A.5.l. | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | PC |
| **IV.A.6. Security Staffing/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.6.a. | SC | SC | SC | PC | PC | PC | NC | NC | NC | NC | NC | NC | NC | PC |
| IV.A.6.b. | SC | SC | SC | PC | PC | PC | NC | NC | NC | NC | PC | PC | PC | PC |
| **IV.A.7 Incidents and Referrals/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.7.a. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.A.7.b. | PC | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.c. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.d. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.e. | PC | SC | SC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.7.f. | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.g. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.h. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.i. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.7.j. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.A.8. Investigations/Margo Frasier** | | | | | | | | | | | | | | |
| IV.A.8.a. | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.A.8.b. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.8.c. | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | PC |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.A.8.d. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.8.e. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC |
| IV.A.8.f. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV.A.9. Pretrial Placement in Alternative Settings/Margo Frasier* | | | | | | | | | | | | | | |
| IV.A.9.a. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.9.b. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.A.10. Custodial Placement within OPP/Patricia Hardyman* | | | | | | | | | | | | | | |
| IV.A.10.a. | PC | SC | SC | SC | SC | PC | PC | NC | PC | PC | PC | PC | PC | PC |
| IV.A.10.b. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.10.c. | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC |
| IV.A.10.d. | SC | PC | PC | SC | SC | SC | PC | NC | NC | NC | NC | NC | PC | NC |
| IV.A.10.e. | PC | PC | PC | SC | PC | PC | NC | NC | SC | NC | PC | SC | SC | NC |
| IV.A.10.f. | SC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC | PC | PC | PC |
| IV.A.10.g. | SC | SC | SC | SC | SC | SC | PC | NC | SC | SC | SC | SC | SC | SC |
| IV.A.10.h. | PC | SC | SC | PC | SC | PC | SC | NC | SC | SC | SC | SC | SC | SC |
| *IV..A.11. Prisoner Grievance Process/Margo Frasier and Shane Poole* | | | | | | | | | | | | | | |
| IV.A.11.a | PC | | | | | | | | | | | | | |
| IV.A.11.a.(1) | | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | SC | SC |
| IV.A.11.a.(2) | | PC | PC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | NC |
| IV.A.11.a.(3) | | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC |
| IV.A.11.a.(4) | | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(5) | | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.A.11.a.(6) | | PC | PC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC |
| *IV.A.12. Sexual Abuse/Margo Frasier* | | | | | | | | | | | | | | |
| IV.A.12. | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.A.13. Access to Information/Margo Frasier* | | | | | | | | | | | | | | |
| IV.A.13. | SC | SC | SC | SC | SC | SC | SC | PC | NC | NC | NC | PC | SC | SC |
| *IV. B. Mental Health Care* | | | | | | | | | | | | | | |
| *IV.B.1. Screening and Assessment/Nicole Johnson* | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.1.a. | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC | PC | PC | SC | SC |
| IV.B.1.b. | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.1.c. | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.1.d. | SC | SC | SC | PC | PC | SC | SC | SC | SC | PC | SC | PC | PC | PC |
| IV.B.1.e. | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.f. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.g. | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC |
| IV.B.1.h. | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| IV.B.1.i. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.j. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.k. | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.1.l. | SC | SC | SC | PC | PC | PC | PC | SC | SC | SC | PC | PC | PC | PC |
| B. 2. Treatment/Nicole Johnson | | | | | | | | | | | | | | |
| IV.B.2.a. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.b. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.c. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.d. | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.2.e. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.B.2.f. | PC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.2.g. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.2.h. | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC |
| IV.B.3. Counseling/Nicole Johnson | | | | | | | | | | | | | | |
| IV.B.3.a. | PC | PC | PC | PC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.3.b. | PC | PC | PC | PC | NC | PC | PC | SC | SC | SC | SC | PC | SC | SC |
| IV.B.4. Suicide Prevention Training Program/Nicole Johnson | | | | | | | | | | | | | | |
| IV.B.4.a. | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.b. | PC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV.B.4.c. | PC | PC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.4.d. | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.4.e. | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.B.4.f. | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | SC | SC | SC | SC |
| IV.B.4.g. | PC | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| **IV.B.5. Suicide Precautions/Nicole Johnson** | | | | | | | | | | | | | | |
| IV.B.5.a. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.b. | SC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.c. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.d. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |
| IV.B.5.e. | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.f. | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.g. | PC | PC | PC | PC | PC | PC | PC | PC | PC | SC | SC | SC | SC | SC |
| IV.B.5.h. | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.i. | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.5.j. | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC |
| IV.B.5.k. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| **IV.B.6. Use of Restraints/Nicole Johnson** | | | | | | | | | | | | | | |
| IV.B.6.a. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.6.b. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC |
| IV.B.6.c. | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC |
| IV.B.6.d. | PC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.B.6.e. | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV.B.6.f. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC |
| IV.B.6.g. | PC | NC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| **IV.B.7. Detoxification and Training/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | |
| IV.B.7.a. | PC | PC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.7.b. | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC |
| IV.B.7.c. | PC | PC | PC | PC | PC | PC | PC | NC | NC | PC | PC | PC | PC | PC |
| IV.B.7.d. | NC | PC | PC | PC | SC | SC | SC | NC | PC | PC | NC | PC | PC | PC |
| **IV.B.8. Medical and Mental Health Staffing/Nicole Johnson/Susi Vassallo** | | | | | | | | | | | | | | |
| IV.B.8.a. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| IV.B.8.b. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *IV.B.9. Risk Management/Nicole Johnson/Susi Vassallo* | | | | | | | | | | | | | | |
| *IV.B.9.a.* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.b.* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.c.* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.d.* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.e.* | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.B.9.f.* | NC | PC | PC | PC | PC | PC | PC | PC | PC | NC | PC | NC | NC | NC |
| *IV.C. Medical Care* <br> *See SA 2/11/15 13.* | | | | | | | | | | | | | | |
| *IV. C. Quality Management of Medication Administration/Susi Vassallo* | | | | | | | | | | | | | | |
| *IV.C.1.a.* | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *IV.C.1.b.* | PC | PC | PC | PC | PC | SC | PC | PC | SC | PC | PC | PC | PC | PC |
| *IV.C.1.c.* | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| *IV.C.1.d.* | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.C.2. Health Care Delivered/Susi Vassallo* | | | | | | | | | | | | | | |
| *IV.C.2.a.* | NC | PC | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.C.2.b.* | NC | PC | PC | PC | PC | PC | PC | PC | SC | PC | PC | PC | PC | PC |
| *IV.C.3. Release and Transfer/Susi Vassallo* | | | | | | | | | | | | | | |
| *IV.C.3.a.* | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.C.3.b.* | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.C.3.c.* | PC | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.C.3.d.* | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.D. Sanitation and Environmental Conditions/Shane Poole* | | | | | | | | | | | | | | |
| *IV.D. 1.a.* | PC | PC | PC | PC | PC | PC | PC | NC | NC | NC | NC | PC | PC | PC |
| *IV. D. 1.b.* | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | NC | NC |
| *IV. D. 1.c.* | PC | SC | SC | SC | SC | SC | SC | NC | NC | PC | PC | PC | PC | PC |
| *IV. D. 1.d.* | SC | SC | SC | PC | PC | PC | NC | NC | SC | PC | SC | PC | PC | PC |
| *IV. D. 1.e.* | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| *IV. D. 1.f.* | PC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV. D. 1.g.* | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV. D. 1.h. | PC | PC | PC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC |
| *IV. D. 2. Environmental Control/Shane Poole* | | | | | | | | | | | | | | |
| IV. D. 2.a. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | PC |
| IV. D. 2.b. | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC |
| *IV. D. 3. Food Service/Diane Skipworth* | | | | | | | | | | | | | | |
| IV. D. 3.a. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 3.b. | NC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 3.c. | PC | PC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC |
| *IV. D. 4. Sanitation and Environmental Conditions Reporting/Shane Poole* | | | | | | | | | | | | | | |
| IV. D. 4.a. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. D. 4.b. | SC | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | PC | SC | SC |
| *IV.E. Fire and Life Safety/Shane Poole* | | | | | | | | | | | | | | |
| *IV. E. 1. Fire and Life Safety* | | | | | | | | | | | | | | |
| IV. E. 1.a. | PC | PC | PC | SC | SC | SC | SC | SC | SC | NC | SC | SC | SC | SC |
| IV. E. 1.b. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV. E. 1.c. | SC | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC | SC | PC |
| IV. E. 1.d. | SC | SC | SC | SC | NC | PC | SC | SC | SC | PC | PC | PC | PC | SC |
| IV. E. 1.e. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV. E. 2. Fire and Life Safety Reporting* | | | | | | | | | | | | | | |
| IV. E. 2.a.1-3 | SC | SC | SC | SC | SC | SC | PC | PC | SC | SC | SC | SC | SC | SC |
| IV. E. 2.b. | SC | SC | SC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| *IV.F. Language Assistance* | | | | | | | | | | | | | | |
| *SCIV.F.1. Timely and Meaningful Access to Services/Margo Frasier* | | | | | | | | | | | | | | |
| IV.F.1.a. | PC | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.2. Language Assistance Policies and Procedures/Margo Frasier* | | | | | | | | | | | | | | |
| IV.F.2.a. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| IV.F.2.b. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.F.3. Language Assistance Training/Margo Frasier* | | | | | | | | | | | | | | |
| IV.F.3.a. | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| *IV.F.4. Bilingual Staff/Margo Frasier* | | | | | | | | | | | | | | |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV.F.4. | PC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| *IV.G. Youthful Prisoners/Margo Frasier* | | | | | | | | | | | | | | |
| IV.G. | PC | PC | PC | SC | SC | SC | SC | SC | PC | SC | SC | SC | SC | SC |
| *VI. The New Jail Facility/Margo Frasier* | | | | | | | | | | | | | | |
| VI. A. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. B. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VI. C. | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | PC | PC |
| VI. D. | * | | | | | | | | | | | | | |
| *VII. Compliance and Quality Improvement/Margo Frasier* | | | | | | | | | | | | | | |
| VII. A. | PC | SC | SC | SC | SC | SC | PC | SC | PC | PC | PC | PC | PC | PC |
| VI. B. (H.) | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC | PC |
| VI. C. (I.) | SC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| VI. D. (J.) | NC | SC | SC | SC | SC | PC | PC | PC | SC | SC | SC | SC | SC | SC |
| *VIII. Reporting Requirements and Right of Access/Margo Frasier* | | | | | | | | | | | | | | |
| VIII.A. | PC | SC | SC | SC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC |
| VIII.B. | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC | SC |
| VIII.C. | PC | SC | SC | SC | SC | PC | PC | PC | PC | PC | PC | SC | SC | SC |
| **Legend:** | | | | | | | | | | | | | | |
| **ND - Not scheduled for review** | | | | | | | | | | | | | | |
| **NC - Non-compliance** | 8 | 5 | 0 | 4 | 7 | 0 | 5 | 17 | 12 | 11 | 9 | 5 | 6 | 8 |
| **PC - Partial Compliance** | 98 | 66 | 60 | 59 | 67 | 77 | 79 | 77 | 85 | 95 | 92 | 97 | 98 | 98 |
| **SC - Substantial Compliance** | 63 | 103 | 114 | 111 | 100 | 97 | 90 | 80 | 77 | 68 | 73 | 72 | 70 | 68 |
| **TOTAL** | | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 | 174 |